CASE 0:19-cv-01815-PAM-ECW   Doc. 44-1   Filed 11/04/20   Page 1 of 120

**Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020**
**Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Court File No. 19-cv-1815 PAM/ECW

- - - - - - - - - - - - - - - - - - - - -

Dr. Malka L. Goodman, Trustee of the Aviel
Goodman Revocable Trust, Assignee of Dr.
Aviel Goodman,

Plaintiff,

v.

Economy Premier Assurance Company, and
MetLife Auto & Home Insurance Agency, Inc.
Defendants.
- - - - - - - - - - - - - - - - - - - - -




- - - - - - - - - - - - - - - - - - - - -

ZOOM DEPOSITION OF
DR. MALKA L. GOODMAN
- - - - - - - - - - - - - - - - - - - - -




Taken September 24, 2020 By Kelly A. Herrick

Exhibit 1

**Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020**
**Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.**

## Page 2

```
 1  APPEARANCES:
 2  (Via Zoom)
    BROWNSON PLLC
 3  225 South Sixth Street
    4800 Capella Tower
 4  Minneapolis, Minnesota  55402
    Phone:  612.332.4020
 5  Email:  Jlulic@brownsonpllc.com
 6  By:  Joseph F. Lulic
        For the Defendants
 7
    TAFT STETTINIUS & HOLLISTER LLP
 8  2200 IDS Center
    80 South 8th Street
 9  Minneapolis, Minnesota  55402
    Phone:  612.977.8660
10  Email:  Jdegnan@taftlaw.com
11  By:  John M. Degnan
        For the Plaintiff
12
13
14
    Also present:  Nancy A. Neibergs
15                 Paula Goodman Maccabee
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1           I N D E X
 2  Examination by Mr. Lulic, page 4
 3
 4
    INDEX OF EXHIBITS
 5
    NUMBER   DESCRIPTION
 6
    (None marked.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1       THE ZOOM DEPOSITION OF DR. MALKA L. GOODMAN
 2  is taken on this 24th day of September,
 3  2020, at Taft Stettinius & Hollister, LLP,
 4  80 South 8th Street, Suite 2200,
 5  Minneapolis, Minnesota, commencing at
 6  10:13 a.m.
 7       DR. MALKA L. GOODMAN,
 8  A witness in the above-entitled action,
 9   after having been first duly sworn,
10   testifies and says as follows:
11       EXAMINATION
12  BY MR. LULIC:
13  Q.  Can you state your full name, please.
14  A.  Malka L. Goodman.
15  Q.  Could you give us your age and date of
16   birth, please.
17  A.  I am 91 years old.  I was born September 13,
18   1929.
19  Q.  And what is your current address?
20  A.  1045 South Davern Street, St. Paul,
21   Minnesota 55116.
22  Q.  Excuse me, did you say Davern?
23  A.  Davern, D-A-V-E-R-N.
24  Q.  Okay.  My name is Joe Lulic, I represent
25   Economy Premier in this lawsuit, and I'm
```

## Page 5

```
 1   going to ask you some questions this
 2   morning, assuming all the technical
 3   difficulties can be resolved regarding some
 4   things --
 5       (Discussion off the record.)
 6  BY MR. LULIC:
 7  Q.  If you don't understand any of my questions
 8   or can't hear the questions, you speak up
 9   and let me know so we make sure we're
10   communicating here properly, and I'll do
11   likewise.
12  A.  Okay.
13  Q.  If you don't -- if you don't understand my
14   questions, please speak up, let me know, and
15   I'll be happy to rephrase them.
16       We can't talk at the same time so
17   please wait for me to finish my question
18   before you answer it.
19       Many times a witness will start to
20   answer one of my questions because they know
21   exactly how I'm going to finish it, but
22   please don't do that so that we can have a
23   clear record and a full question written on
24   the transcript.
25       Likewise, I'll never intentionally
```

Exhibit 1

Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020
Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.

## Page 6

1  interrupt any answer you make, but sometimes
2  a witness will pause, and I'll think that
3  she's done with her answer and start to ask
4  the next question.
5      If I ever do that, you let me know
6  and I'll give you an opportunity to finish
7  your answer; is that understood?
8  **A. Barely.**
9  Q. Pardon me?
10  **A. Barely, I said.**
11  Q. Barely what?
12  **A. Barely understood. You're not clear to me.**
13  **I must admit that it makes me a bit unhappy**
14  **because you're not clear and going to**
15  **request that you speak slowly and clearly.**
16  Q. I am. Thank you.
17      How long have you currently resided
18  at the Davern Street address?
19  **A. 55 years.**
20  Q. Who do you live there with right now?
21  **A. I live alone.**
22  Q. How long have you lived alone?
23  **A. Six and a half years since my husband died.**
24  Q. Since your husband died?
25  **A. Yeah.**

## Page 7

1  Q. And what was his name?
2  **A. Ernest Goodman.**
3  Q. When did you marry Mr. Goodman?
4  **A. When?**
5  Q. Yes.
6  **A. 1951.**
7  Q. And did you have children with Mr. Goodman?
8  **A. Dr. Goodman.**
9  Q. I'm sorry?
10  **A. Dr. Goodman. Correction, he was a**
11  **physician, Dr. Goodman. Is it clear? Do**
12  **you understand me?**
13  Q. Could you answer the question, please.
14  **A. Three children.**
15  Q. What were their -- what are their names,
16  please?
17  **A. Our son is Aviel Goodman; our daughter is**
18  **Paula Goodman Maccabee; our daughter is**
19  **Sheila Goodman Rosenthal.**
20  Q. Where do your daughters reside?
21  **A. St. Paul, Minnesota.**
22  Q. And at the present time your son, Aviel, is
23  incarcerated; is that correct?
24  **A. Correct.**
25  Q. And he's been so incarcerated since, I

## Page 8

1  believe, July of 2018; is that correct?
2  **A. July 20th.**
3  Q. 2018, correct?
4  **A. 2018.**
5  Q. The people who lived at this house,
6  1347 Summit Avenue, when Aviel Goodman
7  became incarcerated, do you know who they
8  were?
9  **A. Do I know where they work?**
10  Q. No. Do you know if anyone was living with
11  Aviel Goodman at 1347 Summit Avenue when he
12  became incarcerated?
13  **A. Nobody was living there besides Aviel. It's**
14  **pronounced Aviel, not Aviel.**
15  Q. So he was the only one living there at the
16  time he became incarcerated on July 20,
17  2018; is that correct?
18  **A. Correct.**
19  Q. And did Aviel return to the home at any
20  point in time after July 20, 2018 until
21  today?
22  **A. No.**
23  Q. Do you know where he is incarcerated today
24  as we speak, Aviel?
25  **A. The question, please, rephrase?**

## Page 9

1  Q. Sure. Where is Aviel Goodman incarcerated,
2  as far as you know?
3  **A. As far as I know, in Terminal Island,**
4  **Federal Correctional Institution, in**
5  **San Pedro, California.**
6  Q. Have you seen him since he became
7  incarcerated on July 20, 2018?
8  **A. I don't understand the question.**
9  Q. Okay. Did you hear it or you don't
10  understand it?
11  **A. I don't understand.**
12  Q. Okay. Well, I'll ask it again then.
13  **A. Say it again.**
14  Q. All right. Have you seen him since he
15  became incarcerated on July 20, 2018?
16  **A. I understand now. Yes, I have. I --**
17  Q. And I -- go ahead. Go ahead.
18  **A. I visited him in the prison.**
19  Q. How many times?
20  **A. One time.**
21  Q. When was that?
22  **A. May 2019.**
23  Q. And what were the circumstances under which
24  you visited him? Did it have to do with
25  this claim, or was it simply a mother and

**Page 10**

1    son visitation, family visitation?
2  A.  The latter.
3  Q.  The latter?
4  A.  Correct.
5  Q.  Okay.  And is that the only time you've seen
6       him then, that one time in May of 2019?
7  A.  Yes.
8  Q.  Have you spoken to him on occasion, Ms. --
9  A.  Yes.
10 Q.  Pardon me?
11 A.  Yes.
12 Q.  How do you communicate with him other than
13      visiting him at the prison?
14 A.  At the prison time or that time?
15 Q.  I'm sorry?
16 A.  The communication you're asking about --
17 Q.  Yes.  How do you communicate with him?
18 A.  Now or then?
19 Q.  Now, since he's been incarcerated.
20 A.  It has changed.
21 Q.  Describe it for me, please.
22 A.  At the present time, we speak on the phone
23      frequently, we email frequently, and we
24      exchange snail mail letters frequently.
25 Q.  And when you say "frequently," is that once

**Page 11**

1    a week, twice a week, roughly?
2  A.  Three, four times a week.
3  Q.  Three or four times a week; is that correct?
4  A.  Correct.
5  Q.  Do other members of your family, your
6       immediate family, and that consists of his
7       two siblings -- you have two daughters --
8       communicate with him regularly as far as you
9       know?
10 A.  Not too regularly, but one daughter
11      communicates with him regularly, the other
12      rarely.
13 Q.  Which daughter communicates with him
14      regularly?
15 A.  Paula Maccabee.
16 Q.  The home at 1347 Summit Avenue, are you
17      aware of how long your son lived there?
18 A.  Yes.  He lived there for 30 years.
19 Q.  3-0?
20 A.  3-0.
21 Q.  Okay.  And did you have any ownership
22      interest in that home at any time?
23 A.  Would you repeat, please?
24 Q.  Sure.  Did you have any interest in the home
25      at 1347 Summit Avenue at any --

**Page 12**

1  A.  Well, my office, I purchased the house in
2       1980.  I had my office there until 1992 for
3       12 years.  I love the house, I know the
4       house, I'm emotionally involved with the
5       house.
6            It is very beautiful.  It is on the
7       National Registry of Historical Buildings.
8       I have a picture here in this book, a
9       picture of the house.  If you'd like to see,
10      I'd be very happy to show you.
11 Q.  I've been in the house -- I've been in the
12      house.
13 A.  You've been in the house, but I wanted you
14      to know that it is an important historical
15      monument.  Also --
16 Q.  Just a second.  Just a second.  Did you say
17      you purchased the house?
18 A.  I purchased the house in 1992.  We sold it
19      to our son on a contract.
20 Q.  How long did you live there?
21 A.  I did not live there.  I had my office
22      there.  My son lived there when he was in
23      medical school.  My second daughter lived
24      there when she was in medical school.  My
25      nephew lived there when he was at the

**Page 13**

1       University of Minnesota.
2  Q.  What is the name of your nephew, please?
3  A.  Again?
4  Q.  What is the name of that nephew, please?
5  A.  The name of?
6  Q.  The nephew that lived there.
7  A.  Dori Hassidoff.  Dori is his name.  He's
8       deceased, unfortunately.
9  Q.  Go ahead.  Continue.  Who else lived there?
10 A.  I had several tenants over the years on the
11      second and third floor, because my office
12      occupied only the first floor, and my
13      children's bedroom -- bedrooms, when they
14      lived there, were on the second floor.
15           So there was another bedroom
16      available separate from theirs, and on the
17      third floor as well.  I had tenants there.
18 Q.  So would it be fair to say that you bought
19      the house to use as an office, and then for
20      your children -- or at least two of your
21      children, and then family members to live
22      in?
23 A.  I bought it for my office, to establish my
24      office there.
25 Q.  All right.  And -- but you also -- your

Exhibit 1

## Page 14

1 children also lived there too, correct?
2 **A. They were under my roof, but not under my**
3 **roof. They had independent life of their**
4 **own, and that worked out very well.**
5 Q. The home, then, was sold to your son, you
6 say, 30 years ago, approximately?
7 **A. Yes.**
8 Q. All right. Did you ever have an insurance
9 policy on the home after it was sold to your
10 son?
11 **A. My son issued an insurance policy.**
12 Q. No, that's not my question.
13       My question is: Did you ever --
14 **A. No.**
15 Q. -- have an insurance policy on your home
16 after you sold it to your son?
17 **A. No.**
18 Q. The same question as to your husband. As
19 far as you are aware, did your husband ever
20 have an insurance policy on the home after
21 it was sold to your son?
22 **A. No.**
23 Q. How long did your office then remain in the
24 home?
25       When I say "the home," just so

## Page 15

1 we're clear, I'm referring to the property
2 at 1347 Summit Avenue in St. Paul.
3 **A. 12 years.**
4 Q. What was the time span?
5 **A. 12 years.**
6 Q. That's not what I -- what's the span,
7 between what year and what year?
8 **A. 1980 to 1992.**
9 Q. Did you retire in 1992, or did your office
10 move elsewhere?
11 **A. My office moved elsewhere.**
12 Q. Where did your office move to?
13 **A. My home was designed with an office built**
14 **in.**
15 Q. Is that your Davern Street address home?
16 **A. Correct.**
17 Q. The other occupants of the home throughout
18 the years, I don't want to necessarily go
19 through and have you name all of them, but
20 what I would like to know is when was the
21 last time that someone else lived there with
22 your son?
23 **A. He had a wife -- they are now divorced. I**
24 **believe they divorced eight years ago but**
25 **I'm not sure.**

## Page 16

1 Q. So the divorce occurred before his
2 incarceration, correct?
3 **A. Yes.**
4 Q. Did they have children?
5 **A. No.**
6 Q. As far as you know, then, the last person
7 who would have lived there with your son,
8 and of course other than your son, would
9 have been his wife?
10 **A. Correct.**
11 Q. And what is her name?
12 **A. Diane Grace Goodman.**
13 Q. Do you know where she lives now?
14 **A. Yes.**
15 Q. Where does she live now?
16 **A. In St. Paul, Selby Avenue.**
17 Q. Did you say Selby?
18 **A. I did.**
19 Q. Did you ever -- when you were involved with
20 the home, did you ever replace, remodel, or
21 otherwise upgrade the heating system?
22 **A. I believe -- I'm not sure, but I believe I**
23 **installed a pump in the basement to propel**
24 **the water more easily to the radiators on**
25 **the third floor.**

## Page 17

1 Q. And do you remember when that was done
2 approximately?
3 **A. No, I don't remember.**
4 Q. Do you remember who did it for you, which
5 contractor?
6 **A. I have no reason to keep records about it.**
7 Q. I didn't ask you if you had any records.
8 **A. No.**
9 Q. My question is: Do you remember who did it
10 for you?
11 **A. No.**
12 Q. The other improvements, or alterations, or
13 repairs, or anything like that, that you
14 made to the heating system, were there any?
15 **A. There were improvements, such as tuck**
16 **pointing, but not in the heating system**
17 **per se.**
18 Q. I guess I don't know what you mean by
19 "per se."
20       Were there any improvements that
21 you made to the heating system at all other
22 than the pump that you described?
23 **A. I have to think about it.**
24 Q. Take your time.
25 **A. Well, I don't recall, really. I know that I**

Exhibit 1

Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020
Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.

**Page 18**

1   was working with the Snelling Company of
2   St. Paul, and technicians did come into the
3   house, but I don't remember for what
4   purpose.
5   Q.  Since the date of the water damage, which
6       we'll describe later in detail, but from
7       November of 2018 or thereabouts, have there
8       been any improvements, upgrades,
9       replacements, any work at all done to the
10      heating system at 1347 Summit Avenue?
11  A.  Since the water damage?
12  Q.  Yes.
13  A.  No.
14          MR. DEGNAN:  Just for
15      clarification, Joe, you're not talking about
16      repairs, you're talking about improvements
17      as opposed to repairs, like fixing the leak?
18          MR. LULIC:  I think the witness is
19      pretty clear.  I think the witness
20      understands.
21          MR. DEGNAN:  I don't.  Object as
22      ambiguous.
23  BY MR. LULIC:
24  Q.  Okay.  The maintenance of the heating
25      system, do you know who conducted that or

**Page 19**

1       who did that for your son?
2   A.  The Snelling Company.
3   Q.  Do you know what they did?
4   A.  I don't know.  I know --
5   Q.  How do you know it's Snelling?
6   A.  I've discussed it.  I referred the Snelling
7       Company to my son and his wife at the time
8       when they did a whole lot of refurbishing.
9   Q.  Do you remember what the Snelling Company
10      did as far as the refurbishing goes?
11  A.  I don't know.  I did not know.  They took
12      care of it.
13  Q.  I understand.  And all I can do is ask you
14      about what you know, and right now I can't
15      ask your son that, so I'm asking you what
16      you know, and if you don't know something,
17      then answer that way.
18          The time period after 1992, when
19      you moved your office out of the home at
20      1347 Summit, did you -- did you maintain any
21      regular occupancy of the home in any way
22      after that time?
23  A.  Occupancy?
24  Q.  Did you continue to use it occasionally for
25      your office?  Did you stay there?  Did you

**Page 20**

1       spend any time there from the standpoint --
2       it's something like a continuous stay there
3       for any period of time for any reason?
4   A.  No.
5   Q.  All right.  So other than to visit your son
6       and his wife for possible holidays or family
7       gatherings or whatever, you made no further
8       use of the home after 1992; is that correct?
9   A.  Correct.
10  Q.  And did you get involved at all with the
11      maintenance of the home at all after 1992?
12  A.  No.
13  Q.  Do you know if any of the major components
14      of the heating system were repaired or
15      replaced between 1992 when you moved out of
16      your office and your son's incarceration?
17  A.  I know from talking to my daughter-in-law
18      that the pump in the basement was replaced
19      several times, she said.
20  Q.  The pump was replaced several times?
21  A.  Correct.
22  Q.  And under what circumstances or in what
23      context did you have that conversation with
24      your daughter-in-law?
25  A.  She helped me during the estate sale of my

**Page 21**

1       son's possessions.  She came over to the
2       house with me frequently in 2019 and we
3       discussed those things.  I asked her.
4   Q.  Okay.  And when did the estate sale take
5       place?
6   A.  April 2019 -- April 6th and 7th.
7   Q.  Other than the pump that she said was
8       replaced, did she mention any other
9       replacement, repairs, refurbishing, any work
10      at all done on the heating system?
11  A.  They did an enormous amount of remodeling.
12      The kitchen was totally remodelled, and so
13      was the kitchenette on the third floor.  It
14      was an enormous job.
15  Q.  My question is just relating to the heating
16      system itself.
17  A.  I don't know.
18  Q.  Okay.  Do you know if any radiators were
19      ever replaced?
20  A.  Not that I know of.
21  Q.  Do you know if any radiators ever
22      malfunctioned when you were there?
23  A.  No.
24  Q.  Do you know if there was ever any
25      malfunction in the heating system when you

Exhibit 1

Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020
Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.

## Page 22

1  were there?
2        By the way, when you were there,
3  when you had your office there, okay, all
4  right --
5  **A. No.**
6  Q. How about afterwards, are you aware of any
7  malfunctions in the heating system up to
8  even the present time?
9  **A. No malfunction that I know of.**
10 Q. And I think I asked you this but I just want
11 to make sure.
12       Since the water damage, discovery
13 of the water damage, there have been no
14 repairs to the heating system for any
15 malfunctions; is that right?
16 **A. Correct.**
17 Q. I've been asking you a lot of questions
18 regarding your knowledge. And I want to ask
19 you, when your son became incarcerated in
20 July of 2018 -- and I'll ask this question
21 very vaguely but broadly -- who was in
22 charge of the place, as you know?
23 **A. Myself and his then girlfriend.**
24 Q. How were you put in charge of the place, if
25 you will?

## Page 23

1  **A. I visited 1347 Summit numerous times during**
2  **the week.**
3  Q. My question is: Did you discuss with your
4  son, Aviel, did you discuss with him after
5  he was incarcerated who would care for the
6  place?
7  **A. Yes. He does --**
8  Q. Just a second. When did you do that?
9  **A. When?**
10 Q. Yes.
11 **A. While he was at Sherburne County Jail.**
12 Q. So that was before he was sent to prison
13 where he is now; is that right?
14 **A. Right.**
15 Q. Okay. And what did he tell you about what
16 he wanted to do regarding the home that
17 we're here about today?
18 **A. He wished for me to feed his cat, he wished**
19 **for me to make sure that the doors were**
20 **locked, and that everything was functioning**
21 **properly.**
22 Q. And did you go ahead and take on that
23 responsibility?
24 **A. I did.**
25 Q. And did you tell him that you would take on

## Page 24

1  that responsibility?
2  **A. I did.**
3  Q. Do you know if he had the same -- "he"
4  meaning your son -- did he have the same
5  conversation with his girlfriend?
6  **A. As far as I know, he gave her permission to**
7  **use the premises for business meetings and**
8  **for --**
9  Q. I'm --
10 **A. -- business meetings and for playing the**
11 **cello.**
12 Q. What is her name?
13 **A. Jeanine Ferland.**
14 Q. Spell her last name for me, please.
15 **A. F-E-R-L-A-N-D.**
16 Q. Where does she reside, as far as you know?
17 **A. In the Schmidt Brewery complex.**
18 Q. Down off West 7th in St. Paul?
19 **A. West 7th Street.**
20 Q. Do you know how long she has lived there?
21 **A. I don't know.**
22 Q. Do you know, did she ever live with your son
23 at 1347 Summit?
24 **A. No. She visited, but she did not live**
25 **there.**

## Page 25

1  Q. Do you know how long they have been
2  together -- or they had been together as
3  girlfriend or boyfriend, or --
4  **A. I don't know.**
5  Q. Pardon me?
6  **A. It's not my business.**
7  Q. Pardon me?
8  **A. It is not my business. I don't know.**
9  Q. You don't know?
10 **A. A couple of years or so, up and down.**
11 Q. As far as you know, they weren't engaged or
12 anything; is that correct?
13 **A. Correct.**
14 Q. So on July 20, 2018, when your son left the
15 home, as far as you know, no one else was
16 living there; is that right?
17 **A. Correct.**
18 Q. When did you find out that he would remain
19 incarcerated?
20 **A. July 20th.**
21 Q. How were you advised of that fact?
22 **A. How?**
23 Q. Yes.
24 **A. I was in court.**
25 Q. You were at his sentencing?

Exhibit 1

**Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020**
**Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.**

## Page 26

1  A. Again?
2  Q. Were you at his sentencing or plea
3     arrangement?
4  A. Yes, yes.
5  Q. Pardon me?
6  A. Yes.
7  Q. Do you know what other family members were
8     there, if any?
9  A. My daughter, Paula, was there. There were
10    other people but I don't remember. There
11    were other family members.
12  Q. Was his girlfriend there?
13  A. Yes.
14  Q. She was there?
15  A. She was there. Jeanine was there.
16  Q. Did any other family members or friends take
17    on any responsibility regarding care and
18    maintenance of the home after July 20, 2018?
19  A. Just myself and Jeanine.
20  Q. All right. So tell me how you went about
21    looking out for the home after Aviel's
22    sentencing.
23  A. I went there several times a week, sometimes
24    every day, sometimes every other day.
25  Q. For what purpose?

## Page 27

1  A. I take care of the mail, feed the cat, look
2     for my son's glasses, look for --
3  Q. Say the last one again, look for --
4  A. Eyeglasses. Are you having trouble hearing?
5  Q. You cut out. You said you took for the
6     mail -- or you worked -- you took care of
7     the mail and the cat, and you looked for
8     something, and then you cut out. I couldn't
9     hear what you said.
10  A. I looked for the titles to his cars.
11  Q. Did you go over there on such a regular
12    basis primarily to feed his cat?
13  A. Primarily to feed the cat. Initially every
14    day, every morning, the cat had to be fed.
15  Q. And how long did the cat stay there?
16  A. Until the end of September.
17  Q. Of which year?
18  A. 2018.
19  Q. Then what happened with the cat?
20  A. A person who was a friend of Jeanine's took
21    the cat to her. She was the one who fed the
22    cat in the evenings so she took the cat to
23    her home.
24  Q. What is that person's name?
25  A. Susanna.

## Page 28

1  Q. And the last name -- or is that her last
2     name?
3  A. I don't know. I never saw her. I fed the
4     cat only in the morning every morning.
5  Q. The person's name that took the cat then in
6     September of '18 -- 2018, is Savannah [sic]
7     her first name -- or his first name or last
8     name?
9  A. Her first name. I don't know her last name.
10  Q. But she was a friend of Jeanine's, did you
11    say?
12  A. Correct.
13  Q. Do you know if she still has the cat?
14  A. I don't know.
15  Q. All right. Then after the cat moved, what
16    was the frequency of your visits to the
17    home?
18  A. Well, as I told you before, I was firmly
19    attached to the home, I loved that place. I
20    had an office there, and it was very
21    important for me to be helpful to my son.
22        It was a sacred duty I had to take
23    care of his home, so I came to the house
24    four times a week at least, possibly even
25    more, including the weekend.

## Page 29

1        If I were in the neighborhood, like
2     at Chico's, or other stores on Grand Avenue,
3     I would stop at the house, even on the
4     weekend when there was no mail. I was there
5     very frequently.
6  Q. Pardon me?
7  A. I was there frequently.
8  Q. And you said you were attached to the home
9     and you needed to take care of it, but what
10    did you do when you went there other than
11    get the mail?
12  A. I retrieved things, from perishable foods, I
13    emptied the freezers, I walked around to
14    make sure that there were no lights on, I
15    made sure that it was comfortably warm when
16    the cold weather started. I would take off
17    my coat and walk all over the house.
18  Q. They -- emptying the freezer and taking care
19    of the perishable foods --
20  A. I'm sorry.
21  Q. Emptying the freezer and taking care of the
22    perishable foods, of course, would be just a
23    one-time thing, correct?
24  A. No, I -- I was not sure what to toss and
25    what to keep, so it took some occasional

Exhibit 1

**Page 30**

1  repeat performance.
2  Q.  What about the mail?  Was the mail ever
3     stopped or forwarded?
4  A.  No.  I did not stop the mail.  I would open
5     the mail on the premises in the living room.
6     I checked the bills that had to be paid
7     because it was important for me to perform
8     my duty properly.
9  Q.  Who made the house payments, if there were
10    any?
11 A.  Beg your pardon?
12 Q.  Was there a mortgage on the home or was it
13    paid for?
14 A.  I can't -- I didn't get it.  Please repeat.
15 Q.  Was there a mortgage on the home or was it
16    paid for at this time?
17 A.  Yes, a small mortgage at the time, which I
18    took over the payments of.
19 Q.  Does that continue to today?
20 A.  Correct.
21 Q.  What is the balance of the mortgage?
22 A.  20-some.  I'm aware only of the monthly
23    payments of the mortgage.  I checked only
24    once, and it might have decreased, but every
25    month I pay 1,766 and 66 cents.

**Page 31**

1  Q.  What is the balance of the mortgage -- or
2     did you say you don't know?
3  A.  Well, I checked only one time, and it might
4     have decreased since then.  It's 20-some
5     thousand, something like that.
6  Q.  Did you ever do anything to adjust the
7     heating system?
8  A.  I'm not sure.
9  Q.  You don't know one way or the other?
10 A.  I'm not sure, because Jeanine mentioned to
11    me that when she discovered -- I call it the
12    flood, it was a flood -- when she discovered
13    the flood, the next-door neighbor told her
14    to turn the thermostat up to 68.
15        I thought I did it, but apparently
16    I turned it up from 68 to 72.
17 Q.  When did you do that?
18 A.  On the 21st of November.
19 Q.  After the flood, correct?
20 A.  After the flood.
21 Q.  And why did you turn the thermostat up?
22 A.  After the flood, sounds ominous, doesn't it.
23    Ominous, after the flood, yeah.
24 Q.  Yeah, no, my question is:  Why did you turn
25    the thermostat from 68 to 72?

**Page 32**

1  A.  Because John Loyear, who is in charge of
2     dehumidifying and demolishing what needed to
3     be demolished of the walls, suggested that I
4     turn it up.
5        And, subsequently, when he started
6     working, they were there for a week with
7     dehumidifiers and fans 24/7, he suggested I
8     turn it up to 76 degrees.
9  Q.  So did you turn the thermostat up twice,
10    from 68 to 72 and then --
11 A.  Correct.
12 Q.  -- from 72 to 76?
13 A.  Correct.
14 Q.  My question, though, is:  Why did you turn
15    it from 68 to 72 on November 21, 2018?
16 A.  It was suggested to me by John Loyear to
17    turn it up.
18 Q.  So both times you turned it up, the reason
19    you did is because it was suggested to you
20    by John Loyear; is that right?
21 A.  Correct.  It was --
22 Q.  Did you ever touch the thermostat on any
23    other occasion?
24 A.  No.
25 Q.  Did you ever turn off or turn on anything

**Page 33**

1     relating to the heating system other than
2     what you just described to me?
3  A.  No.
4  Q.  Pardon me?  No?
5  A.  No.
6  Q.  Do you know anybody else who did?
7  A.  There were technicians working on restarting
8     the boiler -- I can't remember exactly who
9     was the one.  I'm assuming they dealt with
10    the heating system as well.
11 Q.  Is this after or before the flood?
12 A.  After.
13 Q.  Before the flood, do you know anybody who
14    made any adjustments or did anything to the
15    thermostat?
16 A.  No.
17 Q.  Do you know, from the time you first lived
18    there until the time of the flood, if there
19    were ever any other incidents where pipes
20    froze in the home?
21 A.  No.
22 Q.  There was never any reason to unthaw a pipe
23    or a radiator or anything as far as you
24    know, correct?
25 A.  Correct.

Exhibit 1

**Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020**
**Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.**

## Page 34

1 Q. Do you know if Aviel has ever described any
2 type of an incident like that to you where a
3 pipe had froze before the incident -- before
4 the flood, I mean?
5 **A. No.**
6 Q. Have you had a discussion like that with his
7 former spouse regarding any previous
8 incidents relative to pipes freezing?
9 **A. I checked, and the answer is no.**
10 Q. Who did you check with?
11 **A. Diane Grace.**
12 Q. Did you also check with Aviel on that?
13 **A. No, she was in charge.**
14 Q. I don't know what you mean by that.
15 **A. Diane took care of everything pertaining to**
16 **the house, very competent.**
17 Q. When they were married, you mean?
18 **A. When they were married.**
19 Q. But they had been divorced for some number
20 of years before the flood and before his
21 incarceration, correct?
22 **A. Correct.**
23 Q. As it relates to the heat in the home in
24 general, irregardless of whether there were
25 any freeze-ups, are you aware ever of any

## Page 35

1 issues of there being a problem with heat in
2 the house?
3 **A. Not that I'm aware of.**
4 Q. Have you discussed that issue, if you will,
5 with either your son or his former spouse?
6 **A. Which issue?**
7 Q. Whether or not there were any heating issues
8 in the home prior to the flood.
9 **A. No.**
10 Q. You did get -- from a history from Aviel's
11 former spouse, did you get any kind of
12 history from her relative to the heating
13 system?
14 **A. She said she had the Snelling Company check**
15 **every year, once a year every year.**
16 Q. Right. As it relates to when you discovered
17 the flood, do you remember when that was?
18 **A. Jeanine texted me, I believe it was a**
19 **Tuesday, on the 20th of November, late in**
20 **the afternoon, like 4:30, 4:40, something**
21 **like that.**
22 Q. What did the text say, if you recall?
23 **A. Water dripping from the third floor,**
24 **something like that.**
25 Q. All right. And so you found out about the

## Page 36

1 flood via a text from Jeanine.
2       Is she the one that discovered it,
3 as far as you know?
4 **A. Yes.**
5 Q. So there wasn't any situation where a
6 neighbor called, or someone else called you,
7 or Jeanine, and said, here's what's going
8 on?
9       Jeanine was the first person to
10 discover it, as far as you know; is that
11 right?
12 **A. Yes.**
13 Q. The purpose for which Jeanine was there that
14 day when she discovered the flood, do you
15 know what it was?
16 **A. Would you say it again, please.**
17 Q. Sure. Do you know why Jeanine was there
18 that day when she discovered the flood?
19 **A. Jeanine did spend time checking on the**
20 **house. We talked on the phone after July,**
21 **not as frequently as I came there, but she**
22 **did supervise, and she did check on the**
23 **house.**
24       **So that was one of the times that**
25 **she came over, and then she discovered the**

## Page 37

1 flood.
2 Q. As far as you know, was she over at the home
3 on the day she discovered the flood for any
4 specific reason?
5 **A. She was there.**
6 Q. I understand. But was she there just for a
7 general checkup or did she have some
8 specific purpose for being there, whether it
9 be checking the mail, or whatever?
10 **A. I checked the mail. The mail was my job. I**
11 **don't know.**
12 Q. Well, did Jeanine use the place?
13 **A. Yes.**
14 Q. What did she use it for?
15 **A. She met businesspeople there, she played the**
16 **cello there practicing.**
17       **Jeanine had a brother who was very**
18 **sick and she traveled to Michigan**
19 **frequently. She also traveled to Paris to**
20 **perform.**
21       **She's a musician, so when she was**
22 **not here in St. Paul, I would frequently**
23 **fill out for her, but when she was in she**
24 **would come to the house whenever she can --**
25 **whenever she could.**

Exhibit 1

**Page 38**

1  Q.  Okay.  My question is:  As far as you know,
2      on that day when she discovered the flood,
3      she was just there for general purposes, she
4      was not there for any specific --
5  **A.  I don't know.**
6  Q.  Pardon me?
7  **A.  I don't know.**
8  Q.  As far as you know, before July 20, 2018,
9      did Jeanine use the place for business
10     meetings and playing the cello?
11 **A.  Yes.**
12 Q.  And do you know for a fact that, after
13     July 20, 2018, that she did indeed use the
14     premises in addition to checking up on it
15     once in awhile?
16 **A.  I don't know.**
17 Q.  You said she would use the place for
18     business meetings and playing the cello, and
19     you don't know if she actually had business
20     meetings there after Aviel was incarcerated,
21     do you -- or do you?
22 **A.  I'm not sure.**
23 Q.  Did you and Jeanine ever discuss how the
24     home would be prepared for the upcoming
25     heating season, winter?

**Page 39**

1  **A.  Would you rephrase?  I couldn't get it.**
2  Q.  Sure.  Did you and Jeanine ever discuss what
3      to do in order to prepare for the upcoming
4      heating season, which we call winter around
5      here?
6  **A.  No.**
7  Q.  Okay.  Was that discussed with anyone else
8      by you?
9  **A.  Jeanine called Tom, the owner of the next --**
10     **it's a dual house, the next part of the**
11     **house, to the east of my son's portion.**
12         **She called him that evening.  He**
13     **turned off the electricity and the water,**
14     **and when I came there, I talked to him --**
15     **Tom Bergen is his name.**
16 Q.  What, if anything, did Mr. Bergen do other
17     than shut off the water and the electricity?
18 **A.  I'm not sure.**
19 Q.  All right.  Were you there when he did that?
20         MR. DEGNAN:  Joe, I wonder if we
21     could just take a break, too?  If you have a
22     question you want to complete, that's fine,
23     but maybe we can take a break for her.
24         THE WITNESS:  Good idea.  Thank
25     you.

**Page 40**

1          MR. DEGNAN:  Do you --
2          MR. LULIC:  There was a question
3      pending, I think.  Can you read it back,
4      Kelly.
5          (Question read back as requested as
6      follows:
7          "Q.  All right.  Were you there when he
8      did that?")
9      BY MR. LULIC:
10 Q.  By "did that," I mean dealt with the water
11     and the electrical.
12 **A.  Again, it's not clear.  He turned off the**
13     **electricity and the water before I arrived,**
14     **immediately.**
15 Q.  All right.  Were you -- was he there when
16     you got there?
17 **A.  Yes.**
18         MR. LULIC:  All right.  We can take
19     a break now.
20         MR. DEGNAN:  Thank you.
21         (A recess was taken.)
22     BY MR. LULIC:
23 Q.  Do you recall --
24 **A.  I request loud and clear, please, all right?**
25 Q.  Yeah.  Do you recall how long Mr. Becker

**Page 41**

1  [sic] stayed after you arrived and were
2      advised of the flood by Jeanine?
3          MR. DEGNAN:  You mean Bergen, is
4      that the one you were asking about?
5          MR. LULIC:  What's the name --
6      Bergen, is it Bergen?
7          MR. DEGNAN:  Yes.
8          MR. LULIC:  I apologize.  I missed
9      his last name.
10     BY MR. LULIC:
11 Q.  How long did he stay after you arrived?
12 **A.  I don't remember.**
13 Q.  Did he do anything else that night, as far
14     as you know, besides turn off the electrical
15     and the water?
16 **A.  Not that I know of.**
17 Q.  Did Jeanine contact him to do that?
18 **A.  Yes.**
19 Q.  Do you know why she would call him?  What
20     was their relationship or the circumstances
21     involved there?
22 **A.  Two things:  Number one, Tom was a good**
23     **friend of Aviel's, Tom and Jessica both; and**
24     **number two, he was interested in purchasing**
25     **Aviel's part of the house.**

Exhibit 1

**Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020**
**Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.**

### Page 42

1  Q.  You say "Aviel's part of the house."  What
2      do you mean by that?
3  A.  It's a dual house, one by the side of the
4      other.  The two Butler brothers lived in the
5      two separate homes, but they were conjoined.
6  Q.  I see.  The next thing that you did, then,
7      once you arrived at the home after you were
8      advised of the flood, was what?
9  A.  What is the question?
10 Q.  What was the next thing you did in response
11     to the situation that you were advised of
12     and then encountered when you arrived at the
13     home?
14 A.  Either Jeanine or me -- I'm not sure
15     which -- turned up the thermostat to 68.
16 Q.  Why did you do that, or why did she do that,
17     regardless of who did it?
18 A.  At Tom's suggestion.
19 Q.  Do you know why Tom made that suggestion?
20 A.  No, and then I called John Loyear.
21 Q.  Let's go back a little bit.
22         Do you recall or have a record of
23     when the last time it was you were in the
24     home before you came upon the flood, or were
25     advised of the flood by Jeanine?

### Page 43

1  A.  On the 14th, 2018.
2  Q.  What were you doing there on the 14th?
3  A.  The usual thing, checking the mail, opening
4      the mail, collecting things in the house.
5  Q.  What do you mean by that?
6  A.  There was a bottle of Cognac, for instance,
7      that I took home with me; still looking for
8      Aviel's glasses, forever looking for; and
9      just walking through the kitchen and the
10     upstairs.
11 Q.  Was there anything specific that you did
12     that day relative to the house?
13 A.  Don't remember specifics, no.
14 Q.  Do you recall being there on the 14th or do
15     you just remember that from looking at your
16     calendar?
17 A.  My calendar.
18 Q.  I've looked at your calendar and I have seen
19     entries where you say "Aviel's house."
20         Did you write down on your calendar
21     every time you went to Aviel's house, or did
22     you put down Aviel's house as an appointment
23     you wanted to make?
24 A.  Well, it is really complicated.
25 Q.  Okay.

### Page 44

1  A.  I put it down on the calendar when I knew
2      that Jeanine would be traveling to Michigan
3      for her brother's -- visiting her brother,
4      but there were other times that I visited
5      the house, which I did not record on the
6      calendar, because Jeanine was going to be
7      there.
8  Q.  Here's my question:  Did you record what you
9      did on your calendar, or did you put it on
10     your calendar, like I put your deposition on
11     my calendar today so I would remember that
12     it would be here and I would be here for
13     you?
14 A.  I put it --
15 Q.  Just a second.  Did you put it on your
16     calendar when it relates to Aviel's house or
17     record it as a history of your activities?
18         Do you understand my question?
19 A.  No.
20 Q.  Here, there's two ways you can use the
21     calendar:  You can record what you did, or
22     you can use it as a reminder that, when that
23     day comes, you need to do something, okay?
24         How were you using your calendar?
25 A.  Preparing for going there.

### Page 45

1  Q.  So when you wrote down "Aviel's house" on
2      your calendar on November 14th, was that
3      because you knew that Jeanine was going to
4      be gone?
5  A.  Correct.
6  Q.  Why, on the other instances where you wrote
7      down "Aviel's house" on your calendar, why
8      did you do that?
9  A.  Because I knew she was going to be gone, and
10     I wanted to make sure that I am scheduled to
11     go to the house.
12 Q.  Okay.  So you used it as a schedule,
13     correct?
14 A.  Right.  She also traveled to Paris to
15     perform.
16 Q.  So when you knew that she was going to Paris
17     to perform, or somewhere else, I assume, you
18     would write down "Aviel's house" on your
19     calendar to correspond with those days; is
20     that correct?
21 A.  Right, right, she was gone a lot, so it was
22     up to me.
23 Q.  Do you have an understanding that the
24     flooding was caused as a result of the pipe
25     freezing?

Exhibit 1

**Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020**
**Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.**

**Page 46**

1  A.  I don't know that.
2  Q.  You don't know one way or another?
3  A.  Well, John Loyear thought it was --
4  Q.  I'm -- just a second.  I don't want you to
5     tell me what John Loyear thought.
6           I want you to tell me what you have
7     concluded and then we'll talk about what it
8     might be based on.
9  A.  I did not know.
10 Q.  Okay.  Do you know which pipes were replaced
11    and why?
12 A.  The pipes --
13 Q.  After the loss, after the flood.
14 A.  What was the addendum to your question,
15    please?
16 Q.  Sure.  I'd be happy to repeat it.  It's not
17    a very good question.
18           After the flood --
19 A.  Yeah.
20 Q.  -- which pipes, water pipes, pipes that
21    contained water, were replaced, if you are
22    aware?
23 A.  The pipe was replaced on the third floor
24    between the kitchenette and the bathroom.
25 Q.  Do you know what the function of that pipe

**Page 47**

1     was?
2  A.  It was in the wall and I'm assuming it
3     provided water.
4  Q.  Do you know if it was hot water or cold
5     water?
6  A.  I do not know.
7  Q.  What other pipes carrying water have been
8     replaced, fixed, repaired, since the
9     incident, since the flood?
10 A.  Was there a question?
11 Q.  Yeah.
12 A.  What was the --
13 Q.  What other pipes, if any, were replaced
14    after the flood -- water pipes, pipes
15    carrying water?
16 A.  I think -- I think, I'm not sure, though, I
17    have an image of a pipe that was replaced in
18    what used to be my son's office on the
19    second floor.
20          There was an area in the wall that
21    was exposed, but I'm not sure whether that
22    pipe was replaced.
23 Q.  Any other pipes, as far as you know, that
24    were replaced afterwards?
25 A.  No.

**Page 48**

1  Q.  Does the home -- is the home used now since
2     this incident as it normally would be?
3  A.  Yes.
4  Q.  And there's water running through the pipes,
5     correct?
6  A.  Yes.
7  Q.  There's hot water, correct?
8  A.  I don't know if it's cold or hot.  I have
9     three young men living there.
10 Q.  They would have to have hot water, right?
11 A.  I would think so.
12 Q.  Okay.
13 A.  But I --
14 Q.  As far as you know, hot water is restored?
15 A.  I'm assuming so.
16 Q.  And heat is restored to the place, correct?
17 A.  Oh, yeah.
18 Q.  How long have the three young men been
19    living there?
20 A.  October 1, 2019.
21 Q.  And are they paying tenants?
22 A.  No.
23 Q.  Pardon me?
24 A.  No.
25 Q.  What are they doing living there?

**Page 49**

1  A.  They are taking care of the house, they are
2     paying the utilities.  One of them is the
3     son of Tom and Jessica Bergen.
4  Q.  All right.  And are the other two friends of
5     the son?
6  A.  Yes, the son is Gabriel, and Gabriel and his
7     friends are engineers, and they take care of
8     the house and avoid -- make sure to avoid
9     squatters.
10 Q.  So the only thing they pay are the
11    utilities, and then, of course, they watch
12    the house for you, and that's the
13    arrangement, correct?
14 A.  Can you sit a little straighter so I can see
15    your lips a little, because you're in the
16    dark, so I read lips a little.
17 Q.  That's fine.  So the only arrangement, then,
18    for them to pay to live there, these three
19    young men, is for them to pay the utilities,
20    correct?
21 A.  Correct.
22 Q.  And then, of course, they also provide you
23    with monitoring, watchdog type of service
24    for the house, correct?
25 A.  They don't pay rent.

Exhibit 1

**Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020**
**Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.**

## Page 50

1  Q.  I'm just asking you -- I'm just asking you:
2      What is their contribution in order for them
3      to live there?
4          And I think it is paying the
5      utilities and watching the place; is that
6      right?
7  **A.  They did some landscaping as well.**
8  Q.  Anything else?
9  **A.  No.**
10 Q.  Have they done any repairs or upgrading to
11     the home since they've lived there?
12 **A.  No.**
13 Q.  Has the damage from the water been repaired
14     since they lived there?
15 **A.  No.**
16 Q.  Other than the replacements of the pipe, has
17     there been any repair work done to the home
18     since the flood?
19 **A.  I'm thinking.**
20 Q.  Take your time.
21 **A.  Well, the young guys, the three engineers,**
22     **make sure there is light -- all the lights**
23     **are functioning, I don't know if you call it**
24     **repairs, the lights on the outside of the**
25     **house.  No, the answer is really no.**

## Page 51

1  Q.  Okay, fine.  That's what I needed to know.
2          Do you know how many thermostats
3      are in the house that control the heat?
4  **A.  Would you sit straight, please, so I could**
5      **see your lips, please.**
6  Q.  Sure.
7  **A.  Thank you.**
8  Q.  Do you know how many thermostats there are
9      in the home that regulate heat?
10 **A.  The question being what, please?**
11 Q.  Sure.  I'll ask as many times -- sorry.
12     I'll ask as many times as I have to.
13         Do you know how many thermostats
14     there are in the home that regulate heat to
15     the home?
16 **A.  The one that regulates the heat is on the**
17     **first floor.  There is another one on the**
18     **third floor that regulates the air**
19     **conditioning only.**
20 Q.  So the only thermostat that regulates the
21     heat is on the first floor; is that right?
22 **A.  Correct.**
23 Q.  When you had your office there, did you say
24     it was on the third floor?
25 **A.  On the first floor.**

## Page 52

1  Q.  It was on the first floor.  And did you see
2      patients there?
3  **A.  Yes.**
4  Q.  And where, then, did the kids who were
5      living there live?
6  **A.  On the third floor, and one person lived on**
7      **the second floor.**
8  Q.  The kitchens and stuff that are up there,
9      for living purposes, obviously, were they
10     present when you bought the house
11     originally?
12 **A.  The kitchenette on the third floor, you**
13     **mean, is that what you mean?**
14 Q.  Well, yeah.  And, again, I've been in the
15     house, and I've noticed that there was a
16     kitchen, I believe, on the second or third
17     floor, correct?
18 **A.  Third floor.**
19 Q.  That's what I was referring to.  What's it
20     doing there?  Why is it there?
21 **A.  Because my son had space on the third floor**
22     **where he played synthesizer music and**
23     **composed some music, and I believe Diane**
24     **Grace originally arranged for that**
25     **kitchenette to be installed.**

## Page 53

1  Q.  Who is Diane Grace?
2  **A.  My son's ex-wife.**
3  Q.  So did she --
4  **A.  I told you about her.**
5  Q.  Yeah, I just don't remember all the names.
6          The -- so the kitchen was installed
7      on the third floor, as far as you know, when
8      your son and his former spouse were living
9      there?
10 **A.  Right.**
11 Q.  Do you know when that -- when that would
12     have been approximately?
13 **A.  No, I don't.  I don't really know.  I know**
14     **it was a tremendous job that they did there**
15     **and a great expenditure, but I don't know**
16     **when it was.**
17 Q.  After you sold the house to Aviel -- first
18     of all, was Aviel married when you sold the
19     house to him?  Was he married to her?
20 **A.  No, but they were engaged.**
21 Q.  They were engaged at that time?
22 **A.  I believe so.**
23 Q.  And was Diane Grace his only spouse?
24 **A.  No.**
25 Q.  Who else was he married to, if you recall?

Exhibit 1

Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020
Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.

**Page 54**

1  A.  When he was taking -- doing his residency in
2      Tulane University in Louisiana, New Orleans,
3      and that was brief, brief.
4  Q.  Did that -- did his wife ever live at the
5      home?
6  A.  No.
7  Q.  Okay.  All right.  Any other spouses --
8  A.  No.
9  Q.  -- that you're aware of?
10      Any other remodeling that they did
11     to the home -- by "they," I mean your son
12     and his wife -- after you sold it to them --
13     or to him?
14  A.  Your question is what?
15  Q.  We talked about the third floor kitchen that
16     you think was installed.
17  A.  Yes.
18  Q.  Was there anything else done to the home?
19  A.  The kitchen on the first floor was
20     refurbished completely.  It was magnificent,
21     beautiful.  A lot of changes took place in
22     the house.
23  Q.  Any other major remodeling other than the
24     kitchen on the first floor and the third
25     floor, which we've already talked about?

**Page 55**

1  A.  The first and the third, and to some extent
2      the second.  It lasted a long time.  Diane
3      was the general contractor so she saw to it.
4  Q.  Can you name for me just the major work that
5      was done other than the kitchen on the third
6      floor and the kitchen on the first floor?
7  A.  A fence on the west side of the house.
8      Aviel saw patients there in his office on
9      the second floor.  He was also a
10     psychiatrist.
11  Q.  I understand.  Anything else that you can
12     recall that was a major renovation to the
13     home?
14  A.  I'm sorry, sit up.
15  Q.  Anything else that you can recall that they
16     did?  By "they," I mean Aviel and his wife.
17  A.  What is your question?
18  Q.  Any other major remodeling, installation of
19     fixtures, that they did to the home after
20     you sold it to them?
21  A.  Fixtures, did you say?
22  Q.  Yes.
23  A.  Yes.
24  Q.  What, other than the two kitchens?
25  A.  The second floor office was furnished --

**Page 56**

1      refurnished properly.
2          I believe there was some work done
3      in the little bathroom, which is adjacent to
4      Aviel's office on the second floor.  I think
5      that's all.
6          But as I said, the refurbishing,
7      remodeling, whatever you want to call it,
8      lasted a long time.  It was a lot of work
9      done.
10  Q.  Was there any type of remodeling or
11     refurbishing that you are aware of relative
12     to the heating system?
13  A.  Other than what I've already mentioned?
14  Q.  The pumps, yeah, other than the pumps.
15  A.  I don't understand.  I don't understand your
16     question.
17  Q.  Sure.
18  A.  Sit up, please.
19  Q.  Anything else, the radiators, the boiler,
20     all the things that you need to have to have
21     heat in the house, was there any major
22     renovations or remodeling or replacements to
23     any of the fixtures?
24  A.  No.  I would appreciate if you would sit up.
25     It's difficult with faces in the shade.

**Page 57**

1          I'm an old woman, you see, so you
2      have to accommodate me, okay?
3  Q.  Do you -- are you able to hear me now,
4      understand me now?
5  A.  Well enough.
6  Q.  Good.  Do you know if any of the radiators
7      that are in the house ever froze before the
8      flood?
9  A.  I don't know that.
10  Q.  Do you know if there's a thermostat on the
11     second floor of the home?
12  A.  I don't know.
13  Q.  Pardon me?
14  A.  I don't remember a thermostat on the second
15     floor, just on the first floor.
16  Q.  The hot water to the home, was it on at the
17     time of the flood?  Was the hot water on, as
18     far as you know?
19  A.  As far as I know, yes.
20  Q.  Did you use hot water when you were there on
21     occasion after Aviel became incarcerated?
22  A.  Well, when I moved out of there, my visits
23     were short.  My son and his wife came over
24     to my house because I fed them.  They came
25     for dinner, so I did not go there all that

Exhibit 1

**Page 58**

1  frequently.
2      I saw the remodeling and was very
3  impressed by it, but I did not go there that
4  frequently.  They came over every week.
5  Q.  After July 20, 2018, when your son went to
6  prison, did you have occasion to use the hot
7  water at the home?
8  A.  Yes --
9  Q.  What would you --
10 A.  -- when I washed my hands in the bathroom.
11 Q.  Any other use of the hot water?
12 A.  No.
13 Q.  Which bathroom would you use when you did
14  that?
15 A.  The small bathroom on the west side on the
16  first floor.  It's kind of like a guest
17  bathroom.
18 Q.  And the hot water was hot -- or at least hot
19  enough for you to use for washing --
20 A.  Right.
21 Q.  -- is that correct?
22 A.  Right.
23 Q.  The -- Jeanine, do you know if she used the
24  hot water in the home?
25 A.  I have no idea.

**Page 59**

1  Q.  Okay.  I mean, do you know if anybody was
2  using the house at all after your son was
3  incarcerated -- after Aviel went to prison?
4  A.  Of course not.
5  Q.  Why do you say that?
6  A.  Because I was supervising that house.  I was
7  there --
8  Q.  Do you know if Jeanine would wash things or
9  use hot water or anything like that?
10 A.  I have no idea but I doubt it.  She lived in
11  her apartment.
12 Q.  I think you said that you don't remember if
13  it was Jeanine or you that turned up the
14  heat.
15 A.  Correct.
16 Q.  But you do know that you turned it up in
17  speaking with Mr. Lawless, correct -- or was
18  it Mr. Loyear --
19 A.  Bergen.
20 Q.  -- same thing?
21 A.  Bergen.
22 Q.  Pardon me?
23 A.  Tom Bergen.
24 Q.  We gotta go back.
25      As far as you know, the thermostat

**Page 60**

1  was turned up three times after the flood?
2  A.  Correct.
3  Q.  Once when Mr. Bergen suggested it be done,
4  correct?
5  A.  Correct.
6  Q.  But you don't remember whether that was you
7  or Jeanine, correct?
8  A.  Correct.
9  Q.  And you turned it up in response to
10  Mr. Loyear's response, correct?
11 A.  Correct.
12 Q.  And you did that twice, correct?
13 A.  Correct, to --
14 Q.  Other than that, do you know of anyone else
15  who ever touched that thermostat?
16 A.  I don't know.
17      MR. DEGNAN:  Object to the form of
18  the question.  When you say "ever," do you
19  mean that day?
20      MR. LULIC:  No, that's not what I
21  mean.
22  BY MR. LULIC:
23 Q.  The -- just for the record, can you describe
24  who Mr. Loyear is.
25 A.  Mr. Loyear is the president of the company

**Page 61**

1  that is -- you know, I don't remember the
2  exact name, they do the molishiner [ph]
3  restoration.  I had --
4  Q.  All right.  You started to tell me something
5  that I wanted to follow up on.
6  A.  Sit back.
7  Q.  You talked to me about -- earlier about
8  Mr. Loyear and what he told you about the
9  pipes.
10      And I wasn't ready to talk to you
11  about that yet, but what did he say about
12  the pipes freezing?
13 A.  He did not say about the pipes freezing.  He
14  said the pipe that is at fault is probably
15  the one on the third floor between the
16  kitchenette and the bathroom.  He did not --
17 Q.  The third floor.
18 A.  -- talk about freezing.  That's your term,
19  not his.
20 Q.  He didn't say anything about freezing?
21 A.  No, he said the problem is probably with
22  that pipe.
23 Q.  And that was at the third floor?
24 A.  Correct.  That was the one which was --
25 Q.  Did it --

Exhibit 1

**Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020**
**Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.**

## Page 62

1  MR. DEGNAN:  She's not done.  Go
2  ahead.
3  THE WITNESS:  That was the one that
4  was replaced.
5  BY MR. LULIC:
6  Q.  I understand that.
7  Did the replacement of that pipe
8  occur within days, or that day, or how long
9  did that take?
10 **A.  You know, I don't remember that.**
11 Q.  Who did it?
12 **A.  It's in my notes.  I think it is the**
13 **pipefitter's company, a guy by the name of**
14 **Charlie who did it.  It was within several**
15 **days.  It took some time to identify the**
16 **location.**
17 Q.  Do you -- that was in the third floor
18 kitchen that your son and his wife decided
19 to put in after you sold the house to them,
20 correct -- to your son, correct?
21 MR. DEGNAN:  Object to the form of
22 the question.  That's a misstatement of the
23 evidence.
24 THE WITNESS:  I beg your pardon?
25 MR. DEGNAN:  I said it was a

## Page 63

1  misstatement.
2  THE WITNESS:  In the wall between
3  the kitchenette and the bathroom, in the
4  wall.  They had to break the wall to get to
5  the pipe, and they found a rusted -- rusted
6  pipe.  That was information I got, the pipe
7  was rusted.
8  BY MR. LULIC:
9  Q.  What did you say?
10 **A.  I said rust, rusted pipe.**
11 Q.  Okay.  When Tom suggested you turn up the
12 heat, did you ask him why he was making that
13 suggestion?
14 **A.  No, I did not ask.  I just did it.**
15 Q.  All right.
16 MR. LULIC:  That's all I have.
17 MR. DEGNAN:  We don't have any
18 questions.  We will read and sign, and waive
19 notice of receipt of the original, and then
20 I think we can go off the record.
21 (At 12:05 p.m. the deposition was
22 recessed.)
23
24
25

## Page 64

1  ERRATA SHEET
2  Page/Ln   Correction      Reason
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

## Page 65

1  I, DR. MALKA L. GOODMAN, have read this
2  deposition transcript pages 1 - 63 and
3  acknowledge herein its accuracy except as
4  noted on the errata sheet.
5
6
7
8  _____
   Signature
9
   _____
10 Notary Public
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Exhibit 1

Page 66

1   STATE OF MINNESOTA
2                       CERTIFICATE
    COUNTY OF WASHINGTON
3
            I, Kelly A. Herrick, hereby
4   certify that I reported the deposition of
    DR. MALKA L. GOODMAN on the 24th day of
5   September, 2020, in Minneapolis, Minnesota,
    and that the witness was by me first duly
6   sworn to tell the truth and nothing but the
    truth concerning the matter in controversy
7   aforesaid;
8           That I was then and there a notary
    public in and for the County of Washington,
9   State of Minnesota; that by virtue thereof I
    was duly authorized to administer an oath;
10
            That the foregoing transcript is a
11  true and correct transcript of my
    stenographic notes in said matter,
12  transcribed under my direction and control;
13          That the cost of the original has
    been charged to the party who noticed the
14  deposition and that all parties who ordered
    copies have been charged at the same rate
15  for such copies;
16          That the reading and signing of
    the deposition was not waived;
17
            That I am not related to any of
18  the parties hereto, nor interested in the
    outcome of the action and have no contract
19  with any parties, attorneys or persons with
    an interest in the action that has a
20  substantial tendency to affect my
    impartiality;
21
            WITNESS MY HAND AND SEAL this 24th
22  day of September, 2020.
23
24  _____
       Kelly A. Herrick
25     Notary Public

Exhibit 1

**Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020**
**Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.**

**A**

a.m 4:6
able 57:3
above-entitled 4:8
accommodate 57:2
accuracy 65:3
acknowledge 65:3
action 4:8 66:18,19
activities 44:17
addendum 46:14
addition 38:14
address 4:19 6:18 15:15
adjacent 56:3
adjust 31:6
adjustments 33:14
administer 66:9
admit 6:13
advised 25:21 41:2 42:8,11 42:25
affect 66:20
aforesaid 66:7
afternoon 35:20
age 4:15
Agency 1:9
ago 14:6 15:24
ahead 9:17,17 13:9 23:22 62:2
air 51:18
alterations 17:12
ambiguous 18:22
amount 21:11
answer 5:18,20 6:1,3,7 7:13 19:17 34:9 50:25
anybody 33:6 33:13 59:1
apartment 59:11
apologize 41:8
apparently 31:15
APPEARANCES 2:1
appointment 43:22
appreciate 56:24
approximately 14:6 17:2 53:12

**B**

back 40:3,5 42:21 59:24 61:6
balance 30:21 31:1
Barely 6:8,10 6:11,12
based 46:8
basement 16:23 20:18

basis 27:12
bathroom 46:24 56:3 58:10,13,15 58:17 61:16 63:3
beautiful 12:6 54:21
Becker 40:25
bedroom 13:13 13:15
bedrooms 13:13
beg 30:11 62:24
believe 8:1 15:24 16:22 16:22 35:18 52:16,23 53:22 56:2
Bergen 39:15 39:16 41:3,6 41:6 49:3 59:19,21,23 60:3
bills 30:6
birth 4:16
bit 6:13 42:21
boiler 33:8 56:19
book 12:8
born 4:17
bottle 43:6
bought 13:18 13:23 52:10
boyfriend 25:3
break 39:21,23 40:19 63:4
Brewery 24:17
brief 54:3,3
broadly 22:21
brother 37:17 44:3
brother's 44:3
brothers 42:4
BROWNSON 2:2
Buildings 12:7
built 15:13
business 24:7 24:10 25:6,8 38:9,18,19
businesspeo... 37:15
Butler 42:4

**C**

calendar 43:16 43:17,18,20 44:1,6,9,10 44:11,16,21 44:24 45:2,7 45:19
California 9:5

call 31:11 39:4 41:19 50:23 56:7
called 36:6,6 39:9,12 42:20
Capella 2:3
care 19:12 23:5 26:17 27:1,6 28:23 29:9,18 29:21 34:15 49:1,7
carrying 47:7 47:15
cars 27:10
cat 23:18 27:1 27:7,12,13,14 27:15,19,21 27:22,22 28:4 28:5,13,15
caused 45:24
cello 24:11 37:16 38:10 38:18
Center 2:8
cents 30:25
CERTIFICATE 66:2
certify 66:4
changed 10:20
changes 54:21
charge 22:22 22:24 32:1 34:13
charged 66:13 66:14
Charlie 62:14
check 34:10,12 35:14 36:22
checked 30:6 30:23 31:3 34:9 37:10
checking 36:19 37:9 38:14 43:3
checkup 37:7
Chico's 29:2
children 7:7,14 13:20,21 14:1 16:4
children's 13:13
circumstances 9:23 20:22 41:20
claim 9:25
clarification 18:15
clear 5:23 6:12 6:14 7:11 15:1 18:19 40:12,24
clearly 6:15
coat 29:17
Cognac 43:6

cold 29:16 47:4 48:8
collecting 43:4
come 18:2 37:24
comes 44:23
comfortably 29:15
commencing 4:5
communicate 10:12,17 11:8
communicates 11:11,13
communicati... 5:10
communicati... 10:16
company 1:8 18:1 19:2,7,9 35:14 60:25 62:13
competent 34:16
complete 39:22
completely 54:20
complex 24:17
complicated 43:24
components 20:13
composed 52:23
concerning 66:6
concluded 46:7
conditioning 51:19
conducted 18:25
conjoined 42:5
consists 11:6
contact 41:17
contained 46:21
context 20:23
continue 13:9 19:24 30:19
continuous 20:2
contract 12:19 66:18
contractor 17:5 55:3
contribution 50:2
control 51:3 66:12
controversy 66:6
conversation 20:23 24:5
copies 66:14,15

correct 7:23,24 8:1,3,17,18 10:4 11:3,4 14:1 15:16 16:2,10 20:8 20:9,21 22:16 25:12,13,17 28:12 29:23 30:20 31:19 32:11,13,21 33:24,25 34:21,22 45:5 45:13,20 48:5 48:7,16 49:13 49:20,21,24 51:22 52:17 58:21 59:15 59:17 60:2,4 60:5,7,8,10 60:11,12,13 61:24 62:20 62:20 66:11
Correction 7:10 64:2
Correctional 9:4
correspond 45:19
cost 66:13
County 23:11 66:2,8
couple 25:10
course 16:8 29:22 49:11 49:22 59:4
court 1:1,2 25:24
current 4:19
currently 6:17
cut 27:5,8

**D**

D 3:1
D-A-V-E-R-N 4:23
damage 18:5 18:11 22:12 22:13 50:13
dark 49:16
date 4:15 18:5
daughter 7:17 7:18 11:10,13 12:23 26:9
daughter-in-l... 20:17,24
daughters 7:20 11:7
Davern 4:20,22 4:23 6:18 15:15
day 4:2 26:24 26:24 27:14 36:14,18 37:3 38:2 43:12

Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020
Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.

Page 68

44:23 60:19
62:8 66:4,22
**days** 45:19
62:8,15
**dealt** 33:9
40:10
**deceased** 13:8
**decided** 62:18
**decreased**
30:24 31:4
**Defendants**
1:10 2:6
**Degnan** 2:11
18:14,21
39:20 40:1,20
41:3,7 60:17
62:1,21,25
63:17
**degrees** 32:8
**dehumidifiers**
32:7
**dehumidifying**
32:2
**demolished**
32:3
**demolishing**
32:2
**deposition** 1:17
4:1 44:10
63:21 65:2
66:4,14,16
**describe** 10:21
18:6 60:23
**described**
17:22 33:2
34:1
**DESCRIPTION**
3:5
**designed** 15:13
**detail** 18:6
**Diane** 16:12
34:11,15
52:23 53:1,23
55:2
**died** 6:23,24
**difficult** 56:25
**difficulties** 5:3
**dinner** 57:25
**direction** 66:12
**discover** 36:10
**discovered**
31:11,12
35:16 36:2,14
36:18,25 37:3
38:2
**discovery**
22:12
**discuss** 23:3,4
38:23 39:2
**discussed** 19:6
21:3 35:4
39:7
**discussion** 5:5
34:6

**DISTRICT** 1:1,1
**divorce** 16:1
**divorced** 15:23
15:24 34:19
**doing** 43:2
48:25 52:20
54:1
**doors** 23:19
**Dori** 13:7,7
**doubt** 59:10
**Dr** 1:4,5,18 4:1
4:7 7:8,10,11
65:1 66:4
**dripping** 35:23
**dual** 39:10 42:3
**duly** 4:9 66:5,9
**duty** 28:22 30:8

**E**

**E** 3:1
**earlier** 61:7
**easily** 16:24
**east** 39:11
**Economy** 1:8
4:25
**eight** 15:24
**either** 35:5
42:14
**electrical** 40:11
41:14
**electricity**
39:13,17
40:13
**email** 2:5,10
10:23
**emotionally**
12:4
**emptied** 29:13
**emptying** 29:18
29:21
**encountered**
42:12
**engaged** 25:11
53:20,21
**engineers** 49:7
50:21
**enormous**
21:11,14
**entries** 43:19
**Ernest** 7:2
**errata** 64:1
65:4
**establish** 13:23
**estate** 20:25
21:4
**evening** 39:12
**evenings** 27:22
**evidence** 62:23
**ex-wife** 53:2
**exact** 61:2
**exactly** 5:21
33:8
**Examination**
3:2 4:11

**exchange**
10:24
**Excuse** 4:22
**EXHIBITS** 3:4
**expenditure**
53:15
**exposed** 47:21
**extent** 55:1
**Eyeglasses**
27:4

**F**

**F** 2:6
**F-E-R-L-A-N-D**
24:15
**faces** 56:25
**fact** 25:21
38:12
**fair** 13:18
**family** 10:1
11:5,6 13:21
20:6 26:7,11
26:16
**fans** 32:7
**far** 9:2,3 11:8
14:19 16:6
19:10 24:6,16
25:11,15
33:23 36:3,10
37:2 38:1,8
41:13 47:23
48:14 53:7
57:18,19
59:25
**fault** 61:14
**fed** 27:14,21
28:3 57:24
**Federal** 9:4
**feed** 23:18 27:1
27:12,13
**fence** 55:7
**Ferland** 24:13
**File** 1:2
**fill** 37:23
**find** 25:18
**fine** 39:22
49:17 51:1
**finish** 5:17,21
6:6
**firmly** 28:18
**first** 4:9 13:12
28:7,7,9
33:17 36:9
51:17,21,25
52:1 53:17
54:19,24 55:1
55:6 57:15
58:16 66:5
**fixed** 47:8
**fixing** 18:17
**fixtures** 55:19
55:21 56:23
**flood** 31:12,12
31:13,19,20

31:22,23
33:11,13,18
34:4,20 35:8
35:17 36:1,14
36:18 37:1,3
42:8,24,25
46:13,18 47:9
47:14 50:18
57:8,17 60:1
**flooding** 45:24
**floor** 13:11,12
13:14,17
16:25 21:13
35:23 46:23
47:19 51:17
51:18,21,24
51:25 52:1,6
52:7,12,17,18
52:21 53:7
54:15,19,24
54:25 55:6,6
55:9,25 56:4
57:11,15,15
58:16 61:15
61:17,23
62:17
**follow** 61:5
**follows** 4:10
40:6
**foods** 29:12,19
29:22
**foregoing**
66:10
**forever** 43:8
**form** 60:17
62:21
**former** 34:7
35:5,11 53:8
**forwarded** 30:3
**found** 35:25
63:5
**four** 11:2,3
28:24
**freeze-ups**
34:25
**freezer** 29:18
29:21
**freezers** 29:13
**freezing** 34:8
45:25 61:12
61:13,18,20
**frequency**
28:16
**frequently**
10:23,23,24
10:25 21:2
29:5,7 36:21
37:19,22 58:1
58:4
**friend** 27:20
28:10 41:23
**friends** 26:16
49:4,7

**froze** 33:20
34:3 57:7
**full** 4:13 5:23
**function** 46:25
**functioning**
23:20 50:23
**furnished**
55:25
**further** 20:7

**G**

**Gabriel** 49:6,6
**gatherings**
20:7
**general** 34:24
37:7 38:3
55:3
**girlfriend** 22:23
24:5 25:3
26:12
**give** 4:15 6:6
**glasses** 27:2
43:8
**go** 9:17,17 13:9
15:18 23:22
27:11 42:21
45:11 57:25
58:3 59:24
62:1 63:20
**goes** 19:10
**going** 5:1,21
6:14 36:7
44:6,25 45:3
45:9,16
**good** 39:24
41:22 46:17
57:6
**Goodman** 1:4,5
1:5,18 2:15
4:1,7,14 7:2,3
7:7,8,10,11
7:17,18,19
8:6,11 9:1
16:12 65:1
66:4
**gotta** 59:24
**Grace** 16:12
34:11 52:24
53:1,23
**Grand** 29:2
**great** 53:15
**guess** 17:18
**guest** 58:16
**guy** 62:13
**guys** 50:21

**H**

**half** 6:23
**HAND** 66:21
**hands** 58:10
**happened**
27:19
**happy** 5:15
12:10 46:16

**Hassidoff** 13:7
**hear** 5:8 9:9
27:9 57:3
**hearing** 27:4
**heat** 34:23 35:1
48:16 51:3,9
51:14,16,21
56:21 59:14
63:12
**heating** 16:21
17:14,16,21
18:10,24
20:14 21:10
21:15,25 22:7
22:14 31:7
33:1,10 35:7
35:12 38:25
39:4 56:12
**helped** 20:25
**helpful** 28:21
**hereto** 66:18
**Herrick** 1:24
66:3,24
**historical** 12:7
12:14
**history** 35:10
35:12 44:17
**holidays** 20:6
**Hollister** 2:7
4:3
**home** 1:9 8:19
11:16,22,24
14:5,9,15,20
14:24,25
15:13,15,17
16:20 19:19
19:21 20:8,11
23:16 25:15
26:18,21
27:23 28:17
28:19,23 29:8
30:12,15
33:20 34:23
35:8 37:2
38:24 42:7,13
42:24 43:7
48:1,1 50:11
50:17 51:9,14
51:15 54:5,11
54:18 55:13
55:19 57:11
57:16 58:7,24
**homes** 42:5
**hot** 47:4 48:7,8
48:10,14
57:16,17,20
58:6,11,18,18
58:18,24 59:9
**house** 8:5 12:1
12:3,4,5,9,11
12:12,13,17
12:18 13:19
18:3 21:2
28:23 29:3,17

Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020
Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.

Page 69

30:9 34:16
35:2 36:20,23
37:24 39:10
39:11 41:25
42:1,3 43:4
43:12,19,21
43:22 44:5,16
45:1,7,11,18
49:1,8,12,24
50:25 51:3
52:10,15
53:17,19
54:22 55:7
56:21 57:7,24
59:2,6 62:19
**husband** 6:23
6:24 14:18,19

_____
**I**
**idea** 39:24
58:25 59:10
**identify** 62:15
**IDS** 2:8
**image** 47:17
**immediate** 11:6
**immediately**
40:14
**impartiality**
66:20
**important**
12:14 28:21
30:7
**impressed** 58:3
**improvements**
17:12,15,20
18:8,16
**incarcerated**
7:23,25 8:7
8:12,16,23
9:1,7,15
10:19 22:19
23:5 25:19
38:20 57:21
59:3
**incarceration**
16:2 20:16
34:21
**incident** 34:2,3
47:9 48:2
**incidents** 33:19
34:8
**including** 28:25
**independent**
14:3
**INDEX** 3:4
**information**
63:6
**Initially** 27:13
**installation**
55:18
**installed** 16:23
52:25 53:6
54:16
**instance** 43:6

**instances** 45:6
**Institution** 9:4
**insurance** 1:9
14:8,11,15,20
**intentionally**
5:25
**interest** 11:22
11:24 66:19
**interested**
41:24 66:18
**interrupt** 6:1
**involved** 12:4
16:19 20:10
41:21
**irregardless**
34:24
**Island** 9:3
**issue** 35:4,6
**issued** 14:11
**issues** 35:1,7

_____
**J**
**Jail** 23:11
**Jdegnan@taf...**
2:10
**Jeanine** 24:13
26:15,19
31:10 35:18
36:1,7,9,13
36:17,19
37:12,17 38:9
38:23 39:2,9
41:2,17 42:14
42:25 44:2,6
45:3 58:23
59:8,13 60:7
**Jeanine's** 27:20
28:10
**Jessica** 41:23
49:3
**Jlulic@brown...**
2:5
**job** 21:14 37:10
53:14
**Joe** 4:24 18:15
39:20
**John** 2:11 32:1
32:16,20
42:20 46:3,5
**Joseph** 2:6
**July** 8:1,2,16,20
9:7,15 22:20
25:14,20
26:18 36:20
38:8,13 58:5

_____
**K**
**keep** 17:6
29:25
**Kelly** 1:24 40:4
66:3,24
**kids** 52:4
**kind** 35:11
58:16

**kitchen** 21:12
43:9 52:16
53:6 54:15,19
54:24 55:5,6
62:18
**kitchenette**
21:13 46:24
52:12,25
61:16 63:3
**kitchens** 52:8
55:24
**knew** 44:1 45:3
45:9,16
**know** 5:9,14,20
6:5 8:7,9,10
8:23 9:2,3
11:9 12:3,14
15:20 16:6,13
17:18,25
18:25 19:3,4
19:4,5,11,11
19:14,16,16
20:13,17
21:17,18,20
21:21,24 22:9
22:22 24:3,6
24:16,20,21
24:22 25:1,4
25:8,9,11,15
26:7 28:3,9
28:13,14 31:2
31:9 33:6,13
33:17,24 34:1
34:14 36:3,10
36:15,17 37:2
37:11 38:1,5
38:7,8,12,16
38:19 41:14
41:16,19
42:19 46:1,2
46:9,10,25
47:4,6,23
48:8,14 50:23
51:1,2,8,13
53:7,11,13,13
53:15 57:6,9
57:10,12,18
57:19 58:23
59:1,8,16,25
60:14,16 61:1
62:10
**knowledge**
22:18

_____
**L**
**L** 1:4,18 4:1,7
4:14 65:1
66:4
**landscaping**
50:7
**lasted** 55:2
56:8
**late** 35:19
**Lawless** 59:17

**lawsuit** 4:25
**leak** 18:17
**left** 25:14
**Let's** 42:21
**letters** 10:24
**life** 14:3
**light** 50:22
**lights** 29:14
50:22,24
**likewise** 5:11
5:25
**lips** 49:15,16
51:5
**little** 42:21
49:14,15,16
56:3
**live** 6:20,21
12:20,21
13:21 16:15
24:22,24
49:18 50:3
52:5 54:4
**lived** 6:22 8:5
11:17,18
12:22,23,25
13:6,9,14
14:1 15:21
16:7 24:20
33:17 42:4
50:11,14 52:6
59:10
**lives** 16:13
**living** 8:10,13
8:15 25:16
30:5 48:9,19
48:25 52:5,9
53:8
**LLP** 2:7 4:3
**location** 62:16
**locked** 23:20
**long** 6:17,22
11:17 12:20
14:23 24:20
25:1 27:15
40:25 41:11
48:18 55:2
56:8 62:8
**look** 27:1,2,3,5
52:13,13
54:11 55:16
59:1 60:19,21
**looked** 27:7,10
43:18
**looking** 26:21
43:7,8,15
**loss** 46:13
**lot** 19:8 22:17
45:21 54:21
56:8
**loud** 40:24
**Louisiana** 54:2
**love** 12:3
**loved** 28:19
**Loyear** 32:1,16
32:20 42:20
46:3,5 59:18
60:24,25 61:8

**Loyear's** 60:10
**Lulic** 2:6 3:2
4:12,24 5:6
18:18,23 40:2
40:9,18,22
41:5,8,10
60:20,22 62:5
63:8,16

_____
**M**
**M** 2:11
**Maccabee** 2:15
7:18 11:15
**magnificent**
54:20
**mail** 10:24 27:1
27:6,7 29:4
29:11 30:2,2
30:4,5 37:9
37:10,10 43:3
43:4
**maintain** 19:20
**maintenance**
18:24 20:11
26:18
**major** 20:13
54:23 55:4,12
55:18 56:21
**making** 63:12
**malfunction**
21:25 22:9
**malfunctioned**
21:22
**malfunctions**
22:7,15
**Malka** 1:4,18
4:1,7,14 65:1
66:4
**marked** 3:6
**married** 34:17
34:18 53:18
53:19,25
**marry** 7:3
**matter** 66:6,11
**mean** 17:18
34:4,14,17
40:10 41:3
42:2 43:5
52:13,13
54:11 55:16
59:1 60:19,21
**meaning** 24:4
**medical** 12:23
12:24
**meetings** 24:7
24:10 38:10
38:18,20
**members** 11:5
13:21 26:7,11
26:16
**men** 48:9,18
49:19
**mention** 21:8
**mentioned**

**31:10 56:13
met** 37:15
**MetLife** 1:9
**Michigan** 37:18
44:2
**Minneapolis**
2:4,9 4:5
66:5
**Minnesota** 1:1
2:4,9 4:5,21
7:21 13:1
66:1,5,9
**missed** 41:8
**misstatement**
62:22 63:1
**molishiner**
61:2
**monitoring**
49:23
**month** 30:25
**monthly** 30:22
**monument**
12:15
**morning** 5:2
27:14 28:4,4
**mortgage**
30:12,15,17
30:21,23 31:1
**mother** 9:25
**move** 15:10,12
**moved** 15:11
19:19 20:15
28:15 57:22
**music** 52:22,23
**musician** 37:21

_____
**N**
**N** 3:1
**name** 4:13,24
7:1 13:2,4,5,7
15:19 16:11
24:12,14
27:24 28:1,2
28:5,7,7,8,9,9
39:15 41:5,9
55:4 61:2
62:13
**names** 7:15
53:5
**Nancy** 2:14
**National** 12:7
**necessarily**
15:18
**need** 44:23
56:20
**needed** 29:9
32:2 51:1
**Neibergs** 2:14
**neighbor** 31:13
36:6
**neighborhood**
29:1
**nephew** 12:25
13:2,4,6

**Benchmark Reporting Agency**
**612.338.3376**

Exhibit 1

**Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020**
**Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.**

Page 70

never 5:25 28:3
  33:22
New 54:2
next-door
  31:13
night 41:13
normally 48:2
notary 65:10
  66:8,25
noted 65:4
notes 62:12
  66:11
notice 63:19
noticed 52:15
  66:13
November 18:7
  31:18 32:15
  35:19 45:2
number 3:5
  34:19 41:22
  41:24
numerous 23:1

**O**

oath 66:9
Object 18:21
  60:17 62:21
obviously 52:9
occasion 10:8
  32:23 57:21
  58:6
occasional
  29:25
occasionally
  19:24
occupancy
  19:21,23
occupants
  15:17
occupied 13:12
occur 62:8
occurred 16:1
October 48:20
office 12:1,2,21
  13:11,19,23
  13:24 14:23
  15:9,11,12,13
  19:19,25
  20:16 22:3
  28:20 47:18
  51:23 55:8,25
  56:4
Oh 48:17
okay 4:24 5:12
  9:9,12 10:5
  11:21 18:24
  21:4,18 22:3
  23:15 38:1
  39:7 43:25
  44:23 45:12
  46:10 48:12
  51:1 54:7
  57:2 59:1
  63:11

old 4:17 57:1
ominous 31:22
  31:23
once 10:25
  30:24 35:15
  38:15 42:7
  60:3
one-time 29:23
open 30:4
opening 43:3
opportunity
  6:6
opposed 18:17
order 39:3 50:2
ordered 66:14
original 63:19
  66:13
originally 52:11
  52:24
Orleans 54:2
outcome 66:18
outside 50:24
owner 39:9
ownership
  11:21

**P**

p.m 63:21
page 3:2
Page/Ln 64:2
pages 65:2
paid 30:6,13,16
PAM/ECW 1:2
pardon 6:9
  10:10 25:5,7
  26:5 29:6
  30:11 33:4
  38:6 48:23
  57:13 59:22
  62:24
Paris 37:19
  45:14,16
part 39:10
  41:25 42:1
parties 66:14
  66:18,19
party 66:13
patients 52:2
  55:8
Paul 4:20 7:21
  15:2 16:16
  18:2 24:18
  37:22
Paula 2:15 7:18
  11:15 26:9
pause 6:2
pay 30:25
  49:10,18,19
  49:25
paying 48:21
  49:2 50:4
payments 30:9
  30:18,23
Pedro 9:5

pending 40:3
people 8:5
  26:10
perform 30:7
  37:20 45:15
  45:17
performance
  30:1
period 19:18
  20:3
perishable
  29:12,19,22
permission
  24:6
person 16:6
  27:20 36:9
  52:6
person's 27:24
  28:5
persons 66:19
pertaining
  34:15
ph 61:2
phone 2:4,9
  10:22 36:20
physician 7:11
picture 12:8,9
pipe 33:22 34:3
  45:24 46:23
  46:25 47:17
  47:22 50:16
  61:14,22 62:7
  63:5,6,6,10
pipefitter's
  62:13
pipes 33:19
  34:8 46:10,12
  46:20,20,20
  47:7,13,14,14
  47:23 48:4
  61:9,12,13
place 21:5
  22:22,24 23:6
  28:19 37:12
  38:9,17 48:16
  50:5 54:21
Plaintiff 1:6
  2:11
played 37:15
  52:22
playing 24:10
  38:10,18
plea 26:2
please 4:13,16
  5:14,17,22
  7:13,16 8:25
  10:21 11:23
  13:2,4 24:14
  30:14 36:16
  40:24 46:15
  51:4,5,10
  56:18
PLLC 2:2
point 8:20

pointing 17:16
policy 14:9,11
  14:15,20
portion 39:11
possessions
  21:1
possible 20:6
possibly 28:24
practicing
  37:16
Premier 1:8
  4:25
premises 24:7
  30:5 38:14
prepare 39:3
prepared 38:24
Preparing
  44:25
present 2:14
  7:22 10:22
  22:8 52:10
president
  60:25
pretty 18:19
previous 34:7
primarily 27:12
  27:13
prior 35:8
prison 9:18
  10:13,14
  23:12 58:6
  59:3
probably 61:14
  61:21
problem 35:1
  61:21
pronounced
  8:14
propel 16:23
properly 5:10
  23:21 30:8
  56:1
property 15:1
provide 49:22
provided 47:3
psychiatrist
  55:10
public 65:10
  66:8,25
pump 16:23
  17:22 20:18
  20:20 21:7
pumps 56:14
  56:14
purchased 12:1
  12:17,18
purchasing
  41:24
purpose 18:4
  26:25 36:13
  37:8
purposes 38:3
  52:9
put 22:24 43:22

44:1,9,10,14
  44:15 62:19

**Q**

question 5:17
  5:23 6:4 7:13
  8:25 9:8
  14:12,13,18
  17:9 21:15
  22:20 23:3
  31:24 32:14
  38:1 39:22
  40:2,5 42:9
  44:8,18 46:14
  46:17 47:10
  51:10 54:14
  55:17 56:16
  60:18 62:22
questions 5:1,7
  5:8,14,20
  22:17 63:18

**R**

radiator 33:23
radiators 16:24
  21:18,21
  56:19 57:6
rarely 11:12
rate 66:14
read 40:3,5
  49:16 63:18
  65:1
reading 66:16
ready 61:10
really 17:25
  43:24 50:25
  53:13
reason 17:6
  20:3 32:18
  33:22 37:4
  64:2
recall 17:25
  35:22 40:23
  40:25 42:22
  43:14 53:25
  55:12,15
receipt 63:19
recess 40:21
recessed 63:22
record 5:5,23
  42:22 44:5,8
  44:17,21
  60:23 63:20
records 17:6,7
referred 19:6
referring 15:1
  52:19
refurbished
  54:20
refurbishing
  19:8,10 21:9
  56:6,11
refurnished
  56:1

regarding 5:3
  22:18 23:16
  26:17 34:7
regardless
  42:17
Registry 12:7
regular 19:21
  27:11
regularly 11:8
  11:10,11,14
regulate 51:9
  51:14
regulates 51:16
  51:18,20
related 66:17
relates 34:23
  35:16 44:16
relating 21:15
  33:1
relationship
  41:20
relative 34:8
  35:12 43:12
  56:11
remain 14:23
  25:18
remember 17:1
  17:3,4,9 18:3
  19:9 26:10
  33:8 35:17
  41:12 43:13
  43:15 44:11
  53:5 57:14
  59:12 60:6
  61:1 62:10
reminder 44:22
remodel 16:20
remodeling
  21:11 54:10
  54:23 55:18
  56:7,10,22
  58:2
remodelled
  21:12
renovation
  55:12
renovations
  56:22
rent 49:25
repair 50:17
repaired 20:14
  47:8 50:13
repairs 17:13
  18:16,17 21:9
  22:14 50:10
  50:24
repeat 11:23
  30:1,14 46:16
rephrase 5:15
  8:25 39:1
replace 16:20
replaced 20:15
  20:18,20 21:8
  21:19 46:10

**Benchmark Reporting Agency**
**612.338.3376**

Exhibit 1

Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020
Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.

46:21,23 47:8
47:13,17,22
47:24 62:4
**replacement**
21:9 62:7
**replacements**
18:9 50:16
56:22
**reported** 66:4
**represent** 4:24
**request** 6:15
40:24
**requested** 40:5
**reside** 7:20
24:16
**resided** 6:17
**residency** 54:1
**resolved** 5:3
**response** 42:10
60:9,10
**responsibility**
23:23 24:1
26:17
**restarting** 33:7
**restoration**
61:3
**restored** 48:14
48:16
**result** 45:24
**retire** 15:9
**retrieved** 29:12
**return** 8:19
**Revocable** 1:5
**right** 6:20 9:14
13:25 14:8
19:14 20:5
22:4,15 23:13
23:14 25:16
26:20 28:15
32:20 35:16
35:25 36:11
39:19 40:7,15
40:18,24
45:14,21,21
48:10 49:4
50:6 51:21
53:10 54:7
58:20,22 61:4
63:15
**roof** 14:2,3
**room** 30:5
**Rosenthal** 7:19
**roughly** 11:1
**running** 48:4
**rust** 63:10
**rusted** 63:5,5,7
63:10

---

**S**

**sacred** 28:22
**sale** 20:25 21:4
**San** 9:5
**Savannah** 28:6
**saw** 28:3 55:3

55:8 58:2
**says** 4:10
**schedule** 45:12
**scheduled**
45:10
**Schmidt** 24:17
**school** 12:23,24
se 17:17,19
**SEAL** 66:21
**season** 38:25
39:4
**second** 12:16
12:16,23
13:11,14 23:8
44:15 46:4
47:19 52:7,16
55:2,9,25
56:4 57:11,14
**see** 12:9 42:6
49:14 51:5
52:1 57:1
**seen** 9:6,14
10:5 43:18
**Selby** 16:16,17
**sent** 23:12
**sentencing**
25:25 26:2,22
**separate** 13:16
42:5
**September**
1:24 4:2,17
27:16 28:6
66:5,22
**service** 49:23
**shade** 56:25
**sheet** 64:1 65:4
**Sheila** 7:19
**Sherburne**
23:11
**short** 57:23
**show** 12:10
**shut** 39:17
**siblings** 11:7
sic 28:6 41:1
**sick** 37:18
**side** 42:3 55:7
58:15
**sign** 63:18
**Signature** 65:8
**signing** 66:16
**simply** 9:25
**sit** 49:14 51:4
55:14 56:18
56:24 61:6
**situation** 36:5
42:11
**Six** 6:23
**Sixth** 2:3
**slowly** 6:15
**small** 30:17
58:15
**snail** 10:24
**Snelling** 18:1
19:2,5,6,9

35:14
**sold** 12:18 14:5
14:9,16,21
53:17,18
54:12 55:20
62:19
**son** 7:17,22
10:1 11:17
12:19,22 14:5
14:10,11,16
14:21 15:22
16:7,8 19:1,7
19:15 20:5
22:19 23:4
24:4,22 25:14
28:21 35:5
49:3,5,6
52:21 53:8
54:11 57:23
58:5 59:2
62:18,20
**son's** 20:16
21:1 27:2
39:11 47:18
53:2
**sorry** 7:9 10:15
29:20 51:11
55:14
**sounds** 31:22
**South** 2:3,8 4:4
4:20
**space** 52:21
**span** 15:4,6
**speak** 5:8,14
6:15 8:24
10:22
**speaking** 59:17
**specific** 37:4,8
38:4 43:11
**specifics** 43:13
**Spell** 24:14
**spend** 20:1
36:19
**spoken** 10:8
**spouse** 34:7
35:5,11 53:8
53:23
**spouses** 54:7
**squatters** 49:9
**St** 4:20 7:21
15:2 16:16
18:2 24:18
37:22
**standpoint**
20:1
**start** 5:19 6:3
**started** 29:16
32:5 61:4
**state** 4:13 66:1
66:9
**STATES** 1:1
**stay** 19:25 20:2
27:15 41:11
**stayed** 41:1

**stenographic**
66:11
**Stettinius** 2:7
4:3
**stop** 29:3 30:4
**stopped** 30:3
**stores** 29:2
**straight** 51:4
**straighter**
49:14
**Street** 2:3,8 4:4
4:20 6:18
15:15 24:19
**stuff** 52:8
**subsequently**
32:5
**substantial**
66:20
**suggested** 32:3
32:7,16,19
60:3 63:11
**suggestion**
42:18,19
63:13
**Suite** 4:4
**Summit** 8:6,11
11:16,25 15:2
18:10 19:20
23:1 24:23
**supervise**
36:22
**supervising**
59:6
**sure** 5:9 9:1
11:24 15:25
16:22 22:11
23:19 29:14
29:15,24 31:8
31:10 36:17
38:22 39:2,18
42:14 45:10
46:16 47:16
47:21 49:8
50:22 51:6,11
56:17
**Susanna** 27:25
**sworn** 4:9 66:6
**synthesizer**
52:22
**system** 16:21
17:14,16,21
18:10,25
20:14 21:10
21:16,25 22:7
22:14 31:7
33:1,10 35:13
56:12

---

**T**

**Taft** 2:7 4:3
**take** 17:24 21:4
23:22,25
26:16 27:1
28:22 29:9,16

39:21,23
40:18 49:7
50:20 62:9
**taken** 1:24 4:2
40:21
**talk** 5:16 46:7
61:10,18
**talked** 36:20
39:14 54:15
54:25 61:7
**talking** 18:15
18:16 20:17
**technical** 5:2
**technicians**
18:2 33:7
**tell** 23:15,25
26:20 46:5,6
61:4 66:6
**tenants** 13:10
13:17 48:21
**tendency** 66:20
**term** 61:18
**Terminal** 9:3
**testifies** 4:10
**text** 35:22 36:1
**texted** 35:18
**Thank** 6:16
39:24 40:20
51:7
**theirs** 13:16
**thereabouts**
18:7
**thereof** 66:9
**thermostat**
31:14,21,25
32:9,22 33:15
42:15 51:20
57:10,14
59:25 60:15
**thermostats**
51:2,8,13
**thing** 29:23
42:6,10 43:3
49:10 59:20
**things** 5:4 21:3
29:12 41:22
43:4 56:20
59:8
**think** 6:2 17:23
18:18,19
22:10 40:3
47:16,16
48:11 50:4
54:16 56:4
59:12 62:12
63:20
**thinking** 50:19
**third** 13:11,17
16:25 21:13
35:23 46:23
51:18,24 52:6
52:12,16,18
52:21 53:7
54:15,24 55:1

55:5 61:15,17
61:23 62:17
**thought** 31:15
46:3,5
**thousand** 31:5
**three** 7:14 11:2
11:3 48:9,18
49:18 50:21
60:1
**time** 5:16 7:22
8:16,20 9:20
10:5,6,14,14
10:22 11:22
15:4,21 17:24
19:7,18,22
20:1,3 22:8
30:16,17 31:3
33:17,18
36:19 42:23
43:21 50:20
53:21 55:2
56:8 57:17
62:15
**times** 5:19 9:19
11:2,3 20:19
20:20 23:1
26:23 28:24
32:18 36:24
44:4 51:11,12
60:1
**titles** 27:10
**today** 8:21,23
23:17 30:19
44:11
**told** 28:18
31:13 53:4
61:8
**Tom** 39:9,15
41:22,23
42:19 49:3
59:23 63:11
**Tom's** 42:18
**toss** 29:24
**totally** 21:12
**touch** 32:22
**touched** 60:15
**Tower** 2:3
**transcribed**
66:12
**transcript** 5:24
65:2 66:10,11
**traveled** 37:18
37:19 45:14
**traveling** 44:2
**tremendous**
53:14
**trouble** 27:4
**true** 66:11
**Trust** 1:5
**Trustee** 1:4
**truth** 66:6,6
**tuck** 17:15
**Tuesday** 35:19
**Tulane** 54:2

Exhibit 1

Zoom Deposition of Dr. Malka L. Goodman Goodman - 9/24/2020
Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.

Page 72

**turn** 31:14,21
31:24 32:4,8
32:9,14,17,25
32:25 41:14
63:11
**turned** 31:16
32:18 39:13
40:12 42:15
59:13,16 60:1
60:9
**twice** 11:1 32:9
60:12
**two** 11:7,7
13:20 41:22
41:24 42:4,5
44:20 49:4
55:24
**type** 34:2 49:23
56:10

**U**

**understand** 5:7
5:13 7:12 9:8
9:10,11,16
19:13 37:6
44:18 55:11
56:15,15 57:4
62:6
**understanding**
45:23
**understands**
18:20
**understood** 6:7
6:12
**unfortunately**
13:8
**unhappy** 6:13
**UNITED** 1:1
**University** 13:1
54:2
**unthaw** 33:22
**upcoming**
38:24 39:3
**upgrade** 16:21
**upgrades** 18:8
**upgrading**
50:10
**upstairs** 43:10
**use** 13:19
19:24 20:8
24:7 37:12,14
38:9,13,17
44:20,22
57:20 58:6,11
58:13,19 59:9
**usual** 43:3
**utilities** 49:2,11
49:19 50:5

**V**

**v** 1:7
**vaguely** 22:21
**virtue** 66:9
**visit** 20:5

**visitation** 10:1
10:1
**visited** 9:18,24
23:1 24:24
44:4
**visiting** 10:13
44:3
**visits** 28:16
57:22

**W**

**wait** 5:17
**waive** 63:18
**waived** 66:16
**walk** 29:17
**walked** 29:13
**walking** 43:9
**wall** 47:2,20
63:2,4,4
**walls** 32:3
**want** 15:18
22:10,18
39:22 46:4,6
56:7
**wanted** 12:13
23:16 43:23
45:10 61:5
**warm** 29:15
**wash** 59:8
**washed** 58:10
**washing** 58:19
**Washington**
66:2,8
**wasn't** 36:5
61:10
**watch** 49:11
**watchdog**
49:23
**watching** 50:5
**water** 16:24
18:5,11 22:12
22:13 35:23
39:13,17
40:10,13
41:15 46:20
46:21 47:3,4
47:5,7,14,15
48:4,7,10,14
50:13 57:16
57:17,20 58:7
58:11,18,24
59:9
**way** 19:17,21
22:2 31:9
46:2
**ways** 44:20
**we'll** 18:6 46:7
**we're** 5:9 15:1
23:17
**we've** 54:25
**weather** 29:16
**week** 11:1,1,2
11:3 23:2
26:23 28:24

32:6 58:4
**weekend** 28:25
29:4
**went** 26:20,23
29:10 43:21
58:5 59:3
**weren't** 25:11
**west** 24:18,19
55:7 58:15
**wife** 15:23 16:9
19:7 20:6
54:4,12 55:16
57:23 62:18
**winter** 38:25
39:4
**wished** 23:18
23:18
**witness** 4:8
5:19 6:2
18:18,19
39:24 62:3,24
63:2 66:5,21
**woman** 57:1
**wonder** 39:20
**work** 8:9 18:9
21:9 50:17
55:4 56:2,8
**worked** 14:4
27:6
**working** 18:1
32:6 33:7
**write** 43:20
45:18
**written** 5:23
**wrote** 45:1,6

**X**

**X** 3:1

**Y**

**yeah** 6:25
31:23,24
40:25 46:19
47:11 48:17
52:14 53:5
56:14
**year** 15:7,7
27:17 35:15
35:15,15
**years** 4:17 6:19
6:23 11:18
12:3 13:10
14:6 15:3,5
15:18,24
25:10 34:20
**young** 48:9,18
49:19 50:21

**Z**

**Zoom** 1:17 2:2
4:1

**O**

**1**

**1** 48:20 65:2
**1,766** 30:25
**10:13** 4:6
**1045** 4:20
**12** 12:3 15:3,5
**12:05** 63:21
**13** 4:17
**1347** 8:6,11
11:16,25 15:2
18:10 19:20
23:1 24:23
**14th** 43:1,2,14
45:2
**18** 28:6
**19-cv-1815** 1:2
**1929** 4:18
**1951** 7:6
**1980** 12:2 15:8
**1992** 12:2,18
15:8,9 19:18
20:8,11,15

**2**

**20** 8:16,20 9:7
9:15 25:14
26:18 38:8,13
58:5
**20-some** 30:22
31:4
**2018** 8:1,3,4,17
8:20 9:7,15
18:7 22:20
25:14 26:18
27:18 28:6
32:15 38:8,13
43:1 58:5
**2019** 9:22 10:6
21:2,6 48:20
**2020** 1:24 4:3
66:5,22
**20th** 8:2 25:20
35:19
**21** 32:15
**21st** 31:18
**2200** 2:8 4:4
**225** 2:3
**24** 1:24
**24/7** 32:7
**24th** 4:2 66:4
66:21

**3**

**3-0** 11:19,20
**30** 11:18 14:6

**4**

**4** 3:2
**4:30** 35:20
**4:40** 35:20
**4800** 2:3

**5**

**55** 6:19
**55116** 4:21
**55402** 2:4,9

**6**

**612.332.4020**
2:4
**612.977.8660**
2:9
**63** 65:2
**66** 30:25
**68** 31:14,16,25
32:10,15
42:15
**6th** 21:6

**7**

**72** 31:16,25
**76** 32:8,12
**7th** 21:6 24:18
24:19

**8**

**80** 2:8 4:4
**8th** 2:8 4:4

**9**

**91** 4:17

**Benchmark Reporting Agency**
**612.338.3376**

Exhibit 1

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

---------------------------------------------------------

Dr. Malka L. Goodman, Trustee
of the Aviel Goodman Revocable
Trust, Assignee of Dr. Aviel
Goodman,

       Plaintiff,

vs.                          Civil File No.
                             19-CV-1815 PAM/ECW

Economy Premier Assurance
Company, and Metlife Auto &
Home Insurance Agency, Inc.,

       Defendants.


---------------------------------------------------------


Video/Zoom
Deposition of
Dr. Malka L. Goodman
October 1, 2020
10:15 a.m. - 11:39 a.m.




Taken by:  Jackie Young, RPR

Exhibit 2

**Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020**
**Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company, et al.**

## Page 2

```
1   APPEARANCES:
2   TAFT, STETTINIUS & HOLLISTER, LLP
       2200 IDS Center
3   80 South Eighth Street
       Minneapolis, Minnesota 55402
4   jdegnan@taftlaw.com
       nneibergs@taftlaw.com
5
       By:  Mr. John M. Degnan, Esquire
6          Appeared in person
             For the Plaintiff
7
8   BROWNSON, PLLC
       4800 Capella Tower
9   225 South Sixth Street
       Minneapolis, Minnesota 55402
10  Jlulic@brownsonpllc.com
11  By:  Mr. Joseph F. Lulic
            Appeared via Zoom
12          For the Defendants.
13
14  ALSO PRESENT:  Nancy Neibergs, Paralegal, Taft,
            Stettinius & Hollister: Paula Goodman
15          MacCabee; and Steve Smith, Videographer.
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1              I N D E X
2                              PAGE:
3   TITLE............................................     1
4   APPEARANCES.....................................     2
5   INDEX.............................................     3
6   EXAMINATION BY:
7      MR. DEGNAN...................................     5
8      MR. LULIC.....................................    39
9   EXHIBITS MARKED:
10  No. 1.............................................     7
11  No. 2.............................................    11
12  No. 3.............................................    11
13  No. 4.............................................    11
14  No. 5.............................................    17
15  No. 6.............................................    26
16  No. 7.............................................    30
17  No. 8.............................................    30
18  No. 9.............................................    30
19  OBJECTIONS BY MR. LULIC:  10, 13, 14, 18, 26, 27, 28,
20  30, 31, 32, 33, 34
21  OBJECTIONS BY MR. DEGNAN:  40, 41, 42, 43
22  VERIFICATION...................................    48
23  REPORTER'S CERTIFICATE......................    49
24  *Original transcript and exhibits are in the custody of
25  Mr. Degnan.
```

## Page 4

```
1          P R O C E E D I N G S
2          (Exhibits No. 1 through 9 marked for
3   identification)
4          THE VIDEO/ZOOM DEPOSITION OF
5   DR. MALKA L. GOODMAN, was taken on this 1st day
6   of October 2020, commencing at the hour of
7   approximately 10:15 a.m., pursuant to NOTICE:
8          VIDEOGRAPHER:  Good morning.  We are
9   on the record.  Today's date is October 1, 2020,
10  and the time is 10:15 a.m.
11          This is the videotape deposition of
12  Dr. Malka L. Goodman in the matter of Dr. Malka
13  L. Goodman, et al, versus Economy Premier
14  Assurance Company and MetLife Auto & Home
15  Insurance Agency; Case No. 19-CV-1815-PAM/ECW,
16  filed in the United States District Court,
17  District of Minnesota.
18          The court reporter's name is
19  Jackie Young.  My name is Steven Smith, the
20  legal videographer.  We are with Benchmark
21  Reporting Agency.
22          Would the attorneys present please
23  introduce themselves.
24          MR. DEGNAN:  I'm John Degnan, and I
25  represent Dr. Goodman in her capacity for her
```

## Page 5

```
1   son and the home.  I represent Aviel Goodman.
2          MR. LULIC:  Joseph Lulic on behalf
3   of Economy Premier.
4          VIDEOGRAPHER:  Thank you very much.
5   The court reporter will now swear in the witness
6   and then we can proceed.
7          DR. MALKA L. GOODMAN,
8          having been first duly sworn,
9          testified as follows:
10          EXAMINATION
11  BY MR. DEGNAN:
12  Q.  Okay.  Could you please state your -- could you
13     please state your name for the record?
14  A.  Malka L. Goodman.
15  Q.  And what is your current address?
16  A.  1045 South Davern Street, St. Paul, Minnesota
17     55116.
18  Q.  And I understand that you are a medical doctor?
19  A.  Correct.
20  Q.  Okay.  Dr. Goodman, can you just briefly explain
21     what your practice was as a physician?
22  A.  I was an adolescent and child psychiatrist.  I
23     practiced in the City of St. Paul as a private
24     practitioner for 35 years.  Prior to that, I was
25     what we called, at the time, a general
```

Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020
Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company, et al.

**Page 6**

1    practitioner for about seven years.  I --
2    Q.  And --
3    A.  I retired in 1998.
4    Q.  And tell us about your family.  Were you married
5        and do you have children?
6    A.  I am widowed for the past six and a half years.
7        I have three children, a son and two daughters.
8    Q.  And what are their names?
9    A.  My son's name is Aviel.  My daughter's name is
10       Paula.  My daughter's name is Sheila.
11   Q.  And can you tell us what -- what they did for a
12       living or what they do for a living?
13   A.  Aviel was a psychiatrist with analytical
14       training for -- for about 30 years.  Paula
15       MacCabee is a Yale graduate lawyer practicing in
16       St. Paul.  She's married and has three children.
17               Sheila Goodman Rosenthal is a
18       physician, OB/GYN, practicing in Minneapolis.
19       She also has three children.
20   Q.  And we're here about the case involving a home
21       on Summit Avenue.  What's the address of that
22       home?
23   A.  1347 Summit Avenue.
24   Q.  And what is your connection?  Did you ever
25       purchase the home at some point?

**Page 7**

1    A.  I purchased the home in 1980 and practiced in
2        the home until 1992.
3    Q.  And I'm going to hand you what's been marked as
4        Exhibit 1.
5    A.  Thank you.
6    Q.  The first page is entitled St. Paul's Historic
7        Summit Avenue, and the next page attached to it
8        has a picture of a home.
9    A.  Correct.
10   Q.  Is this -- is this the home on 1347 Summit?
11   A.  That is the home that I purchased in 1980.
12   Q.  All right.  Tell us more about the home then.
13   A.  The home is on the National Registry of
14       Historical Building.  It was built in 1900.
15       It's a magnificent mansion.  It was built for
16       the two brothers, Butler by name.  The one that
17       I purchased was occupied by the Minnesota
18       Supreme Court judge by the name of Butler.  It
19       was subsequently used as a place of business for
20       Summit wedding entertainment.
21               When I purchased it, I bought it
22       for the purpose of having my office there.  I
23       did not live there.  My children, at one time or
24       another, lived in the house.  My son, while he
25       was in medical school; my daughter Sheila while

**Page 8**

1    she was in medical school; my nephew Dory, while
2    he was at the University of Minnesota, occupied
3    the house.  I also had tenants while my office
4    was in the first floor.  My tenants were on the
5    second and third floor.
6            The house was always occupied.
7    When the children were in school, they were
8    under my roof and not under my roof.  It was
9    very convenient, and it enhanced the value of
10   the house for me.  I loved that house.
11   Q.  And in 1992, did you sell the home?
12   A.  In 1992, I sold the house to my son, who was in
13       the practice of psychoanalysis.  He had an
14       office on the second floor and he lived also in
15       the house at that time.
16   Q.  And so there are apartments on the second and
17       third floor?
18   A.  By that time, in '92, the tenants had departed
19       already, and the house was owned and inhabited
20       by my son, and subsequently my son and his wife.
21   Q.  Did he have an office or offices in the home on
22       various floors?
23   A.  Yes.  He had an office on the second floor on
24       the northwest corner.
25   Q.  What about the third floor?

**Page 9**

1    A.  The third floor was a fascinating part of the
2        house.  It is very beautiful and it was my
3        daughter-in-law's at the time studio.  It was
4        furnished specifically as an artist studio.  She
5        worked there.
6                There was also a small space on
7        the third floor dedicated to Aviel's, my son
8        Aviel's music.  He had a synthesizer there, and
9        he played and composed music there.  And there
10       was a kitchenette also on the third floor.
11   Q.  And is -- is he still the registered owner,
12       then, as of, let's say, 2018?
13   A.  Yes, he is still the owner.
14   Q.  And have you checked on what, if any,
15       improvements were made by Aviel since he had
16       bought the house up to the present?
17   A.  Since 1992, when he bought the house on a
18       contract, there is a whole sheet of
19       improvements -- I got the information from
20       him -- that he made on the house to the cost of
21       hundreds of thousands of dollars.  I can read it
22       to you if you wish.
23   Q.  Yeah.  Why don't you quickly go through the list
24       of all of the improvements that were --
25   A.  Well --

Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020
Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company, et al.

## Page 10

1  Q. -- made in that home as of --
2      MR. LULIC:  Just a second.  Before
3  the witness does that, I object because she
4  indicated that someone else told her that, and
5  so it's obviously hearsay and lacks foundation.
6  Q. Okay.  Did what you learn verify what you knew
7  about the home, too, as you observed it?
8  **A. Would you repeat?**
9  Q. Yes.  What you learned from Aviel, did that
10  verify what you knew about the home --
11  **A. Yes.**
12  Q. -- as well --
13  **A. Yes.**
14  Q. -- and what you observed?
15  **A. I knew that the roof was replaced, that all the**
16  **windows were replaced, that the pump in the**
17  **basement that pumped water to the third floor**
18  **radiators were replaced repeatedly, several**
19  **times.  That the floors were exposed.  I knew**
20  **that.  I saw it.  Wall-to-wall carpeting was**
21  **ripped off and the floors were finished.  All**
22  **the woodwork -- And I could see that.  All the**
23  **woodwork was newly shellacked and -- and**
24  **refurbished.**
25  Q. Okay.  Anything else?

## Page 11

1  **A. Some old -- a couple of old radiators, and I saw**
2  **that myself, were replaced, and the electrical**
3  **system was enhanced from 100 ohms to 200 ohms.**
4  **That's about it.**
5  Q. All right.
6  **A. There were major, major rebuilding, tuck**
7  **pointing, replaced tiles and bricks in the**
8  **chimney.  You know, this is just about the major**
9  **part of the work.  There might be other things**
10  **that I don't recall.**
11  Q. Thank you.  And, you know, I know that you are
12  the named plaintiff here, and I wanted to go
13  over the documents that explain why you are
14  the -- the plaintiff.
15  **A. Well --**
16  Q. And just a minute.  So I'm going to give you
17  Exhibits 2, 3, and 4.  And then I'll have some
18  questions.
19  **A. All right.**
20      MR. LULIC:  Could I be enlightened
21  as to what Exhibits 2, 3, and 4 are?
22      MR. DEGNAN:  Yeah.  We'll identify
23  them, but they are -- Exhibit 2 is the revocable
24  trust agreement.  I think you did get those
25  yesterday, didn't you, Joe?

## Page 12

1      MR. LULIC:  I don't have them
2  marked.
3      MR. DEGNAN:  Okay.  All right.  So
4  that --
5      MR. LULIC:  They weren't marked when
6  I got them.
7      MR. DEGNAN:  Okay.  I thought they
8  were.  Revocable trust.  Exhibit 3 is the
9  assignment of insurance claim proceeds, and
10  Exhibit 4 is the power of attorney.
11      MR. LULIC:  All right.
12      MR. DEGNAN:  Okay.
13  **A. Correct.  Yes.**
14  Q. And Aviel, is he even in the state at this point
15  in time?
16  **A. No, he's out of state.**
17  Q. Okay.  And can you explain, first, Exhibit 2,
18  identify that for the record.  What is that?
19  **A. It is Aviel Goodman revocable trust agreement.**
20  Q. And under that agreement can you tell us whether
21  or not you are listed?
22  **A. I am the guarantor and the trustee.**
23  Q. Okay.  And let's go to Exhibit 3.
24  **A. I beg your pardon?**
25  Q. Let's go to Exhibit 3, the assignment of

## Page 13

1  insurance claim proceeds.
2  **A. Yes.**
3  Q. And this is an assignment and it assigns from
4  Aviel to this revocable trust the insurance
5  claim proceeds?
6  **A. Right.**
7  Q. And what's the title of this document at the
8  top?
9  **A. Assignment of insurance claim/proceeds.**
10  Q. All right.  And then let's go to the -- the last
11  exhibit we've handed to you.  I think it's
12  Exhibit 4.
13  **A. Correct.**
14  Q. And --
15  **A. This is statutory short form power-of-attorney,**
16  **Minnesota Statutes Section 523.23.**
17  Q. And can you tell us what the statutory
18  power-of-attorney does?  Who does it give power
19  from and who to?
20  **A. It permits me to handle all of my son's**
21  **financial and statutory interests.**
22  Q. And if you go to Page 3, was that -- can you
23  tell us the date that that document was signed
24  in front of a notary?
25      MR. LULIC:  Object on foundation.

**Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020**
**Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company, et al.**

## Page 14

1    MR. DEGNAN:  I'm just asking what
2  the document reflects.
3    MR. LULIC:  Well, it speaks for
4  itself, so I object on that basis.
5  A.  Shall I answer?
6  Q.  Go ahead, yes.
7  A.  The document indicates that I'm an
8    attorney-in-fact.
9  Q.  And at the bottom what's the date that it was
10  signed?
11  A.  The 6th of December 2018.
12  Q.  And is it still in effect as of this time?
13  A.  Yes, it is.
14  Q.  Okay.
15  A.  It is notarized and it is still in effect.
16  Q.  And since Aviel is no longer in the state and
17  cannot take care of his home, did he -- were you
18  requested to take care of the home for him?
19  A.  When Aviel left the home on July 20, 2018, he
20    requested me and his then girlfriend to take
21    care of the home, to see to it that everything
22    was in order.
23    I had a -- still do have a strong
24    attachment to the house.  It is beautiful.  I
25    lived there, practiced there.  I didn't live,

## Page 15

1    but I practiced there 12 years.  All my work was
2    done there.  My children lived there.  It was
3    very important to me.
4    I also love my son very much, and
5    any care that I was asked to take of the house
6    was done as a labor of love.  I'm very invested
7    emotionally, financially, and in every which way
8    in that house.
9  Q.  Okay.  You were fine with accepting that request
10  to take care of the home?
11  A.  I was very happy to be able to take care of the
12    home.
13  Q.  Did you believe that Aviel's request was
14  reasonable to --
15  A.  Very reasonable.
16  Q.  And you also mentioned that his girlfriend was
17  also requested to help.
18  A.  She was also requested to come from time to
19    time.  She would meet business people there
20    because she lived in rather cramped quarters
21    and the house was magnificent and a very
22    appropriate place to find and -- and make
23    business appointments.
24    She also came there to --  She was
25    a performer on the cello, classical cello.  She

## Page 16

1    came there to practice.  And she accepted
2    willingly and reasonably and promised to help
3    me to take care of the house.
4  Q.  What is -- what is her name?
5  A.  Her name is Jeanine Ferland.
6  Q.  And do you know whether or not she frequently or
7  regularly visited the home to check on it?
8  A.  Well, I know that.
9  Q.  How do you know?
10  A.  Well, we talked on the phone frequently.  We
11    talked about the cat.  Aviel had a cat.  The cat
12    had to be fed and taken care of.  We shared this
13    responsibility.  I would feed the cat in the
14    morning, every morning, and she or her woman
15    friend would come in the afternoon to feed the
16    cat.
17    Also we talked about her brother,
18    who was ill in Michigan, and I kept abreast of
19    his medical status.
20  Q.  And at some point did someone else take the cat?
21  A.  Yes.  At the end of September, Suzanna, who was
22    Jeanine Ferland's friend, took the cat because
23    for her it was too onerous to come to the house
24    every evening.  So she took care of the cat.
25  Q.  And after the cat was gone, do -- can you tell

## Page 17

1    us whether or not, first of all, Jeanine Ferland
2    continued to come to the home on a regular
3    basis?
4  A.  When -- she came to the home whenever she was in
5    town.  She was a performer and she traveled to
6    Florida and to Paris, and she also traveled to
7    her brother -- sick brother's bedside.
8    So she was not there as frequently
9    as I was.  Whenever she was out of town, I made
10    sure to make arrangements to be available and to
11    go and visit my son's house.
12  Q.  And I want to show you and identify for the
13    record our next exhibit, Exhibit 5, I believe.
14  A.  Oh, yeah.
15  Q.  Could you please identify this Exhibit 5 for the
16    record?
17  A.  This is a copy of my calendar of July 2018.
18  Q.  And when does it --  This particular part of
19    the calendar, when does it end, then, the last
20    page?
21  A.  Well, I haven't looked at it for -- for a while.
22    I -- I see that I indicated here times that I
23    knew that Jeanine would be out of town and that
24    I would be visiting the house and taking care of
25    the house.

## Page 18

1    Q. But this goes through November, then, of 2018,
2        this particular part of the calendar?
3    A. Yes.
4    Q. And --
5    A. Yes, I see November. Yeah. I indicated the
6        times that I made sure to be there. I also came
7        to the house when I was in the neighborhood,
8        like Chico's or -- or Whole Foods or whatever.
9        I would come to the house just to make sure that
10       everything was all right in addition to what's
11       in the calendar.
12   Q. Okay. On the calendar -- For example, let's go
13       to November. There's a note on November 12th.
14       It says AM 13 --
15               MR. LULIC: Just a second. Just a
16       second. If the -- the exhibit hasn't been
17       offered into evidence yet --
18               MR. DEGNAN: All right.
19               MR. LULIC: -- and I object to it as
20       hearsay.
21               MR. DEGNAN: All right. I offer all
22       of these exhibits, Exhibits 1 through 5.
23               MR. LULIC: You can offer them one
24       at a time if you want, but I object to all of
25       them as being irrelevant and hearsay.

## Page 19

1               MR. DEGNAN: All right. So be it.
2    BY MR. DEGNAN:
3    Q. On Exhibit 5, go to November 12th.
4    A. Yes.
5    Q. There's an en -- I've got a question about the
6        meeting of an entry. It says on November 12,
7        a.m., 1347 Summit.
8    A. Right.
9    Q. Would that -- What would that be an indication
10       of?
11   A. That would be an indication that I made sure to
12       be there in the morning at 1347 Summit.
13   Q. All right. And then on the 14th there's a
14       different entry. It says Aviel's --
15   A. Aviel's house, yes.
16   Q. What does that mean?
17   A. It means that I made sure to make time to be
18       there specifically knowing that Jeanine would
19       not be available.
20   Q. Okay. Can you tell us, then, whether you would
21       visit the home more often than shows up on the
22       calendar?
23   A. Oh, yes. I --
24   Q. Why? Why?
25   A. I would visit the home four or five times a

## Page 20

1        week. I took care of the mail. I took care of
2        looking for specific documents that I needed,
3        such as the car titles, the titles -- the titles
4        for -- for the cars that I intended to sell. I
5        was also looking for Aviel's medical records. I
6        was looking for Aviel's sunglasses. I was
7        looking for Aviel's black-rimmed glasses. I
8        took all sorts of items from his house to my
9        house.
10   Q. And when you would go to the home, would you
11       typically stay on the first floor or would it
12       also include going to the second and third
13       floors?
14   A. Oh, yes, I had to go all over the house. Aviel
15       had a little office, as I indicated before, with
16       a synthesizer and -- and other details on the
17       third floor. I had to look there. He also had
18       a bedroom on the second floor, and the medical
19       records were on the landing of the second floor.
20       So I -- I was all over the house.
21   Q. And I think you mentioned --
22   A. And the basement as well.
23   Q. Okay. And -- Excuse me. You mentioned the
24       first floor. Is that where you would then
25       typically go through all of the mail too?

## Page 21

1    A. Yes. I would pick up the mail, sit down in the
2        living room, which was on the first floor. I
3        would remove my coat and gloves when it was cold
4        enough to wear outdoors, but I was comfortable
5        enough in the house to not need my coat. And I
6        would sort the mail and take to my home only
7        that which was relevant and required some
8        activities, such as bills and so on.
9    Q. And -- Excuse me. As -- as we sit here today,
10       do you recall whether there was one or more
11       thermostats in the home?
12   A. There was one on the first floor and one that I
13       did not remember clearly in my son's bedroom on
14       the second floor. I -- I did not have anything
15       to do with that one on the second floor, so I
16       was not too sure about its presence there.
17   Q. During these visits you had at the home, did you
18       ever have to adjust the temperature?
19   A. Yes. The temperature, I'm not sure originally,
20       whether it was Jeanine or myself, that jacked up
21       the temperature to 68 degrees, but I turned it
22       up to 72 as well.
23   Q. Okay. Is this before or after the event that
24       we're going to get to, the --
25   A. After the event.

Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020
Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company, et al.

**Page 22**

1  Q.  Okay.  And on November 20th, I understand there
2      was an event that, I think --
3  A.  That we call the flood.
4  Q.  That you call the flood.  Okay.  Up until that
5      time, was it necessary, when you would visit the
6      home these multiple times a week, to adjust the
7      temperature on the thermostat?
8  A.  No.
9  Q.  And did you, while you were there, typically use
10     the facilities and determine whether or not the
11     hot water was working and the cold water was
12     working?
13 A.  Oh, oh, yes.  I used the bathroom on the first
14     floor on the west side.  I'm very sensitive to
15     cold water.  There is a hot water faucet and a
16     cold water faucet.  The left one was the hot
17     water faucet, which I used to wash my hands as
18     necessary.  The hot water was functioning
19     properly.
20 Q.  And before November 20th, was there ever any
21     leaks in the home, water?
22 A.  Not that I know of.  No leaks.
23 Q.  And it looks like, at least according to the
24     calendar, we know that you had an entry of
25     visiting the home on the 14th of November.

**Page 23**

1  A.  Yes.
2  Q.  Is there anything unusual you recall about that
3      visit versus all of the others or was it typical
4      as far as you recall?
5  A.  I don't recall anything unusual.  It was just
6      the same as any other visit.
7  Q.  And as far as you know, since you had owned the
8      home in 1980, was there ever any problem with
9      water leaks in the home?
10 A.  I had no problem during the 12 years I occupied
11     the first floor.  I did install a pump in the
12     basement to push the water up from the lower
13     levels to the third floor radiators.  So there
14     was a pump operating in my time.
15 Q.  And on November 20th, did you get any messages
16     from Jeanine Ferland about a problem with the
17     home --
18 A.  Yes.
19 Q.  -- on Summit?
20 A.  She --  I think she texted me rather than called
21     me telling me that she heard water gushing from
22     the third floor through the second onto the
23     first floor.  There was a big flood, as we
24     called it, which she tried to mop up
25     unsuccessfully.

**Page 24**

1  Q.  Did you then go over to the home that day?
2  A.  Oh, yes.  Oh, yes.  I --
3  Q.  What time -- approximately what time did you get
4      that text or did you hear from Jeanine about
5      this?
6  A.  Well, it was about 4:30, 4:40, something like
7      that.
8  Q.  P.m.?
9  A.  P.m.
10 Q.  And do you recall approximately when you went
11     over to the home, when you got there?
12 A.  Right away.  Immediately.
13 Q.  And what did you find when you got there?
14 A.  I was horrified.  Water was dripping.  The house
15     was dark because Jeanine had enough sense to
16     call Aviel's friend, the next door neighbor.
17     It's a dual house.  His name is Tom Burgin.  So
18     Jeanine called Tom.  Tom came over.
19        By the way, Tom is interested in
20     purchasing that -- Aviel's part of the house.
21        And he turned off the water and he
22     turned off the electricity because she told me
23     she smelled something funny.
24 Q.  Do you remember anything else that you saw that
25     night as you toured the home?

**Page 25**

1  A.  Well, I called John Loyear, who is a mitigator
2      of Disaster Restoration.  He has a company
3      called Disaster Restoration.  I had had dealings
4      with him, interestingly enough, just the
5      previous day in my own home on Davern Street.
6        I talked to him about what I found
7      and made an appointment with him to come over
8      on the 21st of November.  I believe it was in
9      the morning.
10 Q.  So that was the following day he was to come
11     over?
12 A.  The following day.  The flood was on the 20th of
13     November, and John Loyear came over on the 21st,
14     a.m.
15 Q.  And what did he do that day, if you recall?
16 A.  Well, he was very knowledgeable and proficient
17     in mitigating any damage that was caused.  The
18     main idea was to prevent mold from forming.  He
19     brought in, to every level of the house,
20     dehumidifiers, enormous ones, and large fans.
21     It kept on working 24/7 to dry up the house.
22        He also suggested to me to push up
23     the temperature to 76 degrees.  I'm not sure if
24     he told John or Chad.  I also called Snelling
25     Company, a heating and air-conditioning company,

Exhibit 2

**Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020**
**Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company, et al.**

**Page 26**

1  whom I have employed for many, many years, and
2  I called the same morning.
3  Q. What was the reason that you were -- you
4  understood that would be --
5  A. Well, we had --
6  Q. -- to turn up the temperature?
7  A. It was -- I was told that it would --
8      MR. LULIC:  That's hearsay.
9  Q. What did you understand as to the reason why you
10  had to turn up the temperature?  What was your
11  understanding?
12  A. Because it would mitigate the formation of mold
13  in the house.
14  Q. Did you follow that direction or suggestion?
15  A. Yes, I did.
16  Q. And I'm going to hand you what's been marked as
17  Exhibit 6.
18  A. Thank you.
19  Q. Could you please identify Exhibit 6 for the
20  record?
21  A. It's a Loyear Disaster Restoration Services.
22  Q. And it's a -- it's an itemized statement and a
23  bill for $34,838.08.  Is that --
24      MR. LULIC:  Objection.
25  Q. -- an amount --

**Page 27**

1      MR. LULIC:  I'm going to move that
2  that be stricken.  The exhibit hasn't been
3  offered --
4      MR. DEGNAN:  All right.
5      MR. LULIC:  -- and counsel is now
6  testifying as to what's contained in the
7  exhibits, so I object.
8      MR. DEGNAN:  Move -- move to
9  introduce, introduce Exhibit 6.
10     MR. LULIC:  Well, I'll object as
11  hearsay, foundation, authenticity.  The witness
12  can't testify as to its content.  Only the
13  author of the same can.  So my objection is
14  hearsay, foundation, and authenticity.
15  Q. Okay.  Did you pay this bill that you received
16  from Mr. Loyear?
17  A. Oh, yes.
18  Q. And how much was that bill for?
19  A. It was $34,838.08.
20  Q. And you understood all of the things that he
21  was doing to help mitigate the damage to the
22  home?
23     MR. LULIC:  Objection.  It's leading
24  and it lacks foundation.
25  Q. Can you tell us whether or not you witnessed and

**Page 28**

1  understood the steps that he was taking to
2  mitigate the damages?
3  A. Oh, yes, indeed.  I talked to him and I talked
4  to his foreman, Gary, every time I was in the
5  house.
6  Q. And can you tell us whether or not this
7  Exhibit 6 is consistent with what you learned
8  the steps were that he was taking to mitigate
9  the damage done?
10     MR. LULIC:  Object on foundation and
11  hearsay.
12  A. I saw it.  That's what was happening.  There's
13  no question about it.  Obvious.
14  Q. And --
15  A. They did all these things.
16  Q. And during this time; that is, let's say, as of
17  the 21st, when Mr. Loyear came over, did you
18  also report this -- this damage, the flood, to
19  the insurance company, the defendants in this
20  case?
21  A. On the 21st, I spent the whole day calling
22  MetLife and the Bremer Agency.  I talked to
23  Denise.  I talked to Heather.  I talked to
24  Megan.  I insisted that somebody has to come
25  over to look at the house and see what was

**Page 29**

1  happening.
2  Q. And this was on the 21st?
3  A. Yes.
4  Q. Did they come on the 21st?
5  A. No.
6  Q. Did you have to call them --
7  A. Repeatedly.
8  Q. -- on more than one occasion?
9  A. Repeatedly I had to call them.  I also called
10  MetLife out of town.  I don't remember which
11  city it was.  I called the -- the home visit --
12  the home -- I can't remember where it was.  But
13  I -- I kept on calling and looking for somebody
14  from this agency, from this insurance agency, to
15  come over, and nobody came until an adjuster
16  appeared on the 27th, a week after the flood.
17  Q. Do you remember who that was?
18  A. It was Jami.  I don't remember her last name.  A
19  woman.
20  Q. Jami Hage, H-a-g-e?
21  A. Sounds right, yes.  She came.  I showed her the
22  first, the second, and the third floor.  I did
23  not get any help from her.  She didn't say
24  anything that could help me mitigate some of the
25  problems because I was concerned about a second

**Benchmark Reporting Agency**
**612.338.3376**

Exhibit 2

Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020
Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company, et al.

## Page 30

1    leak that developed on the 21st, and I was
2    afraid that there might be other leaks.
3    Q.  All right.  I'm going to hand you Exhibits 7, 8,
4    and 9 to review.
5    A.  Thank you.
6    Q.  First of all, could you please identify
7    Exhibit 7 for the record?
8    A.  It is a Snelling Company invoice.  Obviously
9    I -- I called -- The Snelling Company has been
10   responsible for maintaining the heating and
11   cooling in both my home and my son's home for a
12   long time.
13   Q.  Did you pay this bill too?
14   A.  Yes, I did, and --
15          MR. DEGNAN:  Okay.  Offer into
16   evidence Exhibit 7.
17          MR. LULIC:  Objection, hearsay and
18   lacks authenticity and foundation.
19   BY MR. DEGNAN:
20   Q.  Did you call the Snelling Company on your own
21   or was it something suggested by MetLife?
22   A.  I called on my own.  I talked to Chad, who is
23   own of the owners of the company numerous times
24   during the day.  And his tech came over and I --
25   I believe he was one of the people who

## Page 31

1    suggested --
2           MR. LULIC:  Objection; foundation.
3    It's hearsay.
4    Q.  Okay.  What was the purpose of them coming over?
5    What -- what role did they play?
6    A.  To reinstate the boiler, to check the heating
7    system, to check the furnace to make sure that
8    everything was working adequately,
9    appropriately.
10   Q.  Okay.  Let's go to Exhibit 8.
11   A.  It's a Kelly Plumbing invoice.
12   Q.  Yes.  Identify it for the record, if you would.
13   A.  Kelly Plumbing and Heating Company.
14   Q.  And are you the one that called them?
15   A.  I called them.  I called everybody.  That was my
16   responsibility to take care of.  The
17   electrician, the plumber, the heating company.
18   The next one is -- Yes.
19   Q.  All right.  And there's a bill for $895.35.  Did
20   you pay that amount?
21   A.  Yes, I did.
22          MR. DEGNAN:  Okay.  Offer into
23   Exhibit 8.
24          MR. LULIC:  Objection, hearsay,
25   authenticity, and move that counsel's reading

## Page 32

1    from the exhibit be stricken.
2           MR. DEGNAN:  I'm sorry.  I missed
3    the last part.
4           MR. LULIC:  Your reading from the
5    exhibit should be stricken.
6    BY MR. DEGNAN:
7    Q.  All right.  And did you pay the amount shown on
8    the bill?
9    A.  Yes, I did.
10   Q.  And how much is it?
11   A.  $895.35.
12   Q.  And did you, on your own, have to contact them
13   for their services or did MetLife assist you?
14   A.  No, they did not assist me with anything.  I
15   never got any help from Jami.  She came back on
16   the 30th again.  I don't remember being asked
17   any questions, nor offered any help how to
18   mitigate what to do.  All the calling of all
19   these people, all these services, I did on my
20   own.
21   Q.  And what -- what role did Kelly play?  What --
22   what were they doing in the home, as you
23   understood it?
24   A.  Well, it is specified here.  Repair of the
25   faucet on the second floor in the lavatory.

## Page 33

1    Q.  Now, that's -- that's in a different home,
2    though, I think.
3    A.  I beg your pardon?
4    Q.  I think that the second entry is for 1347
5    Summit.  Do you see that on 11-27?
6    A.  It's Davern, yeah, that second {sic} one.
7    Q.  And so what -- what did they --
8    A.  It's a check for --
9           MR. LULIC:  I'm going to object to
10   the witness reading from the exhibit.  I've
11   objected to the exhibit.  The witness can
12   testify regarding her own recollection without
13   the exhibit.  That's a whole another thing.
14   Q.  Yeah.  What was their role?  What did they come
15   to repair?
16   A.  Well, I -- I needed to find out what was the
17   problem, and I called the plumbers to identify
18   the source of the flood.  Actually it required
19   more than one plumber to do so.  There was also
20   a pipefitters company that was involved because
21   he, Kelly Plumbing, could not take care of
22   radiators.
23          So the pipefitter company, I think
24   that's how they were called, the pipefitters.
25   We need -- we needed to identify where the water

Exhibit 2

Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020
Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.

## Page 34

1　was coming from.  That's why I called the
2　plumber.
3　Q.  Okay.  And Exhibit 9, let's just identify that
4　　for the record.
5　A.  That's the Highland Electric.
6　Q.  And did you call them out?
7　A.  Oh, yes, I did.
8　Q.  Were you billed for their services?
9　A.  Yes, I was.
10　Q.  And how much were you billed?
11　A.  $150.
12　Q.  And does this receipt accurately reflect the
13　　bill that you received?
14　A.  I beg your pardon?
15　Q.  Does this exhibit accurately reflect the billing
16　　that you received from them?
17　A.  Yes, it looks like it.  Yes.
18　　　　　MR. DEGNAN:  Okay.  Offer into
19　evidence Exhibit 9.
20　　　　　MR. LULIC:  Objection: hearsay, lack
21　of foundation, lack of authenticity and
22　relevance.
23　BY MR. DEGNAN:
24　Q.  And what was Highland Electric's role?  What did
25　　they do for you when they came out?

## Page 35

1　A.  Well, Tom Burgin turned off the electricity, and
2　　we needed to reinstate the electricity and make
3　　sure everything was functioning.
4　Q.  And did you call them on your own or was this a
5　　suggestion --
6　A.  I called on my own.
7　Q.  -- of --  What --  Was it suggested by MetLife?
8　A.  No.
9　　　　　MR. DEGNAN:  Okay.  All right.
10　Let's -- let's take a break, just a short break.
11　　　　　VIDEOGRAPHER:  Very good.  We are
12　going off the record, and the time is 11:03 a.m.
13　　　　　(Recess taken from 11:03 a.m. to
14　　11:22 a.m.)
15　　　　　VIDEOGRAPHER:  We are back on the
16　record, and the time is 11:22 a.m.
17　BY MR. DEGNAN:
18　Q.  Thank you.  Dr. Goodman, I've got just a few
19　　questions left to ask you.
20　A.  Yes, sir.
21　Q.  First of all, would you just look at Exhibit 8
22　　again.  That was the Kelly Plumbing.
23　A.  Six, 8.  Yes, sir.
24　Q.  And now we should clear up on -- the second
25　　entry is actually the one for 1347 Summit?

## Page 36

1　A.  11-27-18.
2　Q.  It indicates that they were there on
3　　November 27, '18.  Do you recall whether they
4　　would have been out there earlier than that for
5　　additional work?
6　A.  Well, I thought they were there before.  I was
7　　actually surprised to see 11-27.
8　Q.  Okay.  In both instances were they looking at
9　　radiators as opposed to other damage?
10　A.  Well, there was a radiator on the second floor
11　　that sprung a leak on the west side of the
12　　house, not the north, but the west, and that
13　　radiator was capped.  I was very concerned to
14　　see a leak after the original flood was stopped.
15　　But that was capped and --
16　Q.  All right.  And then as you went through the
17　　home and saw the damage, did you see any damage
18　　to the kitchens on either the first floor or the
19　　third floor?
20　　　　　I'm not talking about Exhibit 8
21　now.  I'm just talking in general.
22　A.  You're talking -- the -- the place was --  Are
23　　you talking after the wall was -- was removed
24　　and the pipe was exposed?
25　Q.  That's --  Was that on the third floor?

## Page 37

1　A.  That was on the third floor.  Between the
2　　kitchenette and the bathroom, the wall was
3　　exposed, and the pipe that was the source of the
4　　problem was exposed and replaced.
5　Q.  Can you tell us whether or not that was an
6　　inside wall or an outside wall?
7　A.  An inside wall.
8　Q.  And what about the kitchen on the first floor,
9　　did you notice any damage in spots?
10　A.  Well, the kitchen, both kitchens on the first
11　　and the third floor -- floors were magnificently
12　　appointed.  Everything was contemporary and
13　　beautiful, beautiful and up-to-date as far as
14　　the kitchen is concerned.  Both --
15　Q.  Did -- Go ahead.
16　A.  Both kitchens were in shambles, were in
17　　shambles, especially the one on the first floor
18　　was a calamity.
19　Q.  Do you recall whether or not the kitchens on the
20　　first and third floor were part of any
21　　improvements that had been done on the home?
22　A.  Oh, yes.  It was -- as I was saying, part of the
23　　improvement was fixing up, modernizing both
24　　these kitchens in the course of the years that
25　　my son owned the home.  And they were the kinds

Exhibit 2

Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020
Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company, et al.

**Page 38**

1    of kitchens that you'd see in Better Homes and
2    Gardens.  They were magnificent.
3    Q.  Okay.  And you indicated earlier in your
4    testimony as we were going through your calendar
5    that you were there at the home on
6    November 14th?
7    A.  Yes.  Yes.
8    Q.  Do you remember whether on November 14th there
9    was any evidence of the flood that ultimately
10   showed up?
11   A.  Oh, no, no, no, no.  There was no evidence of
12   any water leaking, no flood, no --  Nothing
13   unusual took place on that date.
14   Q.  Okay.  And then my last area is this.  At some
15   point did you talk to any representatives from
16   MetLife?  Did you meet them at the home or
17   anything?
18   A.  No.  Jami was there the 27th and the 30th, and
19   all she told me was that she needs serious --
20   senior adjuster.  She asked no questions,
21   offered no advice, said nothing about
22   mitigating, about preventing.  Nor did she ask
23   any questions.  When --
24   Q.  And --  Go ahead.
25   A.  When Spencer Funk came over --  I don't remember

**Page 39**

1    the exact date.  20 --  Early -- early December,
2    I believe.
3    Q.  And did -- did he ask you any specific questions
4    about what you had done in the home?
5    A.  He did not ask me any questions at all about
6    anything I had done, nor did he offer any
7    suggestions as to what should be done, nor take
8    any responsibility.  And I assumed, as a matter
9    of course, that -- that MetLife would cover the
10   damage.  My son paid premiums all these years
11   specifically for this all-risk policy so that
12   if something like this happens, it will be
13   covered.
14   Q.  Specifically did -- did Jami Hage or
15   Spencer Funk ever talk to you in any specifics
16   about what you had done to take care of the home
17   since -- since Aviel was gone?  How many times,
18   like you've testified today about the number of
19   times per week you would go and check on the
20   home, did they ever ask you about that?
21   A.  They never asked me any questions.
22       MR. DEGNAN:  Okay.  Thank you.  I
23   don't have anything further.
24           EXAMINATION
25   BY MR. LULIC:

**Page 40**

1    Q.  Good morning, Dr. Goodman.  I do have a few
2    questions for you.
3        First of all, on -- on the topic
4    of conversations you had with people from
5    Economy Premier or MetLife --
6    A.  Yeah.
7    Q.  -- you -- you are not the insured under the
8    policy; is that correct?
9    A.  I was not.  The insured --
10   Q.  The insured under the policy; correct?
11   A.  No, I was not.  My son was.
12   Q.  And your son was not there or present during any
13   of the -- any of this -- any of these happenings
14   relative to the --
15   A.  He was not.
16   Q.  Just let me finish.  -- to the water damage or
17   claim; correct?
18   A.  Right.  He was not present.
19   Q.  Because -- he wasn't present because he's in
20   prison; right?
21       MR. DEGNAN:  And I object to the
22   form of the question as irrelevant and also
23   under Rule 403 of the Federal Rules of Civil
24   Procedure.
25   Q.  Answer the question, please.

**Page 41**

1    A.  Correct.
2    Q.  You said in your direct examination he was out
3    of state, and the reason he is out of state is
4    because, as of July 20, 2018, he was
5    incarcerated; correct?
6        MR. DEGNAN:  Same objection as
7    stated before.
8    A.  On July 20, 2018, he was still in Sherburne
9    County Jail.
10   Q.  All right.  He -- he was placed in the Sherburne
11   County Jail on July 20, 2018, when he pled
12   guilty to possession of child pornography;
13   correct?
14       MR. DEGNAN:  Same objection to the
15   form of the question and the same basis as
16   stated earlier.
17   A.  Do I have to answer that?  This is a dumb
18   question that has nothing to do with what we are
19   dealing with.  Absolutely nothing.  This is an
20   invasion of privacy.
21   Q.  Do you want to answer the question or not?  I
22   can have the court make you so.
23   A.  Ask the next question.
24   Q.  No.  You answer the question I asked before I
25   ask the next question.

Exhibit 2

**Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020**
**Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company, et al.**

### Page 42

1  A. Yes.
2  Q. All right.  And -- as a result of him
3     pleading guilty to that crime, he was placed in
4     the Sherburne County Jail as of July 20, 2018;
5     correct?
6          MR. DEGNAN:  Same objection as
7     before to the form of the question, relevancy,
8     and Rule 4 -- 403.
9  A. Right.
10  Q. And on that day, July 20, 2018, or shortly
11     thereafter, you were asked to be in charge of
12     the home at 1347 Summit in St. Paul where the
13     water -- water loss occurred; is that correct?
14  A. Yes.  I --
15          MR. DEGNAN:  I object to the form of
16     these questions.  Among other things, all of
17     these questions are beyond the scope of my
18     direct, in addition to the other bases I've
19     given.  Go ahead and answer.
20  A. I love my son.
21  Q. I didn't ask you if you love your son.  I asked
22     you if --
23  A. You asked questions, sir, that are irrelevant,
24     and I will answer any way I choose.  I love my
25     son.

### Page 43

1  Q. No, you can't.
2  A. And I was asked to take care of the home.  I
3     took care of the home in his absence.
4  Q. So what you did after July 20, 2018, is you went
5     over to the home and you took care of his cat,
6     took care of the mail, and did other things;
7     correct?
8          MR. DEGNAN:  Object to the form of
9     the question as --
10  A. Yes.
11          MR. DEGNAN:  -- as a misstatement
12     of the evidence and obviously not a fair
13     summary.  So object to the form of the question.
14  Q. Is that correct?
15  A. Yes.
16  Q. And -- and -- and you went over there a lot
17     because of the cat; is that correct?
18  A. I did not hear the second --
19  Q. The frequency of your visits to the home after
20     July 20, 2018, when he was placed -- when he
21     was -- when your son was incarcerated, you --
22     the frequency of your visits, I guess, revolved
23     around the fact that there was a cat there;
24     correct?
25          MR. DEGNAN:  Object to the form of

### Page 44

1     the question because it's a misstatement of the
2     evidence and it's also under 403 since it
3     mentions incarceration.  It's irrelevant as
4     well.
5  A. I fed the cat.  I took care of the mail.  I was
6     looking for documents.  I was looking for
7     papers.  I was looking for my son's glasses.  I
8     was packing up a collection of cats.  There were
9     about 100 different little statuettes, which I
10     wrapped individually.  I was there four or five
11     times a week for 45 to -- 45 minutes to an hour
12     every time.
13  Q. My simple question to you, Dr. Goodman, is,
14     were -- were the frequency of your visits, or
15     was the frequency of your visits, affected by
16     the fact that there was a cat there?
17  A. Is that a question?
18  Q. Yes, it is.
19  A. Would you repeat, please?
20  Q. Sure.  The frequency of your visits after
21     July 20, 2018 --
22  A. Ah-ha.
23  Q. -- was affected by the fact that there was a cat
24     there and you had to feed the cat --
25  A. Yes.

### Page 45

1  Q. -- and do things that were --
2  A. Well, I had --
3  Q. -- necessary for the benefit of the cat;
4     correct?
5  A. Yes.  Yes.  I fed the cat every morning.
6  Q. All right.  After September, though, the cat
7     wasn't there anymore; right?
8  A. The end of September, the cat was not there.
9  Q. September 2018, the cat wasn't there anymore;
10     correct?
11  A. The end of September '18.  The cat was --
12  Q. The cat wasn't there anymore; correct?
13  A. The cat was not there anymore, so my visits
14     were four or five times a week, not every day.
15  Q. The heating system itself and the thermostat,
16     you didn't touch it at all after July 20, 2018,
17     until after the flood; correct?
18  A. Correct.  There was no need.
19  Q. The heating season was upon us in November,
20     correct, of '18?
21  A. Would you repeat, please?
22  Q. The heating season was upon us in November of
23     2018; correct?  Here in Minnesota; correct?
24  A. What was his question?  I -- I have trouble
25     hearing him.

Exhibit 2

**Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020**
**Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company, et al.**

## Page 46

1  Q.  I'll do it again.  The heating season was upon
2  us in November of 2018; correct?  By November?
3  **A.  Yes.  Yes.**
4  Q.  Yes.  And -- and -- But you didn't touch the
5  thermostat at all until after the water damage
6  occurred; correct?
7  **A.  That's correct.  I'm not sure who turned the**
8  **thermostat to 68, whether it was myself or**
9  **Jeanine.**
10  Q.  Regardless of when that was -- what -- what
11  who did it --
12  **A.  It was --**
13  Q.  -- that wasn't done until after the flood;
14  correct?
15  **A.  Correct.**
16  Q.  The radiators leaked after the -- after the
17  flood; correct?
18  **A.  A radiator on the second floor.**
19  Q.  And that radiator provided heat to the second
20  floor; correct?
21  **A.  One of the radiators, yeah.**
22  Q.  After the flood incident, there was no
23  replacement of any furnace components, was
24  there?
25  **A.  There was no replacement; is that the question?**

## Page 47

1  Q.  Right.  Of any furnace components.  Correct?
2  **A.  No.**
3        MR. LULIC:  That's all I have.
4  Thank you.
5        MR. DEGNAN:  I don't have anything
6  further.  Thank you.  We'll read and sign.
7        COURT REPORTER:  Mr. Lulic, would
8  you like to order a copy of the transcript?
9        MR. LULIC:  Yes, please.
10        VIDEOGRAPHER:  And this concludes
11  the deposition of Dr. Malka L. Goodman.  We are
12  going off the record and the time is 11:39 a.m.
13  Thank you.
14
15        (WHEREUPON, the deposition was
16        concluded at 11:39 a.m.)
17
18  * * (END OF RECORD) * *
19
20
21
22
23
24
25

## Page 48

1        READING & SIGNING CERTIFICATE
2        (Dr. Goodman vs Economy Premier, et al)
3
4        BE IT KNOWN, that I, the undersigned
5  Deponent, have on this date, _____,
6  read the transcript of my deposition testimony,
7  noting the following changes (if any):
8
9        _____
10        DR. MALKA L. GOODMAN
11
12 Page & Line No.      Correction        Reason
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21 _____  _____  _____
22 _____  _____  _____
23 _____  _____  _____
24 _____  _____  _____
25 _____  _____  _____

Exhibit 2

Page 49

1  STATE OF MINNESOTA)
2  COUNTY OF HENNEPIN)            CERTIFICATE
3
4        I, JACQUELYN M. YOUNG, hereby certify that
   I reported the deposition of DR. MALKA L. GOODMAN on the
5  1st day of October 2020, in Minneapolis, Minnesota, and
   that the witness was by me first duly sworn to tell the
6  truth and nothing but the truth concerning the matter in
   controversy aforesaid;
7
         That I was then and there a notary public
8  in and for the County of Hennepin, State of Minnesota;
   that by virtue thereof I was duly authorized to
9  administer an oath;
10       That the foregoing transcript is a true and
   correct transcript of my stenographic notes in said
11 matter, transcribed under my direction and control;
12       That the cost of the original has been
   charged to the party who noticed the deposition and that
13 all parties who ordered copies have been charged at the
   same rate for such copies;
14
         That the reading and signing of the
15 deposition were not waived;
16       That I am not related to any of the parties
   hereto, nor interested in the outcome of the action, and
17 have no contract with any parties, attorneys or persons
   with an interest in the action that has a substantial
18 tendency to affect my impartiality;
19       WITNESS MY HAND AND SEAL this 6th day of
   October, 2020.
20
21       _____

         Jacquelyn M. Young, Notary Public
22
23
24
25

Exhibit 2

Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020
Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company, et al.

**A**

a.m 1:18,18 4:7
 4:10 19:7
 25:14 35:12
 35:13,14,16
 47:12,16
able 15:11
abreast 16:18
absence 43:3
Absolutely
 41:19
accepted 16:1
accepting 15:9
accurately
 34:12,15
action 49:16,17
activities 21:8
addition 18:10
 42:18
additional 36:5
address 5:15
 6:21
adequately
 31:8
adjust 21:18
 22:6
adjuster 29:15
 38:20
administer
 49:9
adolescent
 5:22
advice 38:21
affect 49:18
aforesaid 49:6
afraid 30:2
afternoon
 16:15
agency 1:9
 4:15,21 28:22
 29:14,14
agreement
 11:24 12:19
 12:20
Ah-ha 44:22
ahead 14:6
 37:15 38:24
 42:19
air-condition...
 25:25
al 4:13 48:2
all-risk 39:11
amount 26:25
 31:20 32:7
analytical 6:13
answer 14:5
 40:25 41:17
 41:21,24
 42:19,24
anymore 45:7,9
 45:12,13
apartments
 8:16
APPEARANCES

2:1 3:4
appeared 2:6
 2:11 29:16
appointed
 37:12
appointment
 25:7
appointments
 15:23
appropriate
 15:22
appropriately
 31:9
approximately
 4:7 24:3,10
area 38:14
arrangements
 17:10
artist 9:4
asked 15:5
 32:16 38:20
 39:21 41:24
 42:11,21,23
 43:2
asking 14:1
Assignee 1:5
assignment
 12:9,25 13:3
 13:9
assigns 13:3
assist 32:13,14
assumed 39:8
Assurance 1:8
 4:14
attached 7:7
attachment
 14:24
attorney 12:10
attorney-in-f...
 14:8
attorneys 4:22
 49:17
authenticity
 27:11,14
 30:18 31:25
 34:21
author 27:13
authorized
 49:8
Auto 1:9 4:14
available 17:10
 19:19
Avenue 6:21,23
 7:7
Aviel 1:4,5 5:1
 6:9,13 9:15
 10:9 12:14,19
 13:4 14:16,19
 16:11 20:14
 39:17
Aviel's 9:7,8
 15:13 19:14
 19:15 20:5,6
 20:7 24:16,20

**B**

back 32:15
 35:15
basement
 10:17 20:22
 23:12
bases 42:18
basis 14:4 17:3
 41:15
bathroom
 22:13 37:2
beautiful 9:2
 14:24 37:13
 37:13
bedroom 20:18
 21:13
bedside 17:7
beg 12:24 33:3
 34:14
behalf 5:2
believe 15:18
 17:13 25:8
 30:25 39:2
Benchmark
 4:20
benefit 45:3
Better 38:1
beyond 42:17
big 23:23
bill 26:23 27:15
 27:18 30:13
 31:19 32:8
 34:13
billed 34:8,10
billing 34:15
bills 21:8
black-rimmed
 20:7
boiler 31:6
bottom 14:7
bought 7:21
 9:16,17
break 35:10,10
Bremer 28:22
bricks 11:7
briefly 5:20
brother 16:17
 17:7
brother's 17:7
brothers 7:16
brought 25:19
BROWNSON
 2:8
Building 7:14
built 7:14,15
Burgin 24:17
 35:1
business 7:19
 15:19,23
Butler 7:16,18

**C**

C 4:1
calamity 37:18

calendar 17:17
 17:19 18:2,11
 18:12 19:22
 22:24 38:4
call 22:3,4
 24:16 29:6,9
 30:20 34:6
 35:4
called 5:25
 23:20,24
 24:18 25:1,3
 25:24 26:2
 29:9,11 30:9
 30:22 31:14
 31:15,15
 33:17,24 34:1
 35:6
calling 28:21
 29:13 32:18
capacity 4:25
Capella 2:8
capped 36:13
 36:15
car 20:3
care 14:17,18
 14:21 15:5,10
 15:11 16:3,12
 16:24 17:24
 20:1,1 31:16
 33:21 39:16
 43:2,3,5,6
 44:5
carpeting 10:20
cars 20:4
case 4:15 6:20
 28:20
cat 16:11,11,11
 16:13,16,20
 16:22,24,25
 43:5,17,23
 44:5,16,23,24
 45:3,5,6,8,9
 45:11,12,13
cats 44:8
caused 25:17
cello 15:25,25
Center 2:2
CERTIFICATE
 3:23 48:1
 49:2
certify 49:4
Chad 25:24
 30:22
changes 48:7
charge 42:11
charged 49:12
 49:13
check 16:7 31:6
 31:7 33:8
 39:19
checked 9:14
Chico's 18:8
child 5:22
 41:12

children 6:5,7
 6:16,19 7:23
 8:7 15:2
chimney 11:8
choose 42:24
city 5:23 29:11
Civil 1:7 40:23
claim 12:9 13:1
 13:5 40:17
claim/procee...
 13:9
classical 15:25
clear 35:24
clearly 21:13
coat 21:3,5
cold 21:3 22:11
 22:15,16
collection 44:8
come 15:18
 16:15,23 17:2
 18:9 25:7,10
 28:24 29:4,15
 33:14
comfortable
 21:4
coming 31:4
 34:1
commencing
 4:6
company 1:9
 4:14 25:2,25
 25:25 28:19
 30:8,9,20,23
 31:13,17
 33:20,23
components
 46:23 47:1
composed 9:9
concerned
 29:25 36:13
 37:14
concerning
 49:6
concluded
 47:16
concludes
 47:10
connection
 6:24
consistent 28:7
contact 32:12
contained 27:6
contemporary
 37:12
content 27:12
continued 17:2
contract 9:18
 49:17
control 49:11
controversy
 49:6
convenient 8:9
conversations
 40:4

cooling 30:11
copies 49:13,13
copy 17:17
 47:8
corner 8:24
correct 5:19
 7:9 12:13
 13:13 40:8,10
 40:17 41:1,5
 41:13 42:5,13
 43:7,14,17,24
 45:4,10,12,17
 45:18,20,23
 45:23 46:2,6
 46:7,14,15,17
 46:20 47:1
 49:10
Correction
 48:12
cost 9:20 49:12
counsel 27:5
counsel's 31:25
County 41:9,11
 42:4 49:2,8
couple 11:1
course 37:24
 39:9
court 1:1 4:16
 4:18 5:5 7:18
 41:22 47:7
cover 39:9
covered 39:13
cramped 15:20
crime 42:3
current 5:15
custody 3:24

**D**

D 3:1 4:1
damage 25:17
 27:21 28:9,18
 36:9,17,17
 37:9 39:10
 40:16 46:5
damages 28:2
dark 24:15
date 4:9 13:23
 14:9 38:13
 39:1 48:5
daughter 7:25
daughter's 6:9
 6:10
daughter-in-l...
 9:3
daughters 6:7
Davern 5:16
 25:5 33:6
day 4:5 24:1
 25:5,10,12,15
 28:21 30:24
 42:10 45:14
 49:5,19
dealing 41:19
dealings 25:3

Exhibit 2

**Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020**
**Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company, et al.**

Page 51

December
  14:11 39:1
dedicated 9:7
defendants
  1:10 2:12
  28:19
Degnan 2:5 3:7
  3:21,25 4:24
  4:24 5:11
  11:22 12:3,7
  12:12 14:1
  18:18,21 19:1
  19:2 27:4,8
  30:15,19
  31:22 32:2,6
  34:18,23 35:9
  35:17 39:22
  40:21 41:6,14
  42:6,15 43:8
  43:11,25 47:5
degrees 21:21
  25:23
dehumidifiers
  25:20
Denise 28:23
departed 8:18
Deponent 48:5
deposition 1:15
  4:4,11 47:11
  47:15 48:6
  49:4,12,15
details 20:16
determine
  22:10
developed 30:1
different 19:14
  33:1 44:9
direct 41:2
  42:18
direction 26:14
  49:11
Disaster 25:2,3
  26:21
District 1:1,2
  4:16,17
doctor 5:18
document 13:7
  13:23 14:2,7
documents
  11:13 20:2
  44:6
doing 27:21
  32:22
dollars 9:21
door 24:16
Dory 8:1
Dr 1:4,5,16 4:5
  4:12,12,25
  5:7,20 35:18
  40:1 44:13
  47:11 48:2,10
  49:4
dripping 24:14
dry 25:21

dual 24:17
duly 5:8 49:5,8
dumb 41:17

———————
        E
E 3:1 4:1,1
earlier 36:4
  38:3 41:16
early 39:1,1
Economy 1:8
  4:13 5:3 40:5
  48:2
effect 14:12,15
Eighth 2:3
either 36:18
Electric 34:5
Electric's 34:24
electrical 11:2
electrician
  31:17
electricity
  24:22 35:1,2
emotionally
  15:7
employed 26:1
en 19:5
enhanced 8:9
  11:3
enlightened
  11:20
enormous
  25:20
entertainment
  7:20
entitled 7:6
entry 19:6,14
  22:24 33:4
  35:25
especially
  37:17
Esquire 2:5
et 4:13 48:2
evening 16:24
event 21:23,25
  22:2
everybody
  31:15
evidence 18:17
  30:16 34:19
  38:9,11 43:12
  44:2
exact 39:1
examination
  3:6 5:10
  39:24 41:2
example 18:12
Excuse 20:23
  21:9
exhibit 7:4
  11:23 12:8,10
  12:17,23,25
  13:11,12
  17:13,13,15
  18:16 19:3

26:17,19 27:2
  27:9 28:7
  30:7,16 31:10
  31:23 32:1,5
  33:10,11,13
  34:3,15,19
  35:21 36:20
exhibits 3:9,24
  4:2 11:17,21
  18:22,22 27:7
  30:3
explain 5:20
  11:13 12:17
exposed 10:19
  36:24 37:3,4

———————
        F
F 2:11
facilities 22:10
fact 43:23
  44:16,23
fair 43:12
family 6:4
fans 25:20
far 23:4,7 37:13
fascinating 9:1
faucet 22:15,16
  22:17 32:25
fed 16:12 44:5
  45:5
Federal 40:23
feed 16:13,15
  44:24
Ferland 16:5
  17:1 23:16
Ferland's 16:22
File 1:7
filed 4:16
financial 13:21
financially 15:7
find 15:22
  24:13 33:16
fine 15:9
finish 40:16
finished 10:21
first 5:8 7:6 8:4
  12:17 17:1
  20:11,24 21:2
  21:12 22:13
  23:11,23
  29:22 30:6
  35:21 36:18
  37:8,10,17,20
  40:3 49:5
five 19:25
  44:10 45:14
fixing 37:23
flood 22:3,4
  23:23 25:12
  28:18 29:16
  33:18 36:14
  38:9,12 45:17
  46:13,17,22
floor 8:4,5,14

8:17,23,25
  9:1,7,10
  10:17 20:11
  20:17,18,19
  20:24 21:2,12
  21:14,15
  22:14 23:11
  23:13,22,23
  29:22 32:25
  36:10,18,19
  36:25 37:1,8
  37:11,17,20
  46:18,20
floors 8:22
  10:19,21
  20:13 37:11
Florida 17:6
follow 26:14
following 25:10
  25:12 48:7
follows 5:9
Foods 18:8
foregoing
  49:10
foreman 28:4
form 13:15
  40:22 41:15
  42:7,15 43:8
  43:13,25
formation
  26:12
forming 25:18
found 25:6
foundation
  10:5 13:25
  27:11,14,24
  28:10 30:18
  31:2 34:21
four 19:25
  44:10 45:14
frequency
  43:19,22
  44:14,15,20
frequently 16:6
  16:10 17:8
friend 16:15,22
  24:16
front 13:24
functioning
  22:18 35:3
Funk 38:25
  39:15
funny 24:23
furnace 31:7
  46:23 47:1
furnished 9:4
further 39:23
  47:6

———————
        G
G 4:1
Gardens 38:2
Gary 28:4
general 5:25

36:21
girlfriend 14:20
  15:16
give 11:16
  13:18
given 42:19
glasses 20:7
  44:7
gloves 21:3
go 9:23 11:12
  12:23,25
  13:10,22 14:6
  17:11 18:12
  19:3 20:10,14
  20:25 24:1
  31:10 37:15
  38:24 39:19
  42:19
goes 18:1
going 7:3 11:16
  20:12 21:24
  26:16 27:1
  30:3 33:9
  35:12 38:4
  47:12
good 4:8 35:11
  40:1
Goodman 1:4,4
  1:5,16 2:14
  4:5,12,13,25
  5:1,7,14,20
  6:17 12:19
  35:18 40:1
  44:13 47:11
  48:2,10 49:4
graduate 6:15
guarantor
  12:22
guess 43:22
guilty 41:12
  42:3
gushing 23:21

———————
        H
H-a-g-e 29:20
Hage 29:20
  39:14
half 6:6
hand 7:3 26:16
  30:3 49:19
handed 13:11
handle 13:20
hands 22:17
happening
  28:12 29:1
happenings
  40:13
happens 39:12
happy 15:11
hear 24:4 43:18
heard 23:21
hearing 45:25
hearsay 10:5
  18:20,25 26:8

27:11,14
  28:11 30:17
  31:3,24 34:20
heat 46:19
Heather 28:23
heating 25:25
  30:10 31:6,13
  31:17 45:15
  45:19,22 46:1
help 15:17 16:2
  27:21 29:23
  29:24 32:15
  32:17
Hennepin 49:2
  49:8
hereto 49:16
Highland 34:5
  34:24
Historic 7:6
Historical 7:14
Hollister 2:2,14
home 1:9 4:14
  5:1 6:20,22
  6:25 7:1,2,8
  7:10,11,12,13
  8:11,21 10:1
  10:7,10 14:17
  14:18,19,21
  15:10,12 16:7
  17:2,4 19:21
  19:25 20:10
  21:6,11,17
  22:6,21,25
  23:8,9,17
  24:1,11,25
  25:5 27:22
  29:11,12
  30:11,11
  32:22 33:1
  36:17 37:21
  37:25 38:5,16
  39:4,16,20
  42:12 43:2,3
  43:5,19
Homes 38:1
horrified 24:14
hot 22:11,15,16
  22:18
hour 4:6 44:11
house 7:24 8:3
  8:6,10,10,12
  8:15,19 9:2
  9:16,17,20
  14:24 15:5,8
  15:21 16:3,23
  17:11,24,25
  18:7,9 19:15
  20:8,9,14,20
  21:5 24:14,17
  24:20 25:19
  25:21 26:13
  28:5,25 36:12
hundreds 9:21

CASE 0:19-cv-01815-PAM-ECW   Doc. 44-1   Filed 11/04/20   Page 41 of 120

Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020
Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company, et al.

Page 52

**I**
idea 25:18
identification 4:3
identify 11:22 12:18 17:12 17:15 26:19 30:6 31:12 33:17,25 34:3
IDS 2:2
ill 16:18
Immediately 24:12
impartiality 49:18
important 15:3
improvement 37:23
improvements 9:15,19,24 37:21
incarcerated 41:5 43:21
incarceration 44:3
incident 46:22
include 20:12
INDEX 3:5
indicated 10:4 17:22 18:5 20:15 38:3
indicates 14:7 36:2
indication 19:9 19:11
individually 44:10
information 9:19
inhabited 8:19
inside 37:6,7
insisted 28:24
install 23:11
instances 36:8
insurance 1:9 4:15 12:9 13:1,4,9 28:19 29:14
insured 40:7,9 40:10
intended 20:4
interest 49:17
interested 24:19 49:16
interestingly 25:4
interests 13:21
introduce 4:23 27:9,9
invasion 41:20
invested 15:6
invoice 30:8 31:11
involved 33:20

involving 6:20
irrelevant 18:25 40:22 42:23 44:3
itemized 26:22
items 20:8

**J**
jacked 21:20
Jackie 1:24 4:19
Jacquelyn 49:4 49:21
Jail 41:9,11 42:4
Jami 29:18,20 32:15 38:18 39:14
jdegnan@taf... 2:4
Jeanine 16:5 16:22 17:1,23 19:18 21:20 23:16 24:4,15 24:18 46:9
Jlulic@brown... 2:10
Joe 11:25
John 2:5 4:24 25:1,13,24
Joseph 2:11 5:2
judge 7:18
July 14:19 17:17 41:4,8 41:11 42:4,10 43:4,20 44:21 45:16

**K**
Kelly 31:11,13 32:21 33:21 35:22
kept 16:18 25:21 29:13
kinds 37:25
kitchen 37:8,10 37:14
kitchenette 9:10 37:2
kitchens 36:18 37:10,16,19 37:24 38:1
knew 10:6,10 10:15,19 17:23
know 11:8,11 11:11 16:6,8 16:9 22:22,24 23:7
knowing 19:18
knowledgeable 25:16
KNOWN 48:4

**L**
L 1:4,16 4:5,12 4:13 5:7,14 47:11 48:10 49:4
labor 15:6
lack 34:20,21
lacks 10:5 27:24 30:18
landing 20:19
large 25:20
lavatory 32:25
lawyer 6:15
leading 27:23
leak 30:1 36:11 36:14
leaked 46:16
leaking 38:12
leaks 22:21,22 23:9 30:2
learn 10:6
learned 10:9 28:7
left 14:19 22:16 35:19
legal 4:20
let's 9:12 12:23 12:25 13:10 18:12 28:16 31:10 34:3 35:10,10
level 25:19
levels 23:13
Line 48:12
list 9:23
listed 12:21
little 20:15 44:9
live 7:23 14:25
lived 7:24 8:14 14:25 15:2,20
living 6:12,12 21:2
LLP 2:2
long 30:12
longer 14:16
look 20:17 28:25 35:21
looked 17:21
looking 20:2,5 20:6,7 29:13 36:8 44:6,6,7
looks 22:23 34:17
loss 42:13
lot 43:16
love 15:4,6 42:20,21,24
loved 8:10
lower 23:12
Loyear 25:1,13 26:21 27:16 28:17
Lulic 2:11 3:8 3:19 5:2,2

10:2 11:20 12:1,5,11 13:25 14:3 18:15,19,23 26:8,24 27:1 27:5,10,23 28:10 30:17 31:2,24 32:4 33:9 34:20 39:25 47:3,7 47:9

**M**
M 2:5 49:4,21
MacCabee 2:15 6:15
magnificent 7:15 15:21 38:2
magnificently 37:11
mail 20:1,25 21:1,6 43:6 44:5
main 25:18
maintaining 30:10
major 11:6,6,8
Malka 1:4,16 4:5,12,12 5:7 5:14 47:11 48:10 49:4
mansion 7:15
marked 3:9 4:2 7:3 12:2,5 26:16
married 6:4,16
matter 4:12 39:8 49:6,11
mean 19:16
means 19:17
medical 5:18 7:25 8:1 16:19 20:5,18
meet 15:19 38:16
meeting 19:6
Megan 28:24
mentioned 15:16 20:21 20:23
mentions 44:3
messages 23:15
Metlife 1:9 4:14 28:22 29:10 30:21 32:13 35:7 38:16 39:9 40:5
Michigan 16:18
Minneapolis 2:3,9 6:18 49:5
Minnesota 1:2

2:3,9 4:17 5:16 7:17 8:2 13:16 45:23 49:1,5,8
minute 11:16
minutes 44:11
missed 32:2
misstatement 43:11 44:1
mitigate 26:12 27:21 28:2,8 29:24 32:18
mitigating 25:17 38:22
mitigator 25:1
modernizing 37:23
mold 25:18 26:12
mop 23:24
morning 4:8 16:14,14 19:12 25:9 26:2 40:1 45:5
move 27:1,8,8 31:25
multiple 22:6
music 9:8,9

**N**
N 3:1 4:1
name 4:18,19 5:13 6:9,9,10 7:16,18 16:4 16:5 24:17 29:18
named 11:12
names 6:8
Nancy 2:14
National 7:13
necessary 22:5 22:18 45:3
need 21:5 33:25 45:18
needed 20:2 33:16,25 35:2
needs 38:19
Neibergs 2:14
neighbor 24:16
neighborhood 18:7
nephew 8:1
never 32:15 39:21
newly 10:23
night 24:25
nneibergs@t... 2:4
north 36:12
northwest 8:24
notarized 14:15
notary 13:24

49:7,21
note 18:13
notes 49:10
notice 4:7 37:9
noticed 49:12
noting 48:7
November 18:1 18:5,13,13 19:3,6 22:1 22:20,25 23:15 25:8,13 36:3 38:6,8 45:19,22 46:2 46:2
number 39:18
numerous 30:23

**O**
O 4:1
oath 49:9
OB/GYN 6:18
object 10:3 13:25 14:4 18:19,24 27:7 27:10 28:10 33:9 40:21 42:15 43:8,13 43:25
objected 33:11
objection 26:24 27:13,23 30:17 31:2,24 34:20 41:6,14 42:6
OBJECTIONS 3:19,21
observed 10:7 10:14
Obvious 28:13
obviously 10:5 30:8 43:12
occasion 29:8
occupied 7:17 8:2,6 23:10
occurred 42:13 46:6
October 1:17 4:6,9 49:5,19
offer 18:21,23 30:15 31:22 34:18 39:6
offered 18:17 27:3 32:17 38:21
office 7:22 8:3 8:14,21,23 20:15
offices 8:21
oh 17:14 19:23 20:14 22:13 22:13 24:2,2 27:17 28:3 34:7 37:22

Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020
Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company, et al.

Page 53

38:11
ohms 11:3,3
Okay 5:12,20
  10:6,25 12:3
  12:7,12,17,23
  14:14 15:9
  18:12 19:20
  20:23 21:23
  22:1,4 27:15
  30:15 31:4,10
  31:22 34:3,18
  35:9 36:8
  38:3,14 39:22
old 11:1,1
onerous 16:23
ones 25:20
operating
  23:14
opposed 36:9
order 14:22
  47:8
ordered 49:13
original 3:24
  36:14 49:12
originally 21:19
outcome 49:16
outdoors 21:4
outside 37:6
owned 8:19
  23:7 37:25
owner 9:11,13
owners 30:23

**P**

P 4:1
P.m 24:8,9
packing 44:8
page 3:2 7:6,7
  13:22 17:20
  48:12
paid 39:10
PAM/ECW 1:8
papers 44:7
Paralegal 2:14
pardon 12:24
  33:3 34:14
Paris 17:6
part 9:1 11:9
  17:18 18:2
  24:20 32:3
  37:20,22
particular
  17:18 18:2
parties 49:13
  49:16,17
party 49:12
Paul 5:16,23
  6:16 42:12
Paul's 7:6
Paula 2:14 6:10
  6:14
pay 27:15
  30:13 31:20
  32:7

people 15:19
  30:25 32:19
  40:4
performer
  15:25 17:5
permits 13:20
person 2:6
persons 49:17
phone 16:10
physician 5:21
  6:18
pick 21:1
picture 7:8
pipe 36:24 37:3
pipefitter 33:23
pipefitters
  33:20,24
place 7:19
  15:22 36:22
  38:13
placed 41:10
  42:3 43:20
plaintiff 1:6 2:6
  11:12,14
play 31:5 32:21
played 9:9
pleading 42:3
please 4:22
  5:12,13 17:15
  26:19 30:6
  40:25 44:19
  45:21 47:9
pled 41:11
PLLC 2:8
plumber 31:17
  33:19 34:2
plumbers 33:17
Plumbing 31:11
  31:13 33:21
  35:22
point 6:25
  12:14 16:20
  38:15
pointing 11:7
policy 39:11
  40:8,10
pornography
  41:12
possession
  41:12
power 12:10
  13:18
power-of-att...
  13:15,18
practice 5:21
  8:13 16:1
practiced 5:23
  7:1 14:25
  15:1
practicing 6:15
  6:18
practitioner
  5:24 6:1
Premier 1:8

4:13 5:3 40:5
  48:2
premiums
  39:10
presence 21:16
present 2:14
  4:22 9:16
  40:12,18,19
prevent 25:18
preventing
  38:22
previous 25:5
Prior 5:24
prison 40:20
privacy 41:20
private 5:23
problem 23:8
  23:10,16
  33:17 37:4
problems 29:25
Procedure
  40:24
proceed 5:6
proceeds 12:9
  13:1,5
proficient
  25:16
promised 16:2
properly 22:19
provided 46:19
psychiatrist
  5:22 6:13
psychoanalysis
  8:13
public 49:7,21
pump 10:16
  23:11,14
pumped 10:17
purchase 6:25
purchased 7:1
  7:11,17,21
purchasing
  24:20
purpose 7:22
  31:4
pursuant 4:7
push 23:12
  25:22

**Q**

quarters 15:20
question 19:5
  28:13 40:22
  40:25 41:15
  41:18,21,23
  41:24,25 42:7
  43:9,13 44:1
  44:13,17
  45:24 46:25
questions
  11:18 32:17
  35:19 38:20
  38:23 39:3,5
  39:21 40:2

42:16,17,23
quickly 9:23

**R**

R 4:1
radiator 36:10
  36:13 46:18
  46:19
radiators 10:18
  11:1 23:13
  33:22 36:9
  46:16,21
rate 49:13
read 9:21 47:6
  48:6
reading 31:25
  32:4 33:10
  48:1 49:14
reason 26:3,9
  41:3 48:12
reasonable
  15:14,15
reasonably
  16:2
rebuilding 11:6
recall 11:10
  21:10 23:2,4
  23:5 24:10
  25:15 36:3
  37:19
receipt 34:12
received 27:15
  34:13,16
Recess 35:13
recollection
  33:12
record 4:9 5:13
  12:18 17:13
  17:16 26:20
  30:7 31:12
  34:4 35:12,16
  47:12,18
records 20:5,19
reflect 34:12,15
reflects 14:2
refurbished
  10:24
regarding
  33:12
Regardless
  46:10
registered 9:11
Registry 7:13
regular 17:2
regularly 16:7
reinstate 31:6
  35:2
related 49:16
relative 40:14
relevance
  34:22
relevancy 42:7
relevant 21:7
remember

21:13 24:24
  29:10,12,17
  29:18 32:16
  38:8,25
remove 21:3
removed 36:23
repair 32:24
  33:15
repeat 10:8
  44:19 45:21
repeatedly
  10:18 29:7,9
replaced 10:15
  10:16,18 11:2
  11:7 37:4
replacement
  46:23,25
report 28:18
reported 49:4
reporter 5:5
  47:7
reporter's 3:23
  4:18
Reporting 4:21
represent 4:25
  5:1
representati...
  38:15
request 15:9,13
requested
  14:18,20
  15:17,18
required 21:7
  33:18
responsibility
  16:13 31:16
  39:8
responsible
  30:10
Restoration
  25:2,3 26:21
result 42:2
retired 6:3
review 30:4
revocable 1:4
  11:23 12:8,19
  13:4
revolved 43:22
right 7:12 11:5
  11:19 12:3,11
  13:6,10 18:10
  18:18,21 19:1
  19:8,13 24:12
  27:4 29:21
  30:3 31:19
  32:7 35:9
  36:16 40:18
  40:20 41:10
  42:2,9 45:6,7
  47:1
ripped 10:21
role 31:5 32:21
  33:14 34:24
roof 8:8,8

10:15
room 21:2
Rosenthal 6:17
RPR 1:24
Rule 40:23 42:8
Rules 40:23

**S**

S 4:1
saw 10:20 11:1
  24:24 28:12
  36:17
saying 37:22
says 18:14 19:6
  19:14
school 7:25 8:1
  8:7
scope 42:17
SEAL 49:19
season 45:19
  45:22 46:1
second 8:5,14
  8:16,23 10:2
  18:15,16
  20:12,18,19
  21:14,15
  23:22 29:22
  29:25 32:25
  33:4,6 35:24
  36:10 43:18
  46:18,19
Section 13:16
see 10:22 14:21
  17:22 18:5
  28:25 33:5
  36:7,14,17
  38:1
sell 8:11 20:4
senior 38:20
sense 24:15
sensitive 22:14
September
  16:21 45:6,8
  45:9,11
serious 38:19
services 26:21
  32:13,19 34:8
seven 6:1
shambles
  37:16,17
shared 16:12
sheet 9:18
Sheila 6:10,17
  7:25
shellacked
  10:23
Sherburne 41:8
  41:10 42:4
short 13:15
  35:10
shortly 42:10
show 17:12
showed 29:21
  38:10

Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020
Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company, et al.

Page 54

shown 32:7
shows 19:21
sic 33:6
sick 17:7
side 22:14
   36:11
sign 47:6
signed 13:23
   14:10
signing 48:1
   49:14
simple 44:13
sir 35:20,23
   42:23
sit 21:1,9
six 6:6 35:23
Sixth 2:9
small 9:6
smelled 24:23
Smith 2:15
   4:19
Snelling 25:24
   30:8,9,20
sold 8:12
somebody
   28:24 29:13
son 5:1 6:7
   7:24 8:12,20
   8:20 9:7 15:4
   37:25 39:10
   40:11,12
   42:20,21,25
   43:21
son's 6:9 13:20
   17:11 21:13
   30:11 44:7
sorry 32:2
sort 21:6
sorts 20:8
Sounds 29:21
source 33:18
   37:3
South 2:3,9
   5:16
space 9:6
speaks 14:3
specific 20:2
   39:3
specifically 9:4
   19:18 39:11
   39:14
specifics 39:15
specified 32:24
Spencer 38:25
   39:15
spent 28:21
spots 37:9
sprung 36:11
St 5:16,23 6:16
   7:6 42:12
state 5:12,13
   12:14,16
   14:16 41:3,3
   49:1,8

stated 41:7,16
statement
   26:22
States 1:1 4:16
statuettes 44:9
status 16:19
Statutes 13:16
statutory 13:15
   13:17,21
stay 20:11
stenographic
   49:10
steps 28:1,8
Stettinius 2:2
   2:14
Steve 2:15
Steven 4:19
stopped 36:14
Street 2:3,9
   5:16 25:5
stricken 27:2
   32:1,5
strong 14:23
studio 9:3,4
subsequently
   7:19 8:20
substantial
   49:17
suggested
   25:22 30:21
   31:1 35:7
suggestion
   26:14 35:5
suggestions
   39:7
summary 43:13
Summit 6:21
   6:23 7:7,10
   7:20 19:7,12
   23:19 33:5
   35:25 42:12
sunglasses
   20:6
Supreme 7:18
sure 17:10 18:6
   18:9 19:11,17
   21:16,19
   25:23 31:7
   35:3 44:20
   46:7
surprised 36:7
Suzanna 16:21
swear 5:5
sworn 5:8 49:5
synthesizer 9:8
   20:16
system 11:3
   31:7 45:15

_____

T

Taft 2:2,14
take 14:17,18
   14:20 15:5,10
   15:11 16:3,20

21:6 31:16
   33:21 35:10
   39:7,16 43:2
taken 1:24 4:5
   16:12 35:13
talk 38:15
   39:15
talked 16:10,11
   16:17 25:6
   28:3,3,22,23
   28:23 30:22
talking 36:20
   36:21,22,23
tech 30:24
tell 6:4,11 7:12
   12:20 13:17
   13:23 16:25
   19:20 27:25
   28:6 37:5
   49:5
telling 23:21
temperature
   21:18,19,21
   22:7 25:23
   26:6,10
tenants 8:3,4
   8:18
tendency 49:18
testified 5:9
   39:18
testify 27:12
   33:12
testifying 27:6
testimony 38:4
   48:6
text 24:4
texted 23:20
Thank 5:4 7:5
   11:11 26:18
   30:5 35:18
   39:22 47:4,6
   47:13
thereof 49:8
thermostat
   22:7 45:15
   46:5,8
thermostats
   21:11
thing 33:13
things 11:9
   27:20 28:15
   42:16 43:6
   45:1
think 11:24
   13:11 20:21
   22:2 23:20
   33:2,4,23
third 8:5,17,25
   9:1,7,10
   10:17 20:12
   20:17 23:13
   23:22 29:22
   36:19,25 37:1
   37:11,20

thought 12:7
   36:6
thousands 9:21
three 6:7,16,19
tiles 11:7
time 4:10 5:25
   7:23 8:15,18
   9:3 12:15
   14:12 15:18
   15:19 18:24
   19:17 22:5
   23:14 24:3,3
   28:4,16 30:12
   35:12,16
   44:12 47:12
times 10:19
   17:22 18:6
   19:25 22:6
   30:23 39:17
   39:19 44:11
   45:14
title 3:3 13:7
titles 20:3,3,3
today 21:9
   39:18
Today's 4:9
told 10:4 24:22
   25:24 26:7
   38:19
Tom 24:17,18
   24:18,19 35:1
top 13:8
topic 40:3
touch 45:16
   46:4
toured 24:25
Tower 2:8
town 17:5,9,23
   29:10
training 6:14
transcribed
   49:11
transcript 3:24
   47:8 48:6
   49:10,10
traveled 17:5,6
tried 23:24
trouble 45:24
true 49:10
trust 1:5 11:24
   12:8,19 13:4
trustee 1:4
   12:22
truth 49:6,6
tuck 11:6
turn 26:6,10
turned 21:21
   24:21,22 35:1
   46:7
two 6:7 7:16
typical 23:3
typically 20:11
   20:25 22:9

U

ultimately 38:9
undersigned
   48:4
understand
   5:18 22:1
   26:9
understanding
   26:11
understood
   26:4 27:20
   28:1 32:23
United 1:1 4:16
University 8:2
unsuccessfully
   23:25
unusual 23:2,5
   38:13
up-to-date
   37:13
use 22:9

V

value 8:9
various 8:22
VERIFICATION
   3:22
verify 10:6,10
versus 4:13
   23:3
Video/Zoom
   1:14 4:4
videographer
   2:15 4:8,20
   5:4 35:11,15
   47:10
videotape 4:11
virtue 49:8
visit 17:11
   19:21,25 22:5
   23:3,6 29:11
visited 16:7
visiting 17:24
   22:25
visits 21:17
   43:19,22
   44:14,15,20
   45:13
vs 1:7 48:2

W

waived 49:15
wall 36:23 37:2
   37:6,6,7
Wall-to-wall
   10:20
want 17:12
   18:24 41:21
wanted 11:12
wash 22:17
wasn't 40:19
   45:7,9,12
   46:13
water 10:17

22:11,11,15
   22:15,16,17
   22:18,21 23:9
   23:12,21
   24:14,21
   33:25 38:12
   40:16 42:13
   42:13 46:5
way 15:7 24:19
   42:24
We'll 11:22
   47:6
we're 6:20
   21:24
we've 13:11
wear 21:4
wedding 7:20
week 20:1 22:6
   29:16 39:19
   44:11 45:14
went 24:10
   36:16 43:4,16
weren't 12:5
west 22:14
   36:11,12
widowed 6:6
wife 8:20
willingly 16:2
windows 10:16
wish 9:22
witness 5:5
   10:3 27:11
   33:10,11 49:5
   49:19
witnessed
   27:25
woman 16:14
   29:19
woodwork
   10:22,23
work 11:9 15:1
   36:5
worked 9:5
working 22:11
   22:12 25:21
   31:8
wrapped 44:10

X

X 3:1

Y

Yale 6:15
yeah 9:23
   11:22 17:14
   18:5 33:6,14
   40:6 46:21
years 5:24 6:1
   6:6,14 15:1
   23:10 26:1
   37:24 39:10
yesterday
   11:25
Young 1:24

**Video/Zoom Deposition of Dr. Malka L. Goodman - 10/1/2020**
**Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company, et al.**

Page 55

4:19 49:4,21

---
**Z**
**Zoom** 2:11

---
**0**

---
**1**
**1** 1:17 3:3,10
 4:2,9 7:4
 18:22
**10** 3:19
**10:15** 1:18 4:7
 4:10
**100** 11:3 44:9
**1045** 5:16
**11** 3:11,12,13
**11-27** 33:5
 36:7
**11-27-18** 36:1
**11:03** 35:12,13
**11:22** 35:14,16
**11:39** 1:18
 47:12,16
**12** 15:1 19:6
 23:10
**12th** 18:13 19:3
**13** 3:19 18:14
**1347** 6:23 7:10
 19:7,12 33:4
 35:25 42:12
**14** 3:19
**14th** 19:13
 22:25 38:6,8
**150** 34:11
**17** 3:14
**18** 3:19 36:3
 45:11,20
**19-CV-1815**
 1:8
**19-CV-1815-...**
 4:15
**1900** 7:14
**1980** 7:1,11
 23:8
**1992** 7:2 8:11
 8:12 9:17
**1998** 6:3
**1st** 4:5 49:5

---
**2**

**2** 3:4,11 11:17
 11:21,23
 12:17
**20** 14:19 39:1
 41:4,8,11
 42:4,10 43:4
 43:20 44:21
 45:16
**200** 11:3
**2018** 9:12
 14:11,19
 17:17 18:1
 41:4,8,11

42:4,10 43:4
43:20 44:21
45:9,16,23
46:2
**2020** 1:17 4:6,9
 49:5,19
**20th** 22:1,20
 23:15 25:12
**21st** 25:8,13
 28:17,21 29:2
 29:4 30:1
**2200** 2:2
**225** 2:9
**24/7** 25:21
**26** 3:15,19
**27** 3:19 36:3
**27th** 29:16
 38:18
**28** 3:19

---
**3**

**3** 3:5,12 11:17
 11:21 12:8,23
 12:25 13:22
**30** 3:16,17,18
 3:20 6:14
**30th** 32:16
 38:18
**31** 3:20
**32** 3:20
**33** 3:20
**34** 3:20
**34,838.08**
 26:23 27:19
**35** 5:24
**39** 3:8

---
**4**

**4** 3:13 11:17,21
 12:10 13:12
 42:8
**4:30** 24:6
**4:40** 24:6
**40** 3:21
**403** 40:23 42:8
 44:2
**41** 3:21
**42** 3:21
**43** 3:21
**45** 44:11,11
**48** 3:22
**4800** 2:8
**49** 3:23

---
**5**

**5** 3:7,14 17:13
 17:15 18:22
 19:3
**523.23** 13:16
**55116** 5:17
**55402** 2:3,9

---
**6**

**6** 3:15 26:17,19

27:9 28:7
**68** 21:21 46:8
**6th** 14:11 49:19

---
**7**

**7** 3:10,16 30:3
 30:7,16
**72** 21:22
**76** 25:23

---
**8**

**8** 3:17 30:3
 31:10,23
 35:21,23
 36:20
**80** 2:3
**895.35** 31:19
 32:11

---
**9**

**9** 3:18 4:2 30:4
 34:3,19
**92** 8:18

---

**Benchmark Reporting Agency**
**612.338.3376**

Exhibit 2

PLAINTIFF'S
EXHIBIT
Goodman
PENGAD 800-631-6989



Ernest R. Sandeen

# St. Paul's
# Historic Summit Avenue



Exhibit 2



Exhibit 2



PLAINTIFF'S
EXHIBIT
Goodman

## AVIEL GOODMAN
## REVOCABLE TRUST AGREEMENT

**THIS TRUST AGREEMENT** (the "Trust Agreement") is made and effective as of September 9, 2019, by AVIEL GOODMAN, as grantor, and MALKA L. GOODMAN, as trustee.

### ARTICLE 1
### TRUST ASSETS

1.  <u>Transfer and Receipt of Trust Assets</u>.  I have transferred assets to the trust which may be described in Schedule A attached to this instrument and may transfer additional assets to the trust. The trustees acknowledge their receipt of the assets transferred to the trust and agree that all assets transferred or devised to the trustees shall be administered and distributed in accordance with this instrument.

### ARTICLE 2
### FAMILY

2.  <u>Family</u>.  As of the date of this instrument, I have no children and I am not now married.

### ARTICLE 3
### APPOINTMENT OF TRUSTEES

3.  <u>Trustee Appointment</u>.  Trustees shall be appointed, removed, and replaced as follows:

    3.1  <u>Reserved Powers</u>.  Unless I am Incapacitated, I reserve the power to remove any trustee and to appoint any successor or additional trustees.

    3.2  <u>Successor Trustees</u>.  During any period when MALKA L. GOODMAN is unable to act as trustee, I appoint PAULA GOODMAN MACCABEE as successor trustees of each trust created under this Agreement. If both MALKA L. GOODMAN and PAULA GOODMAN MACCABEE die, become Incapacitated, resign, or are removed leaving no co-trustee or successor trustee acting or designated to serve, I appoint SHEILA GOODMAN ROSENTHAL as trustee of each trust created under this Agreement.  Except as otherwise provided in this Article, trustees shall be appointed, removed and replaced as follows:

        3.2.1  <u>Right to Appoint Trustee</u>.  Unless a successor trustee is appointed under the foregoing provisions, each individual trustee shall have the power to appoint one or more co-trustees and one or more successor trustees to replace himself or herself as trustee when he or she ceases to act as trustee for any reason. In the event of a complete vacancy in the trusteeship, a majority of the adult beneficiaries (including both current income beneficiaries and remainder persons) of the applicable trust hereunder shall have the right to appoint a successor to fill any vacancy in the position of trustee, and also may remove any trustee so appointed. To effect the appointment of any trustee, the persons entitled to effect such appointment shall do so by an instrument signed by each of them.

4836-8867-4725, v. 1

Exhibit 2

3.2.2   <u>Independent Trustee</u>.   My trustees who are then serving, by unanimous action, may appoint an Independent Trustee at any time, and also may remove any trustee so appointed, and may appoint an Independent Trustee to replace any such trustee who dies, resigns, becomes Incapacitated, or is removed.

3.2.3   <u>Corporate Trustee</u>.   The trustees may place assets in an account with a trust department of a bank or corporation selected by the trustees under an agency or other such agreement.   In addition, the trustees may appoint a bank or corporation with trust powers as an additional trustee and, when any such trustee ceases to serve, may appoint a successor to such trustee.   The individual trustees shall have the power to remove the corporate trustee, if any, and may appoint a successor corporate trustee to serve in its place.

3.3   <u>Power to Remove and Replace Trustee</u>.   Notwithstanding the foregoing, if any person (other than the grantor) having the power under this instrument both to remove and to replace a trustee:   (i) is a beneficiary to whom income or principal of the applicable trust may be distributed currently; (ii) has a legal obligation to support a beneficiary to whom income or principal may be distributed currently; or (iii) has ever made a gift transfer to the applicable trust, then any successor trustee appointed by such person must be an Independent Trustee.   Except as otherwise expressly stated in this instrument, no cause or justification shall be required for any removal or appointment under this Article.

3.4   <u>Resignation</u>.   Any trustee may resign by notifying the other trustee in writing of the trustee's resignation.

## ARTICLE 4
## ADMINISTRATION OF TRUST DURING MY LIFETIME

4.   <u>Administration of Trust During My Lifetime</u>.   During my lifetime, the trustees shall hold and distribute the trust estate as follows:

4.1   <u>Payments as I Direct</u>.   Unless I am Incapacitated, the trustees shall pay to me such amounts of the net income and principal of the trust as I may direct, and shall also make such other payments of net income or principal of the trust as I may direct in a writing delivered to the trustees.

4.2   <u>Trustees' Discretion</u>.   During any period when I am Incapacitated, the trustees may also pay such sums from the net income and principal of the trust as the trustees, in their sole discretion, deem necessary or advisable to provide for my health, support, maintenance, and education and/or to establish or continue any program established by me of making gifts to any charitable or other nonprofit organization to which I have made gifts during my lifetime.

4.3   <u>Reserved Rights</u>.   I reserve the following rights, to be exercised (except as otherwise specified) without the consent or participation of any other person:

4.3.1   <u>Amendment</u>.   Unless I am Incapacitated, to amend, in whole or in part, or to revoke this instrument by a writing delivered to the trustees.

-2-

Exhibit 2

4.3.2   <u>Additional Assets</u>. To add to the trust estate at any time, any other assets acceptable to the trustees. The trustees shall administer and distribute any assets as if it had been a part of the original trust assets.

4.3.3   <u>Trust as Beneficiary</u>. To make payable to the trustees death benefits from insurance on my life, annuities, retirement plans, or other sources. If I do so, I reserve all rights of ownership, and I shall have the duties of safekeeping all documents, of giving any necessary notice, of obtaining proper beneficiary designations, of paying premiums, contributions, assessments, or other charges and of maintaining any litigation.

4.3.4   <u>Accounts</u>. Unless I am Incapacitated, to examine the books and records of the trustees with respect to the trust, and to receive written statements of account from all trustees (or the personal representative of any deceased trustee). My approval of these accounts by writings delivered to another trustee shall cover all transactions and shall be conclusive as to all persons.

4.3.5   <u>Direction of Investment</u>. Unless I am Incapacitated, to direct the trustees as to the retention, acquisition, or disposition of any trust assets by a writing delivered to the trustees. Any assets retained or acquired pursuant to such directions shall be retained as a part of the trust estate unless I otherwise direct in a writing delivered to the trustees. The trustees shall not be liable to anyone for any loss resulting from any action taken in accordance with any such direction of mine.

## ARTICLE 5
## TRUST ADMINISTRATION AFTER MY DEATH

5.    <u>Administration after Death</u>. Upon my death, the trustees shall hold and distribute the trust assets, including all assets added to the trust at my death, as follows:

5.1    <u>Contribution by Trustees</u>. The trustees, if requested by the personal representatives of my estate, shall, or in their own discretion may, pay any of the following taxes, debts, and expenses directly or through the personal representatives of my estate:

5.1.1   <u>Expenses</u>. The expenses of my last illness and funeral, valid debts, and expenses of administering my estate, including non-probate assets.

5.1.2   <u>Taxes</u>. Any estate taxes occasioned by my death, except to the extent such taxes are paid from other sources, provided that the taxes paid by my trustees shall be apportioned in accordance with the directions set forth in the tax provisions of this instrument.

5.2    <u>Specific Distributions</u>. The trustees shall make the following specific distributions:

5.2.1   <u>List of Tangible Personal Property</u>. I may prepare a written list, signed by me, that describes certain items of my tangible personal property and names the person or persons to whom such items are to be given upon my death. The trustees shall distribute such property that is included in the trust as provided in such a written list as if the list

-3-

4836-8867-4725, v. 1

Exhibit 2

were a part of this agreement. If I have disposed of the same item to different persons on more than one list, the one dated later in time shall control.

5.2.2   Remaining Tangible Personal Property.   Subject to the preceding provisions of this Article, all of my tangible personal property shall be distributed in accordance with Paragraph 5.3.

5.3   Allocation of Remaining Trust Assets.   The trust assets (including assets added to the trust at my death) not effectively disposed of by the preceding Articles of this instrument shall be administered and distributed as follows:

5.3.1   Trust for My Mother - MALKA L. GOODMAN.   If my mother, MALKA L. GOODMAN, survives me, the remaining assets shall be administered, in trust, for the benefit of my mother. The trustees may pay to or for the benefit of my mother from such trust so much of the net income and principal of the trust as the trustees deem advisable to provide for my mother's health, education, support, or maintenance. The Independent Trustee, if one is acting, may also distribute such amounts of the net income and principal as the Independent Trustee deems advisable. Upon the death of my mother, the trustees shall distribute any remaining trust assets as provided under Paragraph 5.3.2.

5.3.2   Trusts for My Sisters – PAULA GOODMAN MACCABEE and SHEILA GOODMAN ROSENTHAL.   The trustees shall divide the remaining trust assets into equal shares so as to provide one (1) share for each of my then-living sister and one (1) share for each then-deceased sister of mine who has descendants then living. Each share for the then-living descendants, collectively, of a deceased sister of mine shall be further divided into shares for the living descendants of my deceased sister by right of representation. The trustees shall administer each share allocated for the benefit of a sister of mine, or for the benefit of a descendant of a deceased sister of mine (the "beneficiary"), as a separate trust as follows:

5.3.2.1   Distributions.   The trustees may pay to or for the benefit of the beneficiary so much of the net income and principal of the trust as the trustees deem advisable to provide for the beneficiary's health, education, support, or maintenance. The Independent Trustee, if one is acting, may also distribute such amounts of the net income and principal as the Independent Trustee deems advisable to assist the beneficiary in buying a home or pursuing a business, trade, or profession, or for any other purpose the Independent Trustee deems advisable.

5.3.2.2   General Power of Appointment.   Upon the beneficiary's death, the beneficiary shall have a testamentary general power to appoint such portion of his or her trust (or separate share thereof), if any, that: (i) would have generated imposition of GST tax (after taking into account any generation-skipping transfer tax exemption allocated to the trust) if, but only if, the beneficiary did not have a general power to appoint such trust (or separate share thereof); (ii) does not exceed the applicable exclusion available to the beneficiary's estate under Section 2010 of the Code; and (iii) will result in the payment of the least possible

-4-

Exhibit 2

combined state and federal estate tax and GST Tax by reason of the beneficiary's death. This general power of appointment must be referred to and expressly exercised by the beneficiary's Will as provided in the general governing provisions of this instrument for the appointment to be effective.

5.3.2.3   Alternate Disposition.   Upon the beneficiary's death, any trust assets not effectively disposed of by the above provisions shall be divided into separate shares for the beneficiary's then-living descendants by right of representation. Each such share shall be administered in trust as provided in this Paragraph. If no such descendants survive the beneficiary, such assets shall be administered as provided in this Paragraph 5.3.2. Any share for a beneficiary for whose benefit there is an existing trust hereunder shall be distributed to such trust.

## ARTICLE 6
## CONTINGENT DISPOSITION

6.   Contingent Disposition.   Any trust assets not effectively disposed of by the above provisions shall be to the persons who would have been my heirs-at-law had I died intestate, not survived by a spouse or descendants, on the date of such distribution, in the proportions specified by the laws of intestacy of the State of Minnesota in effect on the date of this agreement.

## ARTICLE 7
## TRUSTEE PROVISIONS

7.   Trustee Provisions.   The following provisions shall govern the trustees:

7.1   Flexibility.   I desire the trustees to exercise the discretionary powers conferred on them in a manner that will provide flexibility in the administration of each trust under conditions from time to time existing, and in exercising such powers, the discretion of the trustees shall be conclusive as to the advisability of any distribution of income or principal, and as to the person to or for whom such distribution is to be made, and the same shall not be subject to judicial review.

7.2   Factors Relevant to Trustees' Discretion.   The trustees shall have discretion whether or not to take into account other resources or funds available to a beneficiary prior to making distribution to such beneficiary. In determining whether to make discretionary distributions to a beneficiary, the trustees may consider such circumstances and factors as the trustees believe are relevant, including the advisability of supplementing any income or assets known to the trustees to be available to the beneficiary, the tax consequences of any such distribution, the character, habits and personal lifestyle of the beneficiary, the diligence, progress, and aptitude of the beneficiary in acquiring an education and gainful employment, and the ability of the beneficiary to manage money usefully and prudently, and to assume the responsibilities of adult life and self-support. In order to make a determination whether a discretionary distribution should be made, the trustees are authorized to request any information they deem relevant from a beneficiary (and to withhold a distribution if the beneficiary does not provide such information), including, without limitation, the following: (i) a statement of the beneficiary's and his or her spouse's assets and liabilities; (ii) copies of bank statements and

4836-8867-4725, v. 1

Exhibit 2

other materials that evidence the beneficiary's spending habits; (iii) evidence that the beneficiary is enrolled in or performing at a certain level in school; (iv) evidence that the beneficiary is employed, including authorization to contact the beneficiary's current employer; (v) a list of the beneficiary's current places of residence, and (vi) access to medical records, blood tests, or related medical information.

7.3     Compensation.  My trustees shall be entitled to reimbursement for expenses and to receive compensation for their services.  In the case of an individual trustee, such compensation shall be based principally upon the time and labor required in order to fulfill their responsibilities hereunder, giving due regard to the complexity and novelty of any special problems or issues encountered in the administration of the trust, as well as the nature and extent of their responsibilities assumed and the results obtained in performing their duties.  In the case of a corporate trustee, such compensation shall be based on the corporate trustee's published fee schedule as in effect from time to time.

7.4     Bond.  No trustee named in this instrument shall be required to give any bond or security in any jurisdiction.

7.5     Court Supervision.  I expressly waive any requirement that any trust created under this instrument be submitted to the jurisdiction of any court, that the trustees be appointed or confirmed by any court, or that the trustees' accounts be heard or allowed by any court.  This provision, however, shall not prevent any of the trust beneficiaries or the trustees from requesting any of the procedures waived by this Paragraph.

7.6     Trustee Powers.  My trustees shall have, in extension and not in limitation of all powers provided by applicable law, all of the powers granted by applicable Minnesota law, the provisions of which are incorporated herein by reference.  They shall also have the power, without court approval, to:

7.6.1     Merger.  Merge a trust created under this instrument with any other trust, by whomever created, having substantially the same beneficiaries and substantially the same terms, and if there is a disparity in the maximum duration of the trusts so merged, the shortest maximum duration shall control.

7.6.2     Principal and Income Allocations.  Allocate between principal and income, in their discretion, all receipts, credits, and disbursements, including receipts received or accrued and expenses incurred during trust administration.

7.6.2.1     Undistributed Income.  Unless otherwise provided in this instrument, net income of a trust not distributed shall be accumulated and added to the principal of the trust.

7.6.2.2     Income at Termination.  Except to the extent that income is expressly made subject to a sole income beneficiary's general power of appointment, any accrued or undistributed income at the termination of a trust shall be added and disposed of as a part of the principal of the trust.

4836-8867-4725, v. 1

Exhibit 2

7.6.3   <u>Division and Distributions</u>.   Without the consent of any beneficiary, distribute (including the satisfaction of any pecuniary distribution) in cash or in specific property, real or personal, or an undivided interest therein, or partly in cash and partly in such property, and to do so with or without regard to the income tax basis of specific property allocated to any beneficiary (including any trust) and with or without making pro rata distributions of specific assets, in such manner as they shall deem to be in the best interests of the beneficiaries of any trust created hereunder.   In making such division or distribution, the judgment of the trustees concerning the propriety thereof and the valuation of such assets or interests shall be binding and conclusive on all persons in interest.

7.6.4   <u>Payments to Minors and Those under Legal Incapacity</u>.   Pay a sum distributable to a minor or other beneficiary under legal Incapacity, without liability to the trustee, in one or more of the following ways: (i) directly to the beneficiary; (ii) to the legal guardian or conservator of the beneficiary; (iii) directly for the maintenance, education, and general welfare of the beneficiary; (iv) to a parent of the beneficiary; (v) to a person who has custody and care of the person of the beneficiary; (vi) to a custodian under a uniform transfers to minors statute; or (vii) to a qualified tuition program under Section 529 of the Code naming the beneficiary as a designated beneficiary thereunder.

7.6.5   <u>Unequal Distributions</u>.   Except as otherwise specifically provided herein, in making payments of income and principal, the trustees need not make the same for the equal benefit of the beneficiaries of the trust.

7.6.6   <u>Division into Separate Trusts</u>.   Divide any trust hereunder at any time into separate trusts as the trustees may deem advisable.   Each such separate trust share shall be administered and distributed in the same manner as set forth herein for the original trust.

7.6.7   <u>Discretionary Termination</u>.   My Independent Trustee, may, without further responsibility and without prior or subsequent court approval, terminate any trust at any time after determining that:  (i) the trust is no longer economical to administer; or (ii) the trust is otherwise inadvisable to administer as a trust; or (iii) termination is in the best interest of the beneficiary for whom the trust was created, or if such trust has no such beneficiary, in the best interests of the beneficiaries of the trust whose generation assignment is the closest to my own; provided that my Independent Trustee shall not terminate a trust if termination would result in the assets being made available to creditors who have a current claim against the beneficiary, or to any governmental agency that has a claim (including a potential claim for reimbursement against the beneficiary) or would prevent an existing bequest from qualifying (or continuing to qualify) for the charitable deduction, or would cause the revocation of an S corporation election, or would impair special use valuation under Code Section 2032A or similar tax benefits under any state law.

7.6.8   <u>Distribution on Termination</u>.   My Independent Trustee who terminates a trust under the preceding paragraph shall distribute the trust assets, to the beneficiary for whom such trust share was created; if the trust has no such beneficiary, then to the

-7-

Exhibit 2

beneficiary's descendants who are then eligible to receive distributions from the trust, by right of representation. Upon such termination the rights of all other persons who might otherwise have an interest in the trust shall cease. My Independent Trustee may condition termination of any trust upon receiving indemnification from the beneficiaries who are going to receive a terminating distribution.

7.6.9   Renunciation of Transfers.   Renounce, in whole or in part, any gift or any interest in assets within nine (9) months after the date of the transfer that created the interest. I expect that my trustees will make no renunciation that is fundamentally inconsistent with the provisions of this instrument.

7.6.10   Disclaimer of Powers.   Disclaim, release, or restrict any trustee's power, whether granted or implied by law, by delivering a written instrument to the other trustees, if any, specifying the powers disclaimed, released, or restricted and the nature of any such restriction. Any such disclaimed or released power, as well as any other power that the trustee is precluded from exercising, shall be exercised only by the other trustees, if any, or, if there is none, by the successor to the trustee disclaiming or releasing such power.

7.6.11   Use of Real Property.   Permit any beneficiary of any trust created under this instrument to occupy any real property forming part of such trust upon such terms as the trustee shall deem proper, whether rent-free or in consideration of the payment of taxes, insurance, maintenance, and ordinary repairs, or otherwise, and to invest any proceeds from the sale of such real property to purchase other residential property for the use of such persons.

7.6.12   Investments.   My trustees shall have the power to invest in any type of investment that plays an appropriate role in achieving the investment goals of my estate or the trust, which investment shall be considered as part of the total portfolio. Except as otherwise provided in this instrument, it is my specific direction that no category or type of investment shall be prohibited. I specifically do not wish to limit the universe of investments in any way other than is dictated by the trustees' exercise of reasonable care, skill, and caution. In connection with the trustees' investment and management decisions with respect to my estate or the trust, the trustees are specifically entitled to take into account general economic conditions, the possible effect of inflation or deflation, the expected tax consequences of investment decisions or strategies, the role which each investment or course of action may play within the overall trust portfolio, which may include financial assets, interests in closely-held enterprises, tangible and intangible personal property, and real property, the expected total return from income and the appreciation of capital, other resources of the beneficiaries, the needs for liquidity, regularity of income and preservation or appreciation of capital, and the asset's special relationship or special value, if any, to the purposes of the trust or to one or more of the beneficiaries. My trustees shall not be limited to any one investment strategy or theory, including modern portfolio theory, the efficient markets theory, or otherwise, but my trustees should be free to consider any appropriate investment strategy or theory under all the circumstances.

-8-

4836-8867-4725, v. 1

Exhibit 2

7.6.13 <u>Delegation</u>. The trustees may delegate investment and management functions which a prudent person of comparable skills would properly delegate under the circumstances. The trustees may obtain independent investment counsel from a qualified investment advisor, and may compensate such advisor for his or her services to the trust. Should the trustees delegate such function, the trustees shall exercise reasonable care, skill, and caution in selecting an agent, establishing the scope and terms of the delegation consistent with the purposes and terms of the trust, and periodically reviewing the agent's actions to monitor performance and compliance with the terms of the delegation. Should such delegation occur, the trustees who comply with the requirements for delegation shall not be liable to the beneficiaries or to the trusts for the decisions and actions of the agent to whom the function was delegated, but by accepting the delegation of a function by the trustees of the trust, the agent submits to the jurisdiction of the courts of this state. I also direct that the trustee shall not be liable for a loss that results from following a direction by the investment advisor where such trustee has exercised good faith and ordinary diligence in the selection and continuing employment of such investment advisor by the trust.

7.7 <u>Power to Amend</u>. During my Incapacity or after my death, the Independent Trustee, if one is acting, shall have the power to modify and reform this instrument in accordance with the following provisions:

7.7.1 <u>Purpose of Amendments</u>. The power granted by this Paragraph is intended to permit the Independent Trustee:

7.7.1.1 <u>Tax Changes</u>. To address any tax or other circumstantial changes that may affect a trust created under this instrument and/or its beneficiaries;

7.7.1.2 <u>Removal of Provisions</u>. To remove from this instrument any provisions that have become no longer operative in the ongoing administration of the trust due to changed circumstances;

7.7.1.3 <u>Powers of Appointment</u>. To grant, reduce, expand, or eliminate general and special powers of appointment with respect to part or all of any trust assets (such powers may be made subject to any conditions or consents and limited to such objects as may be described in the grant or reduction of each power);

7.7.1.4 <u>Addition of Distributions</u>. To add mandatory distribution or set-aside provisions for one or more beneficiaries or permissible distributees;

7.7.1.5 <u>Creation of Subaccounts</u>. To create one or more subaccounts which are subject to more restrictive or other administrative or dispositive provisions in order to accomplish any purpose consistent with my intent and not prohibited by applicable law;

-9-

Exhibit 2

7.7.1.6  <u>Restriction of Exercise of Powers</u>.  To restrict in any way, revocably or irrevocably, the future exercise of any power held by any beneficiaries and/or trustees hereunder.

7.7.1.7  <u>Amendment</u>.  To amend this instrument in such other manner as the Independent Trustee, in the exercise of his or her sole discretion, may deem appropriate in the best interests of the beneficiaries of the trust share, and of each such beneficiary's family as a whole.

7.7.2  <u>Restrictions on Amendments</u>.  Notwithstanding the foregoing, however, under no circumstances, (a) shall any trustee who is also a beneficiary of such trust participate in any amendment that may result in such trustee beneficiary receiving any direct or indirect financial benefit from any such trust nor (b) shall any such amendment:

7.7.2.1  <u>Extension of Trust</u>.  Extend the period of any trust's existence beyond the maximum period permitted by applicable law;

7.7.2.2  <u>Beneficiaries' Rights</u>.  Diminish in any way any enforceable right any beneficiary may already have to receive the income of any trust, currently or at any time in the future; provided, however, that to the extent that any amendment benefits or grants a power to a current beneficiary of any trust, it may diminish the rights of one or more beneficiaries to receive in the future the income of that trust or of any trust subsequently to come into existence to hold part or all of the assets of that trust;

7.7.2.3  <u>Trustees' Powers</u>.  Reduce in any way the restrictions and limitations applicable to:  (a) the grantor's, personal representatives', and/or trustees' powers as set forth in this instrument; (b) the Independent Trustee's limited power of amendment under this Paragraph; and (c) the persons qualified to serve as a trustee hereunder as set forth in Article 3 hereunder, unless such reduction of restrictions and/or limitations will not have any adverse tax effect on the trust or any of its beneficiaries.  Notwithstanding the foregoing, any one or more of the provisions referred to in (a), (b), and (c) above, may, however, be amended, irrevocably and binding on successors, to increase such restrictions and limitations in any way such amending Independent Trustee may deem appropriate;

7.7.2.4  <u>Adverse Tax Effect</u>.  Give (a) any trustee any powers or discretion that are either granted exclusively to a co-trustee or from the exercise of which such trustee is excluded for any reason nor (b) anyone acting in a nonfiduciary capacity any powers granted herein to trustees unless, in either case, such amendment will not have any adverse tax effect on the trust or any of its beneficiaries;

7.7.2.5  <u>Financial Benefit</u>.  Result in any direct or indirect financial benefit to any individual who is not at the time of such amendment both (a) a member of the grantor's family (meaning any lineal descendant of the grantor, any ancestor

4836-8867-4725, v. 1

Exhibit 2

of the grantor, and any spouse of any of the foregoing) and (b) already a present or contingent beneficiary of such trusts (unless it is to provide for afterborn or after-adopted children of any such beneficiary), except through the exercise of a power of appointment held by or granted to a person described in (a) or (b) above;

7.7.2.6 <u>Discrimination Between Beneficiaries</u>. Discriminate in any significant financial way in favor of one or more siblings to the detriment of any other siblings where such siblings are, under the terms of this instrument, to be treated in substantially equal fashion (for this purpose treating each sibling, or his or her spouse and descendants, and their spouses as one unit); nor

7.7.2.7 <u>Disqualification</u>. Make any change that would have the effect of disqualifying any such trust insofar as such trust, prior to such amendment, otherwise qualified for and was in fact already taking advantage of, while such advantage otherwise will continue, (a) any exception from a surviving spouse's elective right or from any creditor's right to levy on any beneficiary's interest in any such trust or (b) any substantial deduction, credit, exclusion, or other tax benefit (such as any marital or charitable deduction, any annual gift tax exclusion, any election under Section 2032A of the Code, a generation-skipping tax exemption, the opportunity to be a stockholder in an S corporation, a significant grandfathered status under some changed law, and so on).

7.7.3 <u>Manner of Making Amendments</u>. Any such amendment shall be by written instrument, executed by such amending Independent Trustee with all the formalities of a deed, setting forth the trust or trusts hereunder to which the amendment applies and the effective date of such amendment.

7.8 <u>Limitations on Trustees' Powers</u>.

7.8.1 <u>No General Powers of Appointment</u>. If any discretionary power granted to the trustees in this instrument would constitute a general power of appointment in a particular trustee under Section 2041 of the Code, that trustee shall not be entitled to exercise such discretionary power. Instead, such power shall be exercisable only by the trustees, if any, who are not disqualified to act under this Paragraph.

7.8.2 <u>No Payment of Trustee's Obligations</u>. If the exercise of any discretionary power granted to the trustees in this instrument would satisfy the legal obligation of a particular trustee, including the obligation of support, that trustee shall not be entitled to exercise such discretionary power. Instead, such power shall be exercisable only by the trustees, if any, who are not disqualified to act under this Paragraph.

7.9 <u>Administrative Provisions</u>.

7.9.1 <u>Majority Vote and Delegation</u>. If more than one personal representative or trustee is serving, their powers shall be exercisable by a majority vote of the personal representatives or trustees authorized to act. I hereby authorize any personal representative and trustee to delegate for any period of time to any other personal representative or trustee authorized to exercise such power, the power to exercise the

-11-

Exhibit 2

discretion on behalf of the delegating personal representative or trustee, including the power to execute documents. Any personal representative or trustee who is not qualified to participate in or who dissents from an action or decision shall not be liable for the action or decision taken.

7.9.2   Custody of Assets.  If a corporate trustee is serving, it shall have custody of all assets, handle receipts and disbursements and prepare accountings.

7.9.3   Non-Resident Trustee.  A person designated as trustee herein shall be entitled to serve even though he or she is a non-resident of the state of the situs of the trusts.

7.9.4   Change of Trust Situs.  The trustees may transfer the situs of the administration of any trust created hereunder and the trustees may elect to have the governing law of the trust instrument be the law of such jurisdiction even if contrary to provisions herein, provided that the application of those laws to the administration of the trust shall not affect the duration of the trust or the beneficial interests of any beneficiary.

7.9.5   Trustees' Accounts.  The trustees may, or shall upon request by a beneficiary otherwise entitled thereto under applicable law, annually render a written account of the administration of the trust, showing receipts and disbursements of income and principal, and a statement of the principal and undistributed income as of the date of such account.  Such account shall be rendered to each income beneficiary and each beneficiary who would then be entitled to receive distribution of trust assets if the trust had then been terminated.  The trustees' accounts and records shall be available for inspection by any beneficiary.  Any trustee who has resigned or been removed shall render an account for the period ending on the date of resignation or removal.  Nothing contained in this Paragraph shall give any person the power or right to alter, revoke or terminate any trust or to enlarge or shift the beneficial interest of any beneficiary of any trust.

### ARTICLE 8
### TAX PROVISIONS

8.   Tax Provisions.  The following provisions shall govern all tax matters relating to the trusts created hereunder:

8.1   Tax Apportionment.  Except as otherwise specifically provided in this instrument, all estate taxes occasioned by my death shall be apportioned against and paid by those persons entitled to receive the assets resulting in such taxes, in accordance with applicable federal and state law and my trustees shall seek recovery from such persons in the manner and to the extent provided by applicable federal and state law.  This provision applies not only to taxes on the assets passing under this instrument, but also to any assets passing outside of this instrument.

8.2   Tax Elections.  My trustees may exercise all tax elections, options or choices and contest, settle or compromise all tax matters without reimbursement or adjustment between principal or income or in favor of any beneficiary.

-12-

4836-8867-4725, v. 1

Exhibit 2

8.3     Generation-Skipping Transfer ("GST") Taxes. The persons liable for and sources of payment of all GST Taxes shall be in accordance with applicable law, except that any GST Tax imposed on specific distributions under this instrument shall be paid out of the residue of the trust estate and shall not be charged to the assets specifically distributed. Notwithstanding any provision of this instrument to the contrary:

8.3.1   GST Tax Exemption. My trustees may allocate any exemption from the federal GST Tax to any assets with respect to which I am the transferor for purposes of the GST Tax and may exclude any such assets from such allocation.

8.3.2   GST Protective Provisions. Any gift or funding of a pecuniary amount under this instrument shall be satisfied in cash or in kind, or partly in each. Assets allocated in kind shall be deemed to satisfy this distribution on the basis of their values at the date or dates of distribution. All pecuniary gifts and payments that are not made within fifteen (15) months of my death shall bear interest at the "appropriate rate" as that term is defined in Code Regulation Section 26.2642-2(b)(4), or any successor provision.

## ARTICLE 9
## GENERAL GOVERNING PROVISIONS

9.     General Governing Provisions.  In applying the provisions of this instrument, the following shall govern:

9.1     Governing Law. The law of Minnesota, except as specifically altered by this instrument, shall govern the meaning and legal effect of this instrument. Except as otherwise provided, all references to applicable Minnesota or federal law are to those laws in force on the date of my death and shall incorporate any subsequent amendments and successor provisions.

9.2     Duration of Trusts. All trusts established under this instrument shall terminate at the expiration of the longest period allowed by applicable law for the duration of a trust (if measuring lives are required to be identified for this purpose, the measuring lives shall be all current and contingent beneficiaries under this instrument who are living on the date of my death), and the remaining assets shall be distributed in equal shares to the beneficiaries of such trust occupying the highest generation, with the share of a deceased beneficiary of that highest generation being distributed to his or her descendants by right of representation.

9.3     Spendthrift Provisions. Neither principal nor income of any trust nor any beneficiary's interest therein shall be subject to alienation, assignment, encumbrance, appointment or anticipation by the beneficiary, to garnishment, attachment, execution or bankruptcy proceedings, to claims for alimony or support or any other claims of any creditor or other person against the beneficiary or to any other transfer, voluntary or involuntary, by or from any beneficiary; provided, however, that the foregoing shall not restrict the exercise of any power of appointment granted hereunder, and that any principal distributable to any beneficiary at a specified date shall be fully alienable by such beneficiary after such date. Notwithstanding the foregoing, this provision does not prevent the Independent Trustee's exercise of discretion to terminate any trust in accordance with this instrument.

-13-

Exhibit 2

9.4    Retirement Accounts.  The trustees shall administer any Retirement Accounts as follows:

9.4.1    Distributions.  If any Retirement Account benefits are payable to a trust, the trustee may direct the trustee or custodian of the Retirement Account to make such distributions from my Retirement Account to such trust as are permitted under the applicable plan document or Retirement Account agreement as the trustee deems advisable; provided, however, that the trustee shall make all distribution elections permitted under the applicable plan document or Retirement Account agreement in a manner which will ensure that annual distributions from the Retirement Account to such trust will not be less than the amount required under Section 401(a)(9) of the Code and applicable regulations (referred to within this Agreement as the "Minimum Distribution Amount").

9.4.2    Limitations.  Despite any other provision of this Agreement or state law, and except as otherwise provided in this Paragraph:

9.4.2.1    Distribution After Beneficiary Determination Date.  The trustee may not, on or after a Beneficiary Determination Date, distribute to or for the benefit of my estate, any charitable organization or any other non-individual beneficiary any Retirement Account payable or allocable to a trust created under this Agreement.  It is my intent that all such Retirement Accounts held by or payable to any trust under this Agreement on or after a Beneficiary Determination Date only be distributed to or held for the benefit of individual beneficiaries within the meaning of Section 401(a)(9) of the Code and applicable regulations.

9.4.2.2    Payments.  I direct that no Retirement Account may be used or applied, on or after a beneficiary Determination Date, for payment of my debts or other claims against my estate, for expenses of administration of my estate, or for payment of any estate taxes attributable to my death.  This Paragraph shall not apply to any devise, expense, or tax liability which is directed by other provisions of this Agreement to be funded with Retirement Accounts.

9.4.2.3    Powers of Appointment.  At any time that a beneficiary of a trust hereunder is exercising a power of appointment with respect to a trust that includes one or more Retirement Accounts, the eligible appointees of such power shall include only individuals (or a trust for said individuals which satisfies all of the requirements applicable to Retirement Accounts held in trust under this Agreement) born in the same or a later calendar year than a beneficiary exercising such power.

9.4.3    No Power to Appoint.  No person shall have any power of appointment, exercisable in a fiduciary capacity or otherwise, over Retirement Account assets during the lifetime of such person.

9.5    Powers of Appointment.  The following provisions apply to each power of appointment created by this instrument:

-14-

Exhibit 2

9.5.1 <u>Method of Exercise</u>. The beneficiary may only exercise the power in the beneficiary's Will or, where permitted, in a separate writing delivered to the trustees, in each case expressly referring to the power of appointment. The trustees shall presume that there has been no valid exercise of such power unless a document exercising such power (or a certified copy thereof) is delivered to the trustees: (i) within ninety (90) days after the death of the person having such power, in the case of a power taking effect at death, or (ii) prior to the date on which such power is to take effect in all other cases. The trustees shall not be liable to any person for any action taken (including, but not limited to, distributions) in reliance on such presumption.

9.5.2 <u>General Powers</u>. At any time that a beneficiary is given a general power of appointment, unless such power is otherwise limited, such power: (i) shall be exercisable in favor of the exercising beneficiary, his or her creditors, the beneficiary's estate, or the creditors of the beneficiary's estate; and (ii) shall not include the power to suspend the absolute ownership or power of alienation of such assets for a time longer than the maximum period permitted by applicable law.

9.5.3 <u>Priority Among Documents</u>. Unless otherwise indicated, the later executed of any documents exercising such a power shall be deemed to revoke any earlier document in conflict with it.

9.5.4 <u>Release of Power</u>. All powers of appointment created by this instrument are releasable in whole or in part and are also reducible so as to reduce or limit the objects in whose favor the powers otherwise might be exercised, or the terms or duration of the interests that might otherwise be created. A release or reduction of a power of appointment shall be accomplished by a written instrument delivered to the trustees.

9.5.5 <u>Effect of Exercise</u>. If a beneficiary dies before receiving the entire balance of his or her trust, the trustees shall distribute the trust in accordance with the beneficiary's exercise of the power. If the power is not exercised, the trustees shall distribute the trust as directed by the provisions of this instrument governing distribution of the trust absent exercise of the power.

9.6 <u>Definitions</u>. The following definitions shall govern this instrument:

9.6.1 "<u>Beneficiary Determination Date</u>" means the date prescribed by Treasury Regulations Section 1.401(a)(9)-4, A-6(b) or other applicable law as the final date of determining whether the beneficiary of any trust under this instrument may be treated as a "designated beneficiary" under Treasury Regulations Section 1.401(a)(9)-4, A-5 or other applicable law.

9.6.2 "<u>By right of representation</u>" means division into as many shares as there are surviving children of the person whose descendants are referred to and deceased children who left descendants who survive the person whose descendants are referred to, each surviving child receiving one (1) share and the share of each deceased child being divided among his or her descendants in the same manner.

9.6.3 "<u>Child</u>" means a descendant of the first generation.

-15-

4836-8867-4725, v. 1

Exhibit 2

9.6.4   "Code" refers to the Internal Revenue Code of 1986, as amended.

9.6.5   "Descendants" means all persons who are lineally descended from the person referred to, including legally adopted descendants and any direct lineal descendants of any such descendant.

9.6.6   "Education" includes, but is not limited to, all expenses of public and private education at any level, such as tuition, room and board, books, fees, all desirable study materials, dues, reasonable allowance and travel to and from home, as well as graduate and professional education and specialized or vocational training.

9.6.7   "Estate taxes" means any estate, inheritance, succession, transfer or other death taxes that become due because of my death (including any interest and penalties imposed with respect thereto), but excluding:

9.6.7.1   Any generation-skipping transfer taxes (or interest and penalties imposed with respect thereto); and

9.6.7.2   Any additional estate taxes imposed pursuant to Section 2032A(c) of the Code (or interest and penalties imposed with respect thereto).

9.6.8   "Generation-skipping transfer tax" or "GST Tax" means any tax imposed under Chapter 13 of the Code or a similar state statute.

9.6.9   "Incapacitated" or "Incapacity" means that a guardian or conservator has been judicially appointed for the individual, or that the personal physician of the individual has stated in a writing delivered to the trustees, other than the individual, that the individual is unable to manage his or her financial affairs with competence.

9.6.10   "Independent Trustee" means any trustee other than:

9.6.10.1   A trustee who is related or subordinate to the person holding the power to appoint such trustee under this instrument within the meaning of Section 672(c) of the Code or whose personal relationship with the person holding such power may compromise his or her independence in protecting the interests of the remainder beneficiaries of such trust; or

9.6.10.2   A trustee who is a beneficiary to whom income or principal could be distributed currently, unless the trustee's power to direct the beneficial enjoyment of the income or principal of the trust is limited by an ascertainable standard; or

9.6.10.3   A trustee who has a legal obligation to support a beneficiary to whom income or principal could be distributed currently, unless the trustee's power to direct the beneficial enjoyment of the income or principal of the trust is limited by an ascertainable standard.

-16-

4836-8867-4725, v. 1

Exhibit 2

9.6.11 "<u>Retirement Accounts</u>" means any stock bonus, pension, or profit sharing plan under Code Section 401, any individual retirement account under Code Section 408, any annuity contract or custodial account under Code Section 403, any Roth IRA under Code Section 408A, or any other retirement benefits subject to the minimum distribution rules of Code Section 401(a)(9); all references to a Retirement Account shall include any separate portion thereof treated as a separate account under Code Section 401(a)(9) and applicable regulations.

9.6.12 "<u>Surviving</u>" or "<u>living</u>" with respect to any person means that such person shall be presumed to have predeceased me if such person shall die within one hundred twenty (120) hours of my death. "Living" or "surviving" persons include persons in gestation at the time of an event, who are later born alive and survive by at least one hundred twenty (120) hours. Nothing in this paragraph is intended nor shall have the effect of changing any beneficiary's generation assignment for purposes of determining whether a transfer is a generation-skipping transfer under the Code and applicable regulations.

9.6.13 "<u>Tangible personal property</u>" includes, but is not limited to, household goods, clothing, jewelry, automobiles, and personal effects, but excludes money and money having value in excess of the face value (i.e. coin collections), and any property used in a trade or business.

9.6.14 Words and phrases shall be construed in the singular or plural and masculine, feminine, or neuter gender, according to the context. Headings of articles in paragraphs are for convenience only and shall not be resorted to for interpretation.

The grantor and trustee have signed this Trust Agreement effective as of the date appearing at the beginning of this instrument.

_Witness Signature_

_Witness Signature_

AVIEL GOODMAN, Grantor

_Witness Signature_

_Witness Signature_

MALKA L. GOODMAN, Trustee

4836-8867-4725, v. 1

Exhibit 2

-18-

Exhibit 2

**SCHEDULE A TO THE**
**AVIEL GOODMAN**
**REVOCABLE TRUST AGREEMENT**

4836-8867-4725, v. 1

Exhibit 2

## TANGIBLE PERSONAL PROPERTY
## OF
## AVIEL GOODMAN

I direct my trustees to distribute to each person named below who survives me the following item(s) of my tangible personal property set forth opposite the name of such person. This list was prepared by me or at my direction on the date set forth below.

|  | Item | Beneficiary |
|---|---|---|
| 1. |  |  |
| 2. |  |  |
| 3. |  |  |
| 4. |  |  |
| 5. |  |  |
| 6. |  |  |
| 7. |  |  |
| 8. |  |  |
| 9. |  |  |
| 10. |  |  |

DATED: ___2/1/20___          _____
                              AVIEL GOODMAN

NOTE: This document <u>cannot</u> be used to dispose of money, money having value in excess of the face value (i.e. coin collections,) and/or any property used in a trade or business. You can supplement this list or create a new list; however, any new list or additional pages must be in your own handwriting or signed by you to be effective.

Exhibit 2



## ASSIGNMENT OF INSURANCE CLAIM/PROCEEDS

Aviel Li Goodman states and alleges as follows:

1. I am the owner of a house located at 1347 Summit Avenue, St. Paul, MN 55105.

2. In November, 2018, my house was insured by Economy Premier Assurance Company, policy number 6557430730.

3. I am aware that, on September 30, 2019, Economy Premier Assurance Company's counsel produced a "certified" insurance policy stating that policy number 6557430730 was issued by Economy Preferred Insurance Company.

4. My house suffered a water-damage loss in November, 2018. Through my mother, who had power of attorney, I submitted a claim to Economy Premier Assurance Company.

5. The claim was adjusted by Spencer Funk, who acted as a Large Loss Claims Adjuster for Economy Premier Assurance Company.

6. On January 20, 2019, Mr. Funk, acting on behalf of Economy Premier Assurance Company, denied coverage for the claim.

7. I hereby assign any and all claims for insurance coverage from any and all insurance carriers, whether arising in contract, tort, equity, or pursuant to statutory authority, to the Aviel Goodman Revocable Trust.

Exhibit 2

8. This assignment is not intended as a release of any claims (in contract, tort, equity, or pursuant to statutory authority) under any insurance policy issued to me that may provide coverage for the above-described loss.

_2/1/20_
Dated

_Aviel Li Goodman_

_Witness_

_Witness_

Page **2** of **2**

Exhibit 2



PLAINTIFF'S
EXHIBIT
4
Goodman

# STATUTORY SHORT FORM POWER OF ATTORNEY

## MINNESOTA STATUTES, SECTION 523.23

Before completing and signing this form, the principal must read and initial the IMPORTANT NOTICE TO PRINCIPAL that appears after the signature lines in this form. Before acting on behalf of the principal, the attorney(s)-in-fact must sign this form acknowledging having read and understood the IMPORTANT NOTICE TO ATTORNEY(S)-IN-FACT that appears after the notice to the principal.

PRINCIPAL (Name and Address of the Person Granting the Power)

AVIEL GOODMAN

1347 Summit

St. Paul, MN

ATTORNEY(S)-IN-FACT
(Name and Address)

MALKA L. GOODMAN

1045 Davern Street

St. Paul, MN 55116

SUCCESSOR ATTORNEY(S)-IN-FACT
(Optional) To act if any named attorney-in-fact dies, resigns, or is otherwise unable to serve.

(Name and address)

First Successor:

PAULA GOODMAN MACCABEE

1961 Selby Ave.

St. Paul, MN 55104

NOTICE:  If more than one attorney-in-fact is designated to act at the same time, make a check or "x" on the line in front of one of the following statements:

_X_     Each     attorney-in-fact     may independently exercise the powers granted.

_____     All attorneys-in-fact must jointly exercise the powers granted.

EXPIRATION DATE (Optional)

NONE_____     _____     _____
Use Specific Month     Day     Year Only

Exhibit 2

I, AVIEL GOODMAN, hereby appoint the above named Attorney(s)-in-Fact to act as my attorney(s) in fact:

FIRST:  To act for me in any way that I could act with respect to the following matters, as each of them is defined in Minnesota Statutes, Section 523.24:

(To grant to the attorney-in-fact any of the following powers, make a check or "x" on the line in front of each power being granted.  You may, but need not, cross out each power not granted.  Failure to make a check or "x" on the line in front of the power will have the effect of deleting the power unless the line in front of the power of (N) is checked or X-ed.)

Check or "x"

_____     (A)    real property transactions;
             I choose to limit this power to real property in _____
             County, Minnesota, described as follows:  (Use legal description.  Do not use street address.)

             _____
             _____
             _____
             _____

             (If more space is needed, continue on the back or an attachment.)

_____     (B)    tangible personal property transactions;
_____     (C)    bond, share and commodity transactions;
_____     (D)    banking transactions;
_____     (E)    business operating transactions;
_____     (F)    insurance transactions;
_____     (G)    beneficiary transactions;
_____     (H)    gift transactions;
_____     (I)    fiduciary transactions;
_____     (J)    claims and litigation;
_____     (K)    family maintenance;
_____     (L)    benefits from military service;
_____     (M)   records, reports, and statements;
  X      (N)    all of the powers listed in (A) through (M) above and all other matters, other than health care decisions under a health care directive that complies with Minnesota Statutes, chapter 145C.

SECOND:  (You must indicate below whether or not this power of attorney will be effective if you become incapacitated or incompetent.  Make a check or "X" on the line in front of the statement that expresses your intent.)

   X     This power of attorney shall continue to be effective if I become incapacitated or incompetent.

_____    This power of attorney shall not be effective if I become incapacitated or incompetent.

4844-0554-3810, v. 1

Exhibit 2

THIRD:  My attorney(s)-in-fact MAY NOT make gifts to the attorney(s)-in-fact, or anyone the attorney(s)-in-fact are legally obligated to support, UNLESS I have made a check or an "x" on the line in front of the second statement below and I have written in the name(s) of the attorney(s)-in-fact.   The second option allows you to limit the gifting power to only the attorney(s)-in-fact you name in the statement.  Minnesota Statutes, section 523.24, subdivision 8, clause (2), limits the annual gift(s) made to my attorney(s)-in-fact, or to anyone the attorney(s)-in-fact are legally obligated to support, to an amount, in the aggregate, that does not exceed the federal annual gift tax exclusion amount in the year of the gift.

_____X_____   I do not authorize any of my attorney(s)-in-fact to make gifts to themselves or to anyone the attorney(s)-in-fact have a legal obligation to support.

_____   I authorize _____NONE_____, as my attorney(s)-in-fact, to make gifts to themselves or to anyone the attorney(s)-in-fact have a legal obligation to support.

FOURTH:  (You must indicate below whether or not the attorney-in-fact is required to make an accounting.  Make a check or "X" on the line in front of the statement that expresses your intent.)

_____X_____   My attorney-in-fact need not render an accounting unless I request it or the accounting is otherwise required by Minnesota Statutes, Section 523.21.

_____   My attorney-in-fact must render _____ accountings to me or
                                                            (Monthly, Quarterly, Annual)

_____
                                          (Name and Address)
during my lifetime, and a final accounting to the personal representative of my estate, if any is appointed, after my death.

In Witness Whereof, I have hereunto signed my name this _6th_ day of December, 2018.

_____
AVIEL GOODMAN

(Acknowledgment of Principal)

STATE OF MINNESOTA    )
                                        ) ss.
COUNTY OF Sherburne    )

The foregoing instrument was acknowledged before me this _6th_ day of December, 2018, by AVIEL GOODMAN.
                (Insert Name of Principal)

SUSAN J LINK
Notary Public-Minnesota
My Commission Expires Jan 31, 2020

_____
(Signature of Notary Public or other Official)

4844-0554-3810, v. 1

3

Exhibit 2

Acknowledgement of notice to attorney(s)-in-fact and specimen signature of attorney(s)-in-fact.

By signing below, I acknowledge I have read and understand the IMPORTANT NOTICE TO ATTORNEY(S)-IN-FACT required by Minnesota Statutes, section 523.23, and understand and accept the scope of any limitations to the powers and duties delegated to me by this instrument.

(Notarization not required)

_____
MALKA L. GOODMAN

_____
PAULA GOODMAN MACCABEE

This instrument was drafted by:
Susan J. Link, Esq.
Maslon LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
(612) 672-8200

Specimen Signature of Attorney(s)-in-Fact
(Notarization not required)

_____
MALKA L. GOODMAN

_____
PAULA GOODMAN MACCABEE

4

4844-0554-3810, v. 1

Exhibit 2

## IMPORTANT NOTICE TO THE PRINCIPAL

READ THIS NOTICE CAREFULLY. The power of attorney form that you will be signing is a legal document. It is governed by Minnesota Statutes, chapter 523. If there is anything about this form that you do not understand, you should seek legal advice.

PURPOSE: The purpose of the power of attorney is for you, the principal, to give broad and sweeping powers to your attorney(s)-in-fact, who is the person you designate to handle your affairs. Any action taken by your attorney(s)-in-fact pursuant to the powers you designate in this power of attorney form binds you, your heirs and assigns, and the representative of your estate in the same manner as though you took the action yourself.

POWERS GIVEN: You will be granting the attorney(s)-in-fact power to enter into transactions relating to any of your real or personal property, even without your consent or any advance notice to you. The powers granted to the attorney(s)-in-fact are broad and not supervised. THIS POWER OF ATTORNEY DOES NOT GRANT ANY POWERS TO MAKE HEALTH CARE DECISIONS FOR YOU. TO GIVE SOMEONE THOSE POWERS, YOU MUST USE A HEALTH CARE DIRECTIVE THAT COMPLIES WITH MINNESOTA STATUTES, CHAPTER 145C.

DUTIES OF YOUR ATTORNEY(S)-IN-FACT: Your attorney(s)-in-fact must keep complete records of all transactions entered into on your behalf. You may request that your attorney(s)-in-fact provide you or someone else that you designate a periodic accounting, which is a written statement that gives reasonable notice of all transactions entered into on your behalf. Your attorney(s)-in-fact must also render an accounting if the attorney-in-fact reimburses himself or herself for any expenditure they made on behalf of you. An attorney-in-fact is personally liable to any person, including you, who is injured by an action taken by an attorney-in-fact in bad faith under the power of attorney or by an attorney-in-fact's failure to account when the attorney-in-fact has a duty to account under this section. The attorney(s)-in-fact must act with your interests utmost in mind.

TERMINATION: If you choose, your attorney(s)-in-fact may exercise these powers throughout your lifetime, both before and after you become incapacitated. However, a court can take away the powers of your attorney(s)-in-fact because of improper acts. You may also revoke this power of attorney if you wish. This power of attorney is automatically terminated if the power is granted to your spouse and proceedings are commenced for dissolution, legal separation, or annulment of your marriage. This power of attorney authorizes, but does not require, the attorney(s)-in-fact to act for you. You are not required to sign this power of attorney, but it will not take effect without your signature. You should not sign this power of attorney if you do not understand everything in it, and what your attorney(s)-in-fact will be able to do if you do sign it.

Please place your initials on the following line indicating you have read this IMPORTANT NOTICE TO THE PRINCIPAL: ___AG___

5

Exhibit 2

## IMPORTANT NOTICE TO THE ATTORNEY(S)-IN-FACT

You have been nominated by the principal to act as an attorney-in-fact. You are under no duty to exercise the authority granted by the power of attorney. However, when you do exercise any power conferred by the power of attorney, you must:

(1) act with the interests of the principal utmost in mind;

(2) exercise the power in the same manner as an ordinarily prudent person of discretion and intelligence would exercise in the management of the person's own affairs;

(3) render accountings as directed by the principal or whenever you reimburse yourself for expenditures made on behalf of the principal;

(4) act in good faith for the best interest of the principal, using due care, competence, and diligence;

(5) cease acting on behalf of the principal if you learn of any event that terminates this power of attorney or terminates your authority under this power of attorney, such as revocation by the principal of the power of attorney, the death of the principal, or the commencement of proceedings for dissolution, separation, or annulment of your marriage to the principal;

(6) disclose your identity as an attorney-in-fact whenever you act for the principal by signing in substantially the following manner:

Signature by a person as "attorney-in-fact for (name of principal)" or "(name of the principal) by (name of the attorney-in-fact) the principal's attorney-in-fact";

(7) acknowledge you have read and understood this IMPORTANT NOTICE TO THE ATTORNEY(S)-IN-FACT by signing the power of attorney form. You are personally liable to any person, including the principal, who is injured by an action taken by you in bad faith under the power of attorney or by your failure to account when the duty to account has arisen.

The meaning of the powers granted to you is contained in Minnesota Statutes, chapter 523. If there is anything about this document or your duties that you do not understand, you should seek legal advice.

Exhibit 2



PLAINTIFF'S
EXHIBIT
5
Goodman
PENGAD 800-631-6989

# July · 2018

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Notes |
|---|---|---|---|---|---|---|---|
| **1** Ariel 6:00 | **2** Rosie + here Dinner 7:00 | **3** | **4** Rosenthal 11:00 pool party | **5** Marilyn 11:00 am | **6** 10:00 Ellie tal | **7** Dianne lunch 12:00 Rhabort 3:30 Maya sleeping | |
| **8** 6:00 Ariel | **9** wA Tran 12:00 pl Karen + Nino 7:00 Rosie's | **10** 11:30 Bill W. 2:50 Mali 8:30 Paula | **11** (Thrift) 1:00 PM Guthrie W Side Story | **12** Marilyn call +1:00 | **13** Mali 9:35 Village Hartland Lunch La Grolla 12:30 lunch good | **14** Lillie's BD 11:00 | 118 Graveland Ter RSVP |
| **15** Ariel 6:00 | **16** Mali 8:30 11:30 | **17** Mali 8:30 11:30 | **18** Marilyn 11:00 | **19** Mali 8:30 11:30 | **20** Mali 8:30 2 Lisa (home travel) Ariel's Hearing 1:00 PM Mn Orchestra | **21** List & Law 10:00 – 1:00 Dianne 8:00 PM 7:00 | |
| **22** Matana 8:00 – 9:00 | **23** Nirvana Mali 3:00 Parkway auto can'd good | **24** Nirvana 2:30 Mali 11:30 Smoaller | **25** Nirvana Mali 8:30 11:30 Shop Make Borsch shanks | **26** Nirvana Mali 8:30 11:30 Marilyn 12:00 | **27** Nirvana da di at Law 12:00 Ariel + Lisa Lillie Sheila 3:45 | **28** Annie lunch Judy 6:30 dinner here | **June 2018** S M T W T F S ... |
| **29** dinner Mac | **30** Parkway auto | **31** 10:00 Matana 3:20 Dr Caperton | | | | | **August 2018** S M T W T F S ... |

# August

Hartford
5:30
4th House

# 2018

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Notes |
|---|---|---|---|---|---|---|---|
| | | | **1** 10:00 Walena 1:30 Anne 3hrs Doug Lunch | **2** Cecil - 4pm Majel - lunch Mali 5:30 Shop Print 200 | **3** 8:30 am annie 3hrs | **4** Taylor 1:30 | |
| **5** back | **6** | **7** deposit 1st B/n Pirelle Julia 1:30 | **8** 11:00 Marilyn | **9** 9:45 Sara Whittaker podiatrist | **10** 3hrs 9:00 Annie 10:00 Falconer Woodwinds | **11** | |
| **12** 18-12 tech compost | **13** 10:30 Bill 10:30 Walter 11:00 - 1:00 compost tech | **14** Vota !!! Dienne 4:15 Mali Patina | **15** 7:30 Window washers Marilyn | **16** Angela 12:00 N | **17** 7:00 Lunch 4:00 3:45 Mali - Patina | **18** 5:30 dinner hers, naturally! # | |
| **19** | **20** 10:20 lab 10:40 Domingo Patina Mali 345 4:00 | **21** Epilepsy Fair 287-2300 12:00 Lunch (Aaron 12:15) W. A. Frost 2:30 Sara | **22** Bill call 9:00 4:00 | **23** call Marilyn Aziel 12:00 t & Julie | **24** rental car Raymond 10:00 am Dinner C Maccabees & Ryan 4:30 | **25** annie 8:00 Walena 8:00 Jewel Theater | July 2018 S M T W T F S 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 31 |
| **26** Lisa & Benny 9:10 | **27** Suzanna Lisa & Benny 9:30 Raymond 10:30 Toey & Gel clean # | **28** Mario | **29** Shilo & Mary Anna Camellia | **30** 11:00 Marilyn 7:00 Dienne dinner | **31** Bill & Steve 10:00 Valent am Parking office ) 4:00 Mali | c Sheila Hamilton 3:00 11:15 PM - Sheila | September 2018 S M T W T F S 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 |

# September 2018

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Notes |
|---|---|---|---|---|---|---|---|
| | | | | | | 1 — 2 PM Hamilton J sheila Rosies — אולמ ביצה | |
| 2 Labor Day | 3 Oleg + Viena 4:00 Ryaboy at al-Kills | 4 Bdg details 10:30 Make condiments 6:00 Deanne dinner | 5 8:50 Mali 8:45 Marilyn 11:00 ? | 6 Steve Glass works see no text call before →? | 7 ? | 8 אולמ ביצה אזיכר־ | |
| 9 Rosh Hashanah, Begins at Sunset 9:30 Matana Ryaboy @ 5:00 dinner | 10 11:45 i Rosies @ 11t. Zion | 11 Temple of Aaron Diane + Rick 9:00 am | 12 12:30 w. A. Fast Judy Brier | 13 let her know Tema George Dinner here | 14 Marilyn Mali 3:10 | 15 Pay Taxes done 2:00 Shana | |
| 16 | 17 Yoffa Jerving Nadia lunch 11:45 Rosenthals dinner 8:30 here Moons 7:30 | 18 | 19 11:45 P.I. after veg Feast | 20 Mali 7:05 Marilyn 11:00 (call!) | 21 11:30 Jean Haircut Roto-Rooter | 22 annie 8:00 | August 2018 S M T W T F S  1 2 3 4  5 6 7 8 9 10 11  12 13 14 15 16 17 18  19 20 21 22 23 24 25  26 27 28 29 30 31 |
| 23 @ Mare ate 4:30 | 24 10:40 — 12:00 2:30 @ Paula for Benny | 25 desk work | 26 12:15 Sheila 5:00 + Deanne dinner | 27 11:00 am. MN Orchestra OK ICE 7:00 — 9:00 | 28 SPCO check! ? Mali 3:10 | 29 deposit Hazardous waste @ D Shepard Mariska dentist 5:00 | October 2018 S M T W T F S  1 2 3 4 5 6  7 8 9 10 11 12 13  14 15 16 17 18 19 20  21 22 23 24 25 26 27  28 29 30 31 |
| 30 Color Hair! | | | | | | | |

Goodman-00509
Exhibit 2

# October

## 2018

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Notes |
|---|---|---|---|---|---|---|---|
| | 1 *[scribble]* get Rx hydrocodone | 2 *[scribble]* New Sukkah/first bicycle day Tailor . Rx | 3 *[scribble]* 11:00 Marilyn | 4 done (copy letter!) | 5 Shana 2:30PM Denver 6:30 Maccabee | 6 Creative Kidstuff Liat + Lisa Post office | ← bring letter + chicken |
| 7 Liat's birthday at home. ✓ Maccabee let her know | 8 Columbus Day | 9 18:00 Leora-Mission 7th & Marquett | 10 11:00 Marilyn | 11 | 12 lunch? Nadia | 13 7:00 Maya + Liat ✓ Nadia breakfast | |
| 14 ☆ 3:00 PM Opera La Rondine | 15 chase + ... with Paula here | 16 18:30 Carolyn Abramson meet w/ami etc galleria ... | 17 12:30 Dr. Schwartz St Paul 1347 Summit | 18 ✗ 11:00 am Minn. Orchestra PDB 18 ☙ Marilyn 9:45 am ✓ | 19 8:30 Annie Shana 3:00 7/xxx walk by river | 20 | |
| 21 | 22 | 23 (952) 451-1661 Mike 9:00-10:00 lunch : Karen + Sa gate ... 12:30 Nino + 1347 Summit | 24 9:00 am Meredyn H:00 Nadia + ... | 25 call! Marilyn 11:00 ✓ check schedule | 26 Amalia ☆ Liat am 10:50 Ryaberg dinner | 27 ☆ 3:00 Musical Rosies Beautiful | **September 2018** S M T W T F S  1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 |
| 28 10:00 PM Play Shana family change tickets ✓ Mac | 29 Anskin 8:00-10:00 am dentist 12:45 Mail 1:30 Jill here | 30 3:50 Walterud 7:30 Schubert ... music theatre | 31 Mali 8:40 Ariel's House 11:30 Ariel | | | | **November 2018** S M T W T F S  1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 29 30 |

Exhibit 2

# November

2018

| Sunday | Monday | Tuesday | Wednesday |
|---|---|---|---|
| | | | |
| 4 Parade 9:45 Lisa's BD Eden Prairie Comm center 10:15am | 5 Nadia lunch where & when? | 6 Vote! 2:00 Dave (hall) | 7 Aviel's House 11:00 Marilyn |
| 11 am Mali come here 10 2:00 PM Opera Silent night | 12 am 1347 Summit 10:00-10:30 John | 13 11:00 Katie here 5PCO | 14 Mali 8:40 Marilyn Aviel's House Rosie's → Airport 4:30 PM |
| 18 | 19 To & from school 3:45-12:15 TenAdam 5:00 Sheila Airport 4:00 PM | 20 9:00am (basement) 10 year Tech Got Text from Jeannie Flood | 21 34 10:30 John 3:00 Lunch Highland Electric |
| 25 | 26 11:00 Summit 1347 11:50 Caperton 3:00-3:30 plumber Kelly Plumber | 27 9:00 1347 Summit Jamie basement 1:30 am cleaner | 28 9:30 Steve Summit? |

| Thursday | Friday | Saturday | Notes |
|---|---|---|---|
| 1 1:30 Mali from Salby Marilyn 10:30 4:00 class | 2 Rx meds glasses Sheila 12:30 Book store | 3 books mailed | |
| 8 Books arrived Mali from Salby's @ 1:30 | 9 9:00-8 Centering 6:00-6:30 dinner Sheila | 10 Sheila to Creative lighting 3:00 | |
| 15 to & from Salby 8:30 & 1:30 11:00 am Minn Orchestra | 16 11:00am SPCO | 17 To Nadia Kids 11:00 ? | |
| 22 4:00 Kryboy fruit + fruit cake | 23 Electrician 9:00 1347 Summit | 24 | October 2018 |
| 29 11:00 Marilyn | 30 Carpenter (Jamie) 8:30 Nadia et al | | December 2018 |

 **Loyear Disaster Restoration Services, LLC**

PLAINTIFF'S
EXHIBIT
6
Goodman
PENGAD 800-631-6989

12825 Industrial Park Blvd
Plymouth, MN 55441

| | | | |
|---|---|---|---|
| Client: | Goodman, Aviel | Home: | (651) 470-8545 |
| Property: | 1347 Summit Ave | | |
| | St Paul, MN 55105-2219 | | |

| | |
|---|---|
| Operator: | JZATOCIL |

| | |
|---|---|
| Estimator: | Gary Morstad |

| | | |
|---|---|---|
| Type of Estimate: | Water Damage | |
| Date Entered: | 1/3/2019 | Date Assigned: |

| | |
|---|---|
| Price List: | MNMN8X_NOV18 |
| Labor Efficiency: | Restoration/Service/Remodel |
| Estimate: | GOOMAN-AVIEL |

**Loyear Disaster Restoration Services, LLC**
**Fed Tax ID 46-2294316**
**Please Make Checks Payable to: <u>Disaster Restoration Services, LLC</u>**

 **LOYEAR** **Loyear Disaster Restoration Services, LLC**

12825 Industrial Park Blvd
Plymouth, MN 55441

## GOOMAN-AVIEL
### 3rd Floor

**Kitchenette**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 1.  Air mover (per 24 hour period) - No monitoring (2 units x 4 days) | 8.00 | EA @ | 24.95 = | | 199.60 |
| 2.  Dehumidifier (per 24 hour period) - Large - No monitoring | 4.00 | EA @ | 71.00 = | | 284.00 |
| 3.  Neg. air fan/Air scrub.-Large (per 24 hr period)-No monit. (1 unit x 1 days) | 1.00 | DA @ | 107.19 = | | 107.19 |
| 4.  Equipment setup, take down, and monitoring (hourly charge) (.75 Hr x 2 days) | 1.50 | HR @ | 49.50 = | | 74.25 |
| 5.  Remove Tear out wood flooring and subfloor | 36.00 | SF @ | 3.14 = | | 113.04 |
| 6.  Clean floor or roof joist system | 90.00 | SF @ | 0.75 = | | 67.50 |
| 7.  Tear out and bag wet insulation | 90.00 | SF @ | 0.67 = | | 60.30 |
| 8.  Tear out baseboard | 2.00 | LF @ | 0.42 = | | 0.84 |
| 9.  Remove Base shoe | 2.00 | LF @ | 0.16 = | | 0.32 |
| 10.  Apply anti-microbial agent to the surface area | 90.00 | SF @ | 0.22 = | | 19.80 |

**Bathroom**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 11.  Air mover (per 24 hour period) - No monitoring (2 units x 3 days) | 6.00 | EA @ | 24.95 = | | 149.70 |
| 12.  Equipment setup, take down, and monitoring (hourly charge) (.75 Hr x 2 days) | 1.50 | HR @ | 49.50 = | | 74.25 |
| 13.  Clean floor or roof joist system | 140.00 | SF @ | 0.75 = | | 105.00 |
| 14.  Apply anti-microbial agent to the surface area | 140.00 | SF @ | 0.22 = | | 30.80 |
| 15.  Remove Tear out wood flooring and subfloor | 56.00 | SF @ | 3.14 = | | 175.84 |
| 16.  Tear out non-salv underlayment & bag for disposal | 56.00 | SF @ | 1.30 = | | 72.80 |
| 17.  Tear out baseboard | 22.00 | LF @ | 0.42 = | | 9.24 |
| 18.  Toilet - Detach | 1.00 | EA @ | 40.12 = | | 40.12 |
| 19.  Pedestal sink - Detach | 1.00 | EA @ | 45.89 = | | 45.89 |
| 20.  Remove P-trap assembly - ABS (plastic) | 1.00 | EA @ | 6.75 = | | 6.75 |
| 21.  Remove Plumbing fixture supply line | 2.00 | EA @ | 4.50 = | | 9.00 |
| 22.  Remove Tub/shower faucet | 1.00 | EA @ | 22.53 = | | 22.53 |
| 23.  Remove Bathtub | 1.00 | EA @ | 67.57 = | | 67.57 |

**Living Room**

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|

GOOMAN-AVIEL                                          2/19/2019          Page: 2

 **LOYEAR** **Loyear Disaster Restoration Services, LLC**

12825 Industrial Park Blvd
Plymouth, MN 55441

**CONTINUED - Living Room**

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 24. Dehumidifier (per 24 hour period) - XLarge - No monitoring (1 unit x 26 days -13 days at no charge.) | 13.00 | EA @ | 101.25 = | 1,316.25 |
| 25. Equipment setup, take down, and monitoring (hourly charge) (.75 Hr x 2 days) | 1.50 | HR @ | 49.50 = | 74.25 |
| 26. Content Manipulation charge - per hour | 1.00 | HR @ | 39.95 = | 39.95 |
| 27. Water Extraction & Remediation Technician - per hour - Remove radiator cover | 1.00 | HR @ | 49.50 = | 49.50 |
| 28. Remove Tear out wood flooring and subfloor | 24.00 | SF @ | 3.14 = | 75.36 |
| 29. Clean floor or roof joist system | 60.00 | SF @ | 0.75 = | 45.00 |
| 30. Tear out and bag wet insulation | 60.00 | SF @ | 0.67 = | 40.20 |
| 31. Tear out baseboard | 5.00 | LF @ | 0.42 = | 2.10 |
| 32. Remove Base shoe | 5.00 | LF @ | 0.16 = | 0.80 |

**2nd Floor**

**Study & Hall**

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 33. Air mover (per 24 hour period) - No monitoring (4 units x 19 days - 38 at no charge.) | 38.00 | EA @ | 24.95 = | 948.10 |
| 34. Dehumidifier (per 24 hour period) - XLarge - No monitoring (1 unit x 19 days - 9.5 at no charge.) | 9.50 | EA @ | 101.25 = | 961.88 |
| 35. Neg. air fan/Air scrub.-Large (per 24 hr period)-No monit. (1 unit x 10 days - 5 at no charge.) | 5.00 | DA @ | 107.19 = | 535.95 |
| 36. Equipment setup, take down, and monitoring (hourly charge) (1 Hr x 2 days) | 2.00 | HR @ | 49.50 = | 99.00 |
| 37. Content Manipulation charge - per hour (Pack & box extensive amount of books and art objects) | 28.00 | HR @ | 39.95 = | 1,118.60 |
| 38. Provide box, packing paper & tape - medium size | 41.00 | EA @ | 3.08 = | 126.28 |
| 39. Water extraction from area rugs- Heavy | 130.00 | SF @ | 0.57 = | 74.10 |
| 40. Tear out wet non-salvageable carpet runner, cut & bag for disp. | 40.00 | SF @ | 0.49 = | 19.60 |
| 41. Tear out wet carpet pad and bag for disposal | 130.00 | SF @ | 0.46 = | 59.80 |
| 42. Remove Tear out wood flooring and subfloor | 224.00 | SF @ | 3.14 = | 703.36 |
| 43. Remove Pad - felt | 224.00 | SF @ | 0.12 = | 26.88 |
| 44. Tear out baseboard | 28.00 | LF @ | 0.42 = | 11.76 |
| 45. Remove Base shoe | 28.00 | LF @ | 0.16 = | 4.48 |
| 46. Remove Crown molding - 3 1/4" | 56.00 | LF @ | 0.97 = | 54.32 |
| 47. Floor protection - self-adhesive plastic film (15 stairs) | 90.00 | SF @ | 0.56 = | 50.40 |

**Goodman-00105**
Exhibit 2

 **Loyear Disaster Restoration Services, LLC**

12825 Industrial Park Blvd
Plymouth, MN 55441

**CONTINUED - Study & Hall**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 48.  Tear out trim | 2.00 | LF @ | 0.42 | = | 0.84 |
| 49.  Tear out wet plaster, cleanup, bag for disposal | 224.00 | SF @ | 1.84 | = | 412.16 |
| 50.  Clean floor or roof joist system | 224.00 | SF @ | 0.75 | = | 168.00 |
| 51.  Apply anti-microbial agent to the surface area | 784.00 | SF @ | 0.22 | = | 172.48 |

**General**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 52.  Dehumidifier (per 24 hour period) - XLarge - No monitoring (1 unit x 26 days - 13 at no charge.) | 13.00 | EA @ | 101.25 | = | 1,316.25 |
| 53.  Equipment setup, take down, and monitoring (hourly charge) (.75 Hr x 2 days) | 1.50 | HR @ | 49.50 | = | 74.25 |
| 54.  Content Manipulation charge - per hour | 2.00 | HR @ | 39.95 | = | 79.90 |
| 55.  Floor protection - heavy paper and tape | 340.00 | SF @ | 0.28 | = | 95.20 |

**1st Floor**

| **Kitchen & W Entry** | **LxWxH 15' 6" x 13' 10" x 10'** |
|---|---|
| **Subroom 1:  Offset 1** | **LxWxH 8' x 7' 8" x 10'** |
| **Subroom 2:  Offset 2** | **LxWxH 9' x 5' 9" x 10'** |

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 56.  Air mover (per 24 hour period) - No monitoring (6 units x 26 days - 78 at no charge.) | 78.00 | EA @ | 24.95 | = | 1,946.10 |
| 57.  Dehumidifier (per 24 hour period) - XLarge - No monitoring (1 unit x 26 days - 13 at no charge.) | 13.00 | EA @ | 101.25 | = | 1,316.25 |
| 58.  Neg. air fan/Air scrub.-Large (per 24 hr period)-No monit. (1 unit x 19 days - 9.5 at no charge.) | 9.50 | DA @ | 107.19 | = | 1,018.31 |
| 59.  Equipment setup, take down, and monitoring (hourly charge) (2 Hr x 3 days) | 6.00 | HR @ | 49.50 | = | 297.00 |
| 60.  Clean walls - Heavy | 124.00 | SF @ | 0.35 | = | 43.40 |
| 61.  Content Manipulation charge - per hour (Pack & box cabinet contents) | 20.00 | HR @ | 39.95 | = | 799.00 |
| 62.  Provide box, packing paper & tape - medium size | 58.00 | EA @ | 3.08 | = | 178.64 |
| 63.  Remove Tear out wood flooring and subfloor | 286.00 | SF @ | 3.14 | = | 898.04 |

GOOMAN-AVIEL                                    2/19/2019          Page: 4

 **Loyear Disaster Restoration Services, LLC**

12825 Industrial Park Blvd
Plymouth, MN 55441

**CONTINUED - Kitchen & W Entry**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 64. Remove Pad - felt | 286.00 | SF @ | 0.12 = | | 34.32 |
| 65. Remove Crown molding - 3 1/4" | 66.00 | LF @ | 0.97 = | | 64.02 |
| 66. Tear out trim | 3.00 | LF @ | 0.42 = | | 1.26 |
| 67. Tear out wet drywall, cleanup, bag for disposal | 485.00 | SF @ | 0.82 = | | 397.70 |
| 68. Tear out and bag wet insulation | 457.00 | SF @ | 0.67 = | | 306.19 |
| 69. Remove Chandelier | 1.00 | EA @ | 16.89 = | | 16.89 |
| 70. Remove Track lighting - track only | 20.00 | LF @ | 2.81 = | | 56.20 |
| 71. Remove Fixture (can) for track lighting | 12.00 | EA @ | 1.88 = | | 22.56 |
| 72. Remove Outlet | 3.00 | EA @ | 4.53 = | | 13.59 |
| 73. Sink - double bowl - Detach | 1.00 | EA @ | 25.88 = | | 25.88 |
| 74. Remove Garbage disposer | 1.00 | EA @ | 22.53 = | | 22.53 |
| 75. Remove P-trap assembly - ABS (plastic) | 1.00 | EA @ | 6.75 = | | 6.75 |
| 76. Dishwasher - Detach | 1.00 | EA @ | 53.25 = | | 53.25 |
| 77. Refrigerator - Remove & reset | 1.00 | EA @ | 39.43 = | | 39.43 |
| 78. Cabinet - lower (base) unit - Detach | 18.00 | LF @ | 16.22 = | | 291.96 |
| 79. Cabinet - upper (wall) unit - Detach | 18.00 | LF @ | 13.87 = | | 249.66 |
| 80. Water Extraction & Remediation Technician - per hour (Extra labor to save oak cabinet faces) | 16.00 | HR @ | 49.50 = | | 792.00 |
| 81. Tear out toe kick and bag for disposal | 8.00 | LF @ | 2.65 = | | 21.20 |
| 82. Countertop - solid surface/granite - Detach | 52.00 | SF @ | 7.00 = | | 364.00 |
| 83. Remove Backsplash - solid surface - Unattached | 13.00 | LF @ | 0.82 = | | 10.66 |
| 84. HEPA Vacuuming - Detailed - (PER SF) | 1,808.50 | SF @ | 0.76 = | | 1,374.46 |
| 85. Clean the ceiling | 327.50 | SF @ | 0.28 = | | 91.70 |
| 86. Clean floor or roof joist system | 286.00 | SF @ | 0.75 = | | 214.50 |
| 87. Apply anti-microbial agent to ceiling, walls, floor, and joists | 1,850.00 | SF @ | 0.22 = | | 407.00 |
| 88. Clean stud wall | 485.00 | SF @ | 0.62 = | | 300.70 |

**General**

| DESCRIPTION | QTY | | UNIT PRICE | | TOTAL |
|---|---|---|---|---|---|
| 89. Floor protection - self-adhesive plastic film | 192.00 | SF @ | 0.56 = | | 107.52 |

GOOMAN-AVIEL

2/19/2019       Page: 5

**Goodman-00107**
Exhibit 2

 **Loyear Disaster Restoration Services, LLC**

12825 Industrial Park Blvd
Plymouth, MN 55441

### Basement

**Laundry Room & Hall**

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 90.  Air mover (per 24 hour period) - No monitoring (4 units x 6 days) | 24.00 | EA @ | 24.95 = | 598.80 |
| 91.  Dehumidifier (per 24 hour period) - XLarge - No monitoring (1 unit x 26 days - 13 at no charge.) | 13.00 | EA @ | 101.25 = | 1,316.25 |
| 92.  Neg. air fan/Air scrub.-Large (per 24 hr period)-No monit. (1 unit x 6 days) | 6.00 | DA @ | 107.19 = | 643.14 |
| 93.  Equipment setup, take down, and monitoring (hourly charge) (1 Hr x 3 days) | 3.00 | HR @ | 49.50 = | 148.50 |
| 94.  Clean floor - Heavy | 196.00 | SF @ | 0.58 = | 113.68 |
| 95.  Apply anti-microbial agent to floor, ceiling, and joists | 515.00 | SF @ | 0.22 = | 113.30 |
| 96.  Content Manipulation charge - per hour (Laundry room contents & art exhibit crates) | 4.00 | HR @ | 39.95 = | 159.80 |
| 97.  Tear out baseboard | 8.00 | LF @ | 0.42 = | 3.36 |
| 98.  Tear out wet drywall, cleanup, bag, per LF - up to 4' tall | 8.00 | LF @ | 4.35 = | 34.80 |
| 99.  Remove Metal lath | 32.00 | SF @ | 0.68 = | 21.76 |
| 100.  Tear out wet plaster, cleanup, bag for disposal | 186.00 | SF @ | 1.84 = | 342.24 |
| 101.  Remove Suspended ceiling tile - 2' x 2' | 196.00 | SF @ | 0.21 = | 41.16 |
| 102.  Washing machine - Remove & reset | 1.00 | EA @ | 32.83 = | 32.83 |
| 103.  Dryer - Remove & reset | 1.00 | EA @ | 29.57 = | 29.57 |

**Miscellaneous**

| DESCRIPTION | QTY | | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 104.  Water Extraction & Remediation Technician - per hour (Clearing snow for access) | 2.00 | HR @ | 49.50 = | 99.00 |
| 105.  Water Extraction & Remediation Technician - per hour (Accompany tradesmen for utility & plumbing work) | 7.00 | HR @ | 49.50 = | 346.50 |
| 106.  Dumpster load - Approx. 30 yards, 5-7 tons of debris | 2.00 | EA @ | 531.20 = | 1,062.40 |
| 107.  Atlas -  Asbestos test fee - full service survey - per sample | 1.00 | EA @ | 250.00 = | 250.00 |
| 108.  Lead test fee - full service lead survey (4 swabs) | 1.00 | EA @ | 78.00 = | 78.00 |
| 109.  Highland Electric | 1.00 | EA @ | 525.00 = | 525.00 |
| 110.  Hang dry custom oriental rug in plant | 174.00 | SF @ | 0.73 = | 127.02 |
| 111.  Clean rug - large - Full service | 1.00 | EA @ | 135.95 = | 135.95 |
| 112.  Clean rug - Full service | 1.00 | EA @ | 85.49 = | 85.49 |
| 113.  Clean rug - small - Full service | 5.00 | EA @ | 26.89 = | 134.45 |
| 114.  Apply anti-microbial agent to area rugs | 174.00 | SF @ | 0.22 = | 38.28 |
| 115.  Insite Document Drying | 1.00 | EA @ | 2,288.00 = | 2,288.00 |
| 116.  Transport area rugs and documents, and return items. | 5.50 | HR @ | 49.50 = | 272.25 |
| 117.  Meet with attorney to review loss. | 4.00 | HR @ | 49.50 = | 198.00 |
| 118.  10/10 Profit & Overhead on sub-contractors | 1.00 | EA @ | 840.68 = | 840.68 |

**Goodman-00108**
Exhibit 2

 **LOYEAR** **Loyear Disaster Restoration Services, LLC**

12825 Industrial Park Blvd
Plymouth, MN 55441

## Grand Total Areas:

| | | |
|---|---|---|
| 1,195.00 SF Walls | 327.50 SF Ceiling | 1,522.50 SF Walls and Ceiling |
| 327.50 SF Floor | 36.39 SY Flooring | 119.50 LF Floor Perimeter |
| 325.00 SF Long Wall | 272.50 SF Short Wall | 119.50 LF Ceil. Perimeter |
| | | |
| 0.00 Floor Area | 0.00 Total Area | 0.00 Interior Wall Area |
| 0.00 Exterior Wall Area | 0.00 Exterior Perimeter of Walls | |
| | | |
| 0.00 Surface Area | 0.00 Number of Squares | 0.00 Total Perimeter Length |
| 0.00 Total Ridge Length | 0.00 Total Hip Length | |

GOOMAN-AVIEL

2/19/2019          Page: 7

**Goodman-00109**
Exhibit 2

 **Loyear Disaster Restoration Services, LLC**

12825 Industrial Park Blvd
Plymouth, MN 55441

## Summary

| | |
|---|---:|
| Line Item Total | 32,356.21 |
| Cleaning Sales Tax | 2,481.87 |
| **Replacement Cost Value** | **$34,838.08** |
| **Net Claim** | **$34,838.08** |

Gary Morstad

**Goodman-00110**
Exhibit 2



Disaster Restoration Services, LLC
12825 Industrial Park Blvd
Plymouth, MN  55441

**Invoice**

| Date | Invoice # |
|------|-----------|
| 2/20/2019 | 41379 |

Fed ID# 46-2294316

**Bill To**

Aviel Goodman
1347 Summit Avenue
St. Paul, MN  55105-2219

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Description | Amount |
|-------------|--------|
| Water Damage | 31,515.81T |
| Water Damage Non Taxable | 840.40 |

| | |
|---|---|
| Subtotal | $32,356.21 |
| Sales Tax  (7.875%) | $2,481.87 |
| Total | $34,838.08 |
| Payments/Credits | $0.00 |
| Balance Due | $34,838.08 |

**Please Make Checks Payable To:**
**Disaster Restoration Services LLC**
**Please Mail Checks to:**
**12825 Industrial Park Blvd Plymouth, MN  55441**

**For Your Convenience We Do Accept Payments**
**on Debit & Credit Cards.**
**Call 218.724.5800 to Make Your Payment Today.**

**Goodman-00111**
Exhibit 2

# Snelling Company

1400 Concordia Avenue
St. Paul, MN 55104
(651) 646-7381



PLAINTIFF'S
EXHIBIT
7
*Goodman*

## INVOICE

| Invoice # |
|---|
| **69691** |

**Bill To:** Aviel Goodman
1347 Summit Ave.
Saint Paul, MN 55105

**Account:** Goodman. Aviel
1347 Summit Ave
Saint Paul, MN 55105

**Account #:** 1347-SUMM *SP105*

| Date | Nov 21, 2018 | Terms | Upon Receipt | Route | Default | Job # | 31963 |
|---|---|---|---|---|---|---|---|
| Inv # | 69691 | PO # | | Territory | Snelling | Type | Other |

| Quantity | Description | Taxable | Measure | Price | Amount |
|---|---|---|---|---|---|
| 1.00 | A-3 - Diagnostic/emergency - residential | No | Flat Rate | 199.00 | $199.00 |

| Diagnostic/emergency - residential | | | | Taxable | $0.00 |
|---|---|---|---|---|---|
| | | | | Non-Taxable | $199.00 |
| | | | | Sub-Total | $199.00 |
| | | | | Sales Tax | $0.00 |
| | | | | **TOTAL** | **$199.00** |

Page 1

Rev. 11/10/99

---

*PLEASE DETACH THIS PORTION AND RETURN WITH PAYMENT*

**Snelling Company**
1400 Concordia Avenue
St. Paul, MN 55104

| Account # | 1347-SUMM SP105 Goodman. Aviel |
|---|---|
| Invoice # | 69691 |
| Amount | $ 199.00 |
| Paid | |

**Goodman-00112**
Exhibit 2



**Saint Paul**
**Kelly Plumbing**
and Heating

Serving St. Paul & Our Twin Cities Neighbors Since 1975

1932 Saint Clair Ave
St. Paul, MN  55105
(651) 699-1232

www.kellyplumbing.com

PAID
01/09/2019

PLAINTIFF'S
EXHIBIT
8
Goodman

| INVOICE | |
|---|---|
| **INVOICE NO.** | **DATE** |
| 994767 | 12/27/2018 |

| BILL TO: | PROJECT LOCATION: |
|---|---|
| Malka Goodman<br>1045 Davern Street<br>Saint Paul, MN  55116 | Malka Goodman<br>1045 Davern Street<br>Saint Paul, MN 55116 |

| TERMS | DUE DATE |
|---|---|
| Net 30 Days/1.5% Finance Charge | 1/26/2019 |

| DESCRIPTION | AMOUNT |
|---|---|
| Service at 1045 Davern St.<br>11-26-18:   Repair delta laundry faucet and 2nd floor lav faucet.  Repair toilets on 1st and 2nd floors.  Replace fill valves, flush valves,<br>tilt disc seat and supplies. | |
| Labor:  2.25 hours @ $150.00 per hour:  $337.50 | 337.50 |
| Materials:  $257.85 | 257.85 |
| Service at 1347 Summit.<br>11-27-18:  Check hour for cause of water damage.  Found broken cast - iron fitting on 3rd floor radiator. | |
| Labor:  2 hours @ $150.00 per hour:  $300.00 | 300.00 |
| TOTAL DUE:  $895.35 | |

**If you are happy with your recent service, we ask that you leave an online review(s)
for our company at the following websites:**

yelp  Google  Nextdoor    **Please help us share our great
service with others.**

| Thank you for choosing Kelly Plumbing & Heating, Inc.<br>We appreciate your business and value you as a customer. | **Total** | **$895.35** |
|---|---|---|

**Goodman-00099**
Exhibit 2



**PLAINTIFF'S EXHIBIT**
9
*Goodman*

Invoice

Highland Electric
2333 Waters Dr
Mendota Heights, MN 55120
651-690-1551

**PAID**
**04/01/2019**

| 4/1/2019 | 13980 |
|---|---|

Goodman, Malka
1045 Davern
St Paul, MN 55116

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 1 | Need to follow up with customer for electrical repairs after water damage to basement.<br><br>Work done at 1347 Summit Ave<br>      St Paul, MN 55105 | 150.00 | 150.00 |
| | | | $150.00 |

**Goodman-00098**
Exhibit 2

**MetLife Auto & Home®**
Dayton Customer Service Center
9797 Springboro Pike, Dayton, Ohio 45448

This is to certify that the attached insurance policy is a true and accurate representation of the insurance policy described below:

| | |
|---|---|
| Named Insured(s): | DR AVIEL L GOODMAN |
| Policy Type: | PAK II |
| Policy Number: | 6557430730 |
| Issuing Insurance Company: | Economy Premier Assurance Company |
| As of Date: | 11/20/2018 |

Signed by: _Dave Walter_

Notary: _Patricia L Massie_

Date: 10/31/2019



PATRICIA L MASSIE
NOTARY PUBLIC   OHIO
MY COMMISSION EXPIRES 03-25-24

MetLife® Auto & Home is a brand of Metropolitan Property and Casualty Insurance Company and its Affiliates, Warwick, RI

MPL9192-078

Printed in U.S.A. 1105

Exhibit 3

**PAK II**     **Coverage Summary**

**MetLife** Auto & Home

| | |
|---|---|
| **POLICY INFORMATION** | **Insured name and address**<br>DR. AVIEL L. GOODMAN<br>1347 SUMMIT AVENUE<br>ST. PAUL MN  55105 |

**ECONOMY PREMIER ASSURANCE COMPANY**
FREEPORT, ILLINOIS  61032
Policy Number   6657430730
Effective Date   01-05-18     12:01 A.M. Std. Time
Expiration Date  01-05-19     12:01 A.M. Std. Time

**Agency name and address**
BREMER INSURANCE AGENCIES INC
SUITE 225
633 CONCORD ST SO
SOUTH ST PAUL MN  55075
Agency phone # 651-552-2424

---

**POLICY COVERAGE LIMITS**

**Personal liability limit: $  100,000**
We'll pay up to this amount for your legal liability resulting from an occurrence in which there is actual accidental property damage, personal injury or death, subject to the limitations and exclusions in PAK II.

**Umbrella liability limit: $  1,000,000**
This limit in addition to your PAK II personal liability limit. We'll pay up to this limit for each accident or incident happening during the policy period subject to the exclusions and minimum limit requirements specified in the Personal Umbrella Liability endorsement.

**Property coverage limit: $  2,720,000**
We'll pay up to this amount for actual accidental physical damage or loss to your property covered by this policy for any one loss subject to the provisions, limitations and exclusions specified in this policy.

**Policy deductible:       $ 1,000**
We'll pay anything over this amount up to the maximum coverage limits shown. This deductible is replaced with any coverage-specific deductibles listed in your policy.

---

**POLICY CONDITIONS AND PREMIUM**

**Policy conditions**
The following forms represent attachments applicable to your entire policy. Forms applicable to a specific coverage are listed in subsequent pages of this summary.

**Premium**
Your total premium is shown below. You will receive a bill shortly that gives you the option of paying your premium in up to nine payments.

| | | | |
|---|---|---|---|
| 98986   (12-94) MN CONTRACT | **Renewal Credit of 5%** | $ | -364.00 |
| PK0026  (06-12) MN PAK II AMENDMENT | MN Property Surtax | $ | 35.85 |
| PK0062  (10-00) COMPANY CHANGE ENDORSEMENT | MN Anti-Theft Surcharge | $ | 2.00 |
| 33877   (06-99) MN PERSONAL UMBRELLA LIAB ENDR | MN Fire Surcharge | $ | 25.60 |
| | **Total annual premium** | $ | 6,939.00 |

---

**PROPERTY COVERED**

Unless otherwise stated in your policy, your property coverage and personal liability coverage apply only to property listed below. The following pages include detailed information on the property covered, additional coverage, credits and associated premiums.

**HOMES**     1347 SUMMIT AVENUE
              ST. PAUL MN 55105

**VEHICLES**  2015 BMW          2016 BMW
              Z4 SDRIVE28I      328 XI SULEV 4W

---

Exhibit 3

**AUTHORIZED SIGNATURES**

_Marv C. Swor_
Secretary

_William D. Moore_
President

Page  2  of  6   Insured Copy

Exhibit 3

**PAK II**    **Coverage Summary**

**MetLife** Auto & Home

| | |
|---|---|
| Policy Number | 6557430730 |
| Policy Effective | 01-05-18   12:01 A.M. Std. Time |
| Policy Expiration | 01-05-19   12:01 A.M. Std. Time |
| Policy Processed | 10-30-17 18:22:52 |

**YOUR HOME**    1347 SUMMIT AVENUE
ST. PAUL                          MN  55105        RAMSEY

**DWELLING INFORMATION**

Type of Dwelling: House
Dwelling Replacement
   Cost Value          $1,218,000

**SPECIAL LIMITS AND/OR DEDUCTIBLES**

PAK II includes automatic limits and
deductibles. You've chosen some
modifications for this location. The
following reflects your selections.

Deductible            $   5,000

**ADDITIONAL/OPTIONAL ENDORSEMENTS**

Following is a list of endorse-
ments you've selected to tailor
PAK II coverage to suit your
individual needs.

BROADENED PROPERTY COV
   Form # 32320   (02-92)
ID THEFT AND CREDIT PROTECTION
   Form # PK0071  (06-05)
ASSOCIATION DED LOSS ASSESSMENT
   Form # PK0075  (03-06)

**PREMIUMS**

The following premiums include
any listed credits.

| | | |
|---|---|---|
| Liability/Property | $ | 5,391.00 |
| Broadened Prop. | | Included |
| Renewal Credit | $ | 270.00- |
| Total Premium | $ | 5,121.00 |

**CREDITS**

This location is eligible for
the following credits.

Fire Central Station
Smoke Detector
Home Safety

**ADDITIONAL INTEREST**

MORTGAGEE
   J.P. MORGAN CHASE BANK, N.A.

**MINNESOTA VEHICLE INFORMATION**    The following coverages and limits apply to all listed land motor vehicles
garaged in this state where a premium is shown for the coverage.

**COVERAGE LIMITS**

| | | |
|---|---|---|
| Personal Injury | | |
| Protection | | |
| Maximum Aggregate | $ | 40,000 |
| Medical | $ | 20,000 |
| Maximum Aggregate of: | $ | 20,000 |
| Work Loss Per Week | $ | 500 |
| Essential Services | | |
| Per Week | $ | 200 |
| Funeral Expense | $ | 5,000 |
| Survivors Loss/Week | $ | 500 |

**ADDITIONAL/OPTIONAL ENDORSEMENTS**

MN PERSONAL INJURY PROTECTION
   FORM # PK0010 (01-15)

CONTINUED ON FOLLOWING PAGE

MetLife Auto & Home is a brand of Metropolitan Property and Casualty Insurance Company and its Affiliates, Warwick, RI.

Insured Copy   Page  3  of  6

Exhibit 3

**MINNESOTA VEHICLE INFORMATION (CONTINUED)**

The following coverages and limits apply to all listed land motor vehicles garaged in this state where a premium is shown for the coverage.

**COVERAGE LIMITS**

| | | |
|---|---|---|
| Uninsured Motorist Limit | $ | 100,000 |
| Underinsured Motorist Limit | $ | 100,000 |

**ADDITIONAL/OPTIONAL ENDORSEMENTS**

---

**2015 BMW Z4 SDRIVE28I**

VIN/Serial #: WBALL5C58FJ997676

Garaging State: Minnesota

**VEHICLE INFORMATION**

Type of Vehicle: Auto
Vehicle Usage:  Pleasure

**SPECIAL LIMITS AND/OR DEDUCTIBLES**

You've chosen to modify the automatic limits and deductibles for this vehicle.  The following reflects your selections.

| | | |
|---|---|---|
| Comprehensive Deductible | $ | 1,000 |
| Collision Deductible | $ | 1,000 |

**ADDITIONAL/OPTIONAL ENDORSEMENTS**

Following is a list of endorsements you've selected to tailor PAK II coverage to suit your individual needs.

FULL SAFETY GLASS COVERAGE
   FORM # 3527 (08-83)
TOWING AND LABOR COSTS COV.
   Towing Limit: $50
   FORM # 99086 (08-87)

**PREMIUMS**

The following premiums include any listed credits.

| | | |
|---|---|---|
| Liability | $ | 169.00 |
| Uninsured Motorist | $ | 27.00 |
| Underinsured Motorist | $ | 35.00 |
| Personal Injury Protection | $ | 61.00 |
| Comprehensive | $ | 147.00 |
| Collision | $ | 318.00 |
| Full Safety Glass | $ | 59.00 |
| Towing | $ | 6.00 |
| | | |
| Renewal Credit | $ | 40.00- |
| Total Premium | $ | 782.00 |

**CREDITS**

The following credits apply to this Vehicle.

Passive Restraint
Anti-Lock Brakes
Superior Driver
Multi-Vehicle

Page  4  of  6  Insured Copy

Exhibit 3

**PAK II**      **Coverage Summary**

**MetLife** Auto & Home

| | |
|---|---|
| Policy Number | 6657430730 |
| Policy Effective | 01-05-18   12:01 A.M. Std. Time |
| Policy Expiration | 01-05-19   12:01 A.M. Std. Time |
| Policy Processed | 10-30-17 18:22:52 |

2016
BMW
328 XI SULEV 4

VIN/Serial #: WBA8E3G54GNU00774          Garaging State: Minnesota

**VEHICLE INFORMATION**

Type of Vehicle: Auto
Vehicle Usage:   Pleasure

**SPECIAL LIMITS AND/OR DEDUCTIBLES**

You've chosen to modify the automatic
limits and deductibles for this
vehicle.  The following reflects your
selections.

| | | |
|---|---|---|
| Comprehensive Deductible | $ | 1,000 |
| Collision Deductible | $ | 1,000 |

**ADDITIONAL/OPTIONAL ENDORSEMENTS**

Following is a list of endorse-
ments you've selected to tailor
PAK II coverage to suit your
individual needs.

FULL SAFETY GLASS COVERAGE
   FORM # 3527 (08-83)
TOWING AND LABOR COSTS COV.
   Towing Limit: $50
   FORM # 99086 (09-87)

**PREMIUMS**

The following premiums include any
listed credits.

| | | |
|---|---|---|
| Liability | $ | 169.00 |
| Uninsured Motorist | $ | 27.00 |
| Underinsured Motorist | $ | 35.00 |
| Personal Injury Protection | $ | 61.00 |
| Comprehensive | $ | 210.00 |
| Collision | $ | 346.00 |
| Full Safety Glass | $ | 84.00 |
| Towing | $ | 6.00 |
| Renewal Credit | $ | 46.00- |
| Total Premium | $ | 892.00 |

**CREDITS**

The following credits apply
to this Vehicle.

Passive Restraint
Anti-Lock Brakes
Superior Driver
Multi-Vehicle

**ADDITIONAL INTEREST**

LIENHOLDER
   BMW BANK OF NORTH AMERICA

Exhibit 3

| DRIVER INFORMATION | The following is a list of all licensed drivers in the household covered by this policy. If any of this information changes, please contact your agent. |
|---|---|

**DRIVERS**          **BIRTH DATE**   **LICENSE #**

01. AVIEL LI GOODMAN      08-01-55   G355075522603

| UMBRELLA LIABILITY | Your Umbrella liability limit does not apply to Automobile No Fault and Medical Expense coverages. Refer to the Personal Umbrella Liability Endorsement, Form # 33877 (06-99), for the minimum limits required for exposures not covered by the PAK II |
|---|---|

**PREMIUMS**

| Liability | $ | 152.00 |
|---|---|---|
| Renewal Credit | $ | 8.00- |
| Total Premium | $ | 144.00 |

Exhibit 3

**PAK II**        **Your Property Coverage**

Under the property insurance section of this policy, we insure against actual accidental physical loss or damage to property that you or your family own or use anywhere in the world. "Actual accidental physical loss or damage" means physical damage to tangible property, its theft, or destruction, whether because of the intended or accidental act of someone else or because of an accidental act by you or anyone else covered by this policy. This includes all loss or damage caused by fire or any damage caused by lightening, except as excluded by this policy. The covered property owned or used must be non business in nature. Business property isn't covered except as specifically provided in this policy. PAK II covers your home, including its contents, your vehicles and your boats as indicated on the Coverage Summary. We cover them for the causes of loss as indicated. **Coverage is subject to the policy exclusions and additional limitations listed elsewhere in this policy.**

If you or anyone else covered under this policy intentionally damages property, there is no coverage. This includes, but is not limited to, situations in which covered property is taken or damaged during a marriage dissolution or dissolution of joint ownership.

*You're driving down an icy road and skid into a tree. The physical damage to your car is covered under PAK II.*

*Someone sets fire to your home and the house and your furnishings in it are damaged. You're covered for the loss and physical damage under PAK II.*

*A tornado destroys your home and other personal property. This damage is covered under PAK II.*

*The area in which your home is located is condemned as unsafe by the city. In the settlement with the city, you receive less than you paid for the property. Because there is no physical damage to your home, this "loss" is not covered by PAK II.*

If there is actual accidental physical damage, we have the option to repair or replace the property or pay you the amount of such physical loss or damage that exceeds the deductible shown on the Coverage Summary. You pay the deductible. We pay the rest up to the property limit on the Coverage Summary, or up to the limit specified within PAK II for certain types of property or loss. The deductible applies to each occurrence.

*Your auto is totally destroyed by fire. It was worth $4,000 before the destruction. If you have a comprehensive deductible of $150, you pay the first $150 and we'll pay $3,850.*

We do not cover animals, birds, or fish. Nor do we cover aircraft of any kind or condition, whether assembled or disassembled. We do cover model aircraft not capable of carrying passengers or property.

Exhibit 3

**YOUR PROPERTY COVERAGE**

**Payment Limitations.** PAK II has payment limitations on certain kinds of property. A complete list and limits are given under "Your Other Personal Property" on page 17.

What happens if more than one kind of property is destroyed? Do you pay the deductible more than once? If more than one kind of covered property is damaged or destroyed in the same accident or incident, we add everything together that you are entitled to collect. You only pay one deductible (the largest that applies). The same principle applies if more than one item of the same kind of property is damaged in the same occurrence. For example, if one of your cars collides with another of your cars (both on PAK II), damaging both, only one deductible (the highest) applies.

If an item is permanently attached to your home, it is covered as part of the dwelling. If the item is permanently installed on your property but not attached to the dwelling, it is covered as an "other structure." If an item is not permanently installed on your land or attached to a building (and is not a vehicle or boat), it is covered as "other personal property."

*If you buy a satellite dish TV antenna and have it mounted permanently on a concrete base in your yard, it is covered as an "other structure."*

*If you have a hot tub on your deck, but do not have it permanently installed, it is covered as "your other personal property."*

*If you have a solar heating system added and have the solar panels mounted on your roof, they are covered as part of "your home."*



**Your Home**

PAK II protects insured homes against actual accidental physical loss or damage. We explained what this means on page 11. Insured homes are those listed on the Coverage Summary. These may include single- family homes, two- three- or four family homes (if you live there), townhouses, or condominiums. We also cover any other non business buildings or non business structures situated on the same land as an insured home, such as a separate garage, a carport, or shed.

**If your home is a condominium,** we don't cover the condominium structure itself. We do cover additions, alterations, fixtures or improvements to the unit which are within the unfinished interior surfaces of the perimeter walls, floors and ceilings of your condominium unit for actual accidental physical loss or damage up to $10,000. We also cover items of real property which pertain exclusively to your unit and property which is your insurance responsibility under the condominium association agreement for actual physical loss or damage up to $10,000. We will also pay your share up to $10,000 of any assessment charged against all condominium unit-owners by the condominium association. The assessment must be made as a result of actual accidental physical loss covered by this policy to the condominium property, owned by all unit-owners collectively, or when the assessment is made as a result of an accident or incident that happens in any area of the condominium for which you are responsible. If your assessment results from a deductible in the insurance purchased by the condominium association, we will not pay more than $1,000. We will not pay for your assessment for maintenance of buildings or grounds. "Maintenance"

Exhibit 3

**YOUR PROPERTY COVERAGE**

**Building Law.** If your home or other structure is damaged due to a covered loss and a building ordinance or law regulates the construction, use, or repair of covered property, we will pay to repair or replace your home or other structure as follows:

1. We'll pay the cost, subject to the Property coverage limit shown on your Coverage Summary, to repair, rebuild or demolish *the damaged portion* of your home or other structure that is required to conform to any applicable building law or ordinance.

2. If the covered damage to your home or other structure exceeds 50% of its replacement cost we'll provide building law coverage for *the undamaged portion* of your home or other structure. We'll pay up to 10% of your Dwelling Replacement Cost Value shown on your Coverage Summary for that location for the cost to repair, rebuild or demolish the undamaged portion of your home or other structure that is required to conform to any applicable building law or ordinance.

This coverage is in addition to the Property Coverage Limit shown on the Coverage Summary. And it includes your demolition and debris removal costs.

3. If your home or other structure is partially damaged but a building ordinance or law requires it to be *totally destroyed*, we will pay the Dwelling Replacement Cost Value shown on your Coverage Summary for the covered location if you choose not to rebuild it. If you do rebuild, we will pay replacement cost up to your Property Coverage Limit shown on your Coverage Summary. In either case, you will not have to pay the deductible.

Building Law coverage applies only if you repair or replace the damaged property within one year of the loss.

We will not cover any loss in value to your home or other structure because of

any building ordinance or law. Nor will we cover any loss, costs or expense that results from pollution work.

"Pollution work" means:
• the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing of any pollutant; or
• the responding to or assessing, in any way, the effects of any pollutant.

"Pollutant" means any solid, liquid, gaseous or thermal irritant or contaminate, including:
• smoke, vapors, soot, fumes;
• acids, alkalis, chemicals; and
• waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**Debris Removal.** We'll pay your reasonable expense for the removal of debris of covered property caused by a covered loss and of ash, dust or particles from a volcanic eruption that has caused direct loss to a covered building or property contained in a covered building. This expense is included in the property coverage limit shown on the Coverage Summary. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the property coverage limit, an additional 5% of that limit is available for debris removal expense.

Provided the tree(s) damages covered property, we'll also pay up to $500 for the removal from a covered location of:

a. your tree(s) felled by windstorm, hail or the weight of ice, snow or sleet; or

b. your neighbor's tree(s) felled by fire or lightning; windstorm or hail; explosion; riot or civil commotion; aircraft; vehicles; vandalism or malicious mischief; theft; falling objects; weight of ice, snow or sleet; or volcanic eruption.

Exhibit 3

**YOUR PROPERTY COVERAGE**

The $500 limit is the most we will pay in any one loss regardless of the number of fallen trees.

**Reasonable Repairs.** We will pay the cost of reasonable repairs, excluding land repair, to protect covered property from further damage if the damage is caused by a covered loss. This is in addition to the property coverage limit shown on the Coverage Summary.

**Fire Department Service Charge.** We'll pay up to $500 for Fire Department service charges and no deductible will apply. This coverage is in addition to the property coverage limit shown on the Coverage Summary.

**Modification of Locks.** We will pay up to $500 to modify the locks to your home if the keys for your covered home are stolen. However, we will pay only if the theft of the keys is reported to the police within 24 hours. The deductible does not apply.

**Freezing, Vandalism, Glass.** PAK II covers damages from freezing inside your home only if you've used reasonable care to keep it heated or if you've drained the water from all plumbing and appliances. PAK II covers your home for vandalism and glass breakage as long as you haven't left it vacant for thirty days or more.

**Collapse.** PAK II covers actual accidental physical loss or damage to covered property involving collapse of a building or any part of a building only if caused by one or more of the following and only if the following perils were not themselves caused by a peril excluded by the policy:

1. Fire or lightning;
2. Windstorm or hail;
3. Explosion;
4. Riot or civil commotion;
5. Aircraft;
6. Vehicles;
7. Vandalism or malicious mischief;
8. Falling objects;
9. Weight of ice, snow, sleet, or rain;
10. Water or steam accidentally coming from your plumbing, heating, air conditioning or other household appliance;
11. Weight of contents, equipment, animals or people;
12. Hidden decay;
13. Hidden insect or vermin damage; or
14. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

PAK II does not cover loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock resulting from the collapse of a building, unless the collapse is caused by one of the 14 perils listed. We do cover loss by fire, explosion or theft caused by collapse.

**Additional Exclusions**

PAK II doesn't cover damage, except for damage to refrigerator or freezer contents (see page 19), caused by the interruption of electricity, gas, or other utility supply if the interruption or failure takes place away from your premises. If the interruption is caused by damage to your home or results in another cause of loss such as fire, vandalism, theft, or other peril covered by PAK II, it is covered.

PAK II, doesn't cover freezing, thawing, ice or snow damage to fences, pavements, patios, swimming pools, foundations, retaining walls, docks, piers, or wharfs.

PAK II, doesn't cover physical damage caused by wear and tear, latent defect, mechanical breakdown, rust, mold, wet or dry rot, contamination, corrosion, industrial or agricultural smoke, vermin, rodents, termites, insects, or domestic animals, or electrolysis.

Exhibit 3

YOUR
PROPERTY
COVERAGE



## Your Boats

PAK II covers boats 31 feet and under in overall length that you or your family own or lease and are listed on the Coverage Summary. In addition to the boat, we also cover the trailer, motors and all other equipment permanently attached to the covered boat such as batteries, pumps, fuel containers, depth finders, fire extinguishers, etc. Boats, trailers, motors and equipment are protected against actual accidental physical loss or damage, but we don't cover boats if they are used in business or rented out. Motors not permanently attached to a boat are covered under "Your Other Personal Property".

If your or your family's boats, permanently attached motors or trailers are not listed on the Coverage Summary the most we will pay is $1,000 in any one loss regardless of the number of unlisted boats, motors, or trailers involved.

PAK II doesn't cover losses due and confined to normal wear and tear, marine life deterioration; rust; corrosion; latent defects; freezing; overheating; structural, mechanical or electrical breakdown or electrolysis.



## Your Other Personal Property

PAK II covers any tangible personal property you or your family own or use anywhere in the world against the causes of loss listed. Since PAK II protects your home, motor vehicles, and small boats in other sections, "tangible personal property" in this section means personal property other than homes, motor vehicles, and boats.

*You're traveling on vacation and your clothing, luggage and cameras are stolen from your hotel room. Because it's all tangible personal property, it's covered by PAK II, since theft is a cause of loss covered by PAK II.*

*Your home catches fire and your furniture is damaged. Furniture is tangible personal property so it's covered under PAK II. Fire is a cause of loss covered by PAK II.*

In addition to property owned by you and your family, PAK II will also cover personal property owned by your guests or household employees that's actually on your premises (motor vehicles and boats aren't covered). Also, at your request, we will cover personal property owned by others while it is at your home. However, we do not cover property of roomers, boarders or other tenants unless they are related to you or family and are living in your household.

*You have guests staying in your home. One evening, while you are out to dinner, your home is burglarized and some of your guests' personal property is taken along with yours. It is covered under PAK II.*

If your home is a condominium, we cover your personal property for actual accidental physical loss or damage except for the following exclusions or limitations:

1. Damage to fragile items such as eyeglasses, glassware, statuary, marble, bric-a-brac, porcelains and similar items (other than jewelry, watches, bronzes, cameras, photographic lenses), are only covered for the causes of loss listed on page 18 and 19 under "If your home is not a condominium".
2. Loss caused by any of the following: wear and tear, marring or scratching, deterioration, inherent vice, latent defect, mechanical breakdown, rust, mold, mildew, rot, contamination including staining or discoloration,

Exhibit 3

**YOUR PROPERTY COVERAGE**

birds, vermin, rodents, moths, termites, insects or domestic animals, smog or smoke from agricultural smudging or industrial operations, artificially generated electrical currents to a tube, transistor or similar electronic components.

3. We don't cover disappearances, whether mysterious or not. However, if it is likely that property has been stolen from a known location, the loss is considered to be theft.

4. We don't cover theft committed by anyone insured under this policy or theft in or to a home under construction or theft of construction materials or supplies.

5. We don't cover loss to your personal property caused by dampness of atmosphere or extremes of temperature unless direct cause of damage is rain, snow, sleet, or hail.

6. We don't cover losses caused by refinishing, renovating or repairing your other personal property (other than watches, jewelry, and furs) unless the damage is a result of one or more of the causes of loss listed below under "If your home is not a condominium".

7. Interruption of power or other utility service is not covered if the interruption takes place away from the premises where your other personal property is located.

The special limits shown on page 19 apply to the types of property indicated for loss due to theft.

**If your home is not a condominium,** your other personal property is covered for the following causes of loss:

1. Fire or lightning.
2. Windstorm or hail. Covered property contained in a building is covered only if the building is first damaged by windstorm or hail. If water then enters the building, the damage caused by water will be covered.
3. Explosion.
4. Riot or civil commotion.
5. Aircraft.

6. Smoke but not including industrial or agricultural smoke, smudging, or pollution.
7. Vehicles.
8. Vandalism or malicious mischief.
9. Theft but not including theft that is:
  a. Committed by anyone insured under this policy.
  b. In or to your covered home while it is under construction; or theft of construction materials or supplies from your covered home while it is under construction.
  c. Of property money, bank notes, bullion, gold, goldware, silver, silverware, pewter ware, platinum, coins, medals, jewelry, watches, furs, precious and semi-precious stones, securities, accounts, deeds, evidence of debt, letters of credit, notes other than bank notes, manuscripts, passports, tickets or stamps contained in a portion of your home that is rented to others.
10. Falling objects, but only if:
  • The covered property is contained in a structure;
  • The structure is first damaged by a falling object; and
  • The covered property is damaged by the falling object or by portions of the damaged structure.
Damage to the falling object is not covered.
11. Weight of ice, snow, or sleet.
12. Water or steam accidentally coming from your plumbing, heating, air conditioning or other household appliance. PAK II doesn't cover damage to the appliance causing the loss. We also won't cover damage caused by freezing, except as indicated.
13. Cracking, burning, or rupture of your air conditioner, steam or hot water heating system, or hot water heating unit. Damage to the system must be sudden and accidental. It must not be caused by freezing except as indicated.
14. Freezing of plumbing, heating, or other household appliance but only if you used reasonable care to keep your home heated or drained the water from all plumbing and appliances.

Exhibit 3

**PAK II**       **Other Policy Provisions**

### How We Settle Claims

If you have a loss insured under PAK II we'll make every effort to settle your claim fast. If your property has been damaged and we think it's feasible to repair it, we'll pay you to have it repaired. If your property is lost or destroyed, we have the option to replace it with similar property or pay you what it was worth subject to policy limitations. Some of the following provisions refer to actual cash value. By "actual cash value", we mean the cost to replace an item minus depreciation.

**Motor Vehicles.** If your vehicle is destroyed or stolen and we choose not to replace it, we'll pay you the actual cash value of that make, model and year of motor vehicle. When we do this, we'll consider the vehicle's condition before the loss. If there's a manufacturer's or dealer's price guide available, we'll use that along with any other facts and figures that are available, such as market surveys, to help determine the actual cash value. If your vehicle is damaged and we choose not to repair it we'll pay you the actual cash value of the cost to repair, but we will not pay more than the actual cash value of the vehicle.

**Homes.** If a home covered under PAK II is damaged or destroyed, we'll pay what it would cost to repair or replace it. Repair means to restore the damaged portion of your home to its original condition prior to the loss. Replace means to reproduce your destroyed home on the existing location using like kind and quality of materials and construction.

If your home is totally destroyed, we will pay the Dwelling Replacement Cost Value shown on the Coverage Summary for the covered location if you choose not to rebuild it. If you do rebuild after a total loss, we will pay replacement cost subject to your Property Coverage Limit shown on your Coverage Summary. In either case, you will not have to pay the deductible.

If your home is not totally destroyed after a covered loss, payment will not exceed the smaller of the following amounts:

1. The repair cost for the portion of the home that is damaged. The damaged portion will be repaired on the same premises for the same use as before the damage occurred.
2. The amount actually spent to repair your damaged home.

After a covered loss, if an ordinance, building code or civil authority will not permit repair or replacement on the existing location or if the land is no longer suitable for repair or reconstruction, we will pay the cost to repair your damaged home or reproduce your destroyed home. Payment will be limited to the cost of reproduction or repair at the existing location, or another location you choose, whichever is less.

If the cost to repair or replace your home or other structure is more than $2,500, we'll pay no more than actual

Exhibit 3

**OTHER POLICY PROVISIONS**

cash value until actual repair or replacement is completed. You may file your claim on an actual cash value basis and then make a claim within 180 days after the loss for any additional amount due because of completed repair or replacement. The repair or replacement must be completed within 180 days after the loss. If claims are made more than 180 days after a loss they are not valid. We may extend this time period in writing.

**Boats.** If a boat, trailer, motor or other equipment permanently attached to a boat covered by PAK II is damaged, destroyed or stolen, we'll pay to have it repaired or replaced, but we won't pay more than the market value. Market value will be determined from available manufacturer's or dealer's price guides. We'll use these along with any other facts and figures that are available such as market surveys to determine the value.

**Other Tangible Personal Property.** If other tangible personal property covered by PAK II is damaged, we will pay as follows:

a. We will pay the cost of repair or replacement, without deduction for depreciation, but not exceeding the smallest of:

　1) replacement cost at the time of the loss, if the property is actually replaced;
　2) the full cost of repair; or
　3) any special limits contained in the policy.

b. With respect to antiques, fine arts, statuary, souvenirs, collectors items and memorabilia, in no event will we pay you less than we would have paid you if we had covered the loss on an actual cash value basis.

c. In the case of a loss to a pair or set, we may elect to repair or replace any part to restore the pair or set to its original value, or pay you the difference in value before and after the loss.

d. We will pay only actual cash value for property not repaired or replaced within 180 days after the loss. We may extend this time period in writing.

**What to Do If You Have Changes**

If there is a change to the information used to develop the policy premium, we may adjust your premium. Changes during the policy term that may result in a premium increase or decrease include, but are not limited to, changes in:

1. The number, type or use classification of insured vehicles;
2. Operators using insured vehicles;
3. The place of principal garaging of insured vehicles;
4. Coverage, deductible or limits.

If a change requires a premium adjustment, we will make the premium adjustment in accordance with our manual rules.

If you acquire new items, there are special rules you need to follow to have them covered by PAK II. You should also tell us if you dispose of major items such as vehicles, boats or homes. We will amend your premium based on the change itself and the date of the change.

**Personal Liability Protection is provided for newly acquired items as follows:**

1. Newly acquired motor vehicles of the same types that may be covered by PAK II (see page 4) if you report them to us within 30 days after you acquire them. But, if the newly acquired vehicle replaces one already covered by PAK II, it has automatic coverage for personal liability.
2. Newly acquired small boats must be reported to us within 30 days after you acquire them for coverage to apply.

Exhibit 3

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Dr. Malka L. Goodman, Trustee of the Aviel
Goodman Revocable Trust, Assignee of Dr.
Aviel Goodman,

        Plaintiff,

    v.

Economy Premier Assurance Company,
and MetLife Auto & Home Insurance
Agency, Inc.

        Defendants.

Case No. 0:19-cv-01815 (PAM/ECW)

**PLAINTIFF'S ANSWERS TO
DEFENDANTS' INTERROGATORIES**

---

**TO: DEFENDANTS ECONOMY PREMIER ASSURANCE COMPANY AND
METLIFE AUTO & HOME INSURANCE AGENCY, INC. AND THEIR
ATTORNEY JOSEPH F. LULIC, BROWNSON PLLC, 225 SOUTH SIXTH
STREET, SUITE 4800, MINNEAPOLIS, MN 55402.**

Plaintiff Dr. Malka L. Goodman, Trustee of the Aviel Goodman Revocable Trust, Assignee

of Dr. Aviel Goodman ("Plaintiff") responds to Defendants Economy Premier Assurance

Company's and MetLife Auto & Home Insurance Agency, Inc.'s Interrogatories as follows:

### <u>RESERVATION OF RIGHTS</u>

Plaintiff responds without waiving, but on the contrary preserving, the following:

1.      The right to question as to competency, relevancy, materiality, privilege and as

evidence for any purpose, any responses or answers or the subject matter thereof in any subsequent

proceeding, whether in this or any other action.

2.      The right to object to the use of any such responses or answers or subject matter

thereof in any subsequent proceeding, whether in this or any other action.

Exhibit 4

3.      The right to object on any ground at any time to a demand for further response to these or any other discovery.

4.      The right at any time to revise, correct, add to, or clarify any of the responses or answers propounded herein. Investigation and discovery in connection with this matter are continuing and additional information or documents responsive to these requests may become known during the course of such investigation.

## **INTERROGATORIES**

**INTERROGATORY NO. 1:** Identify by name, address, telephone number and occupation each individual who has knowledge of the subject matter of the claims and/or allegations in regards to this matter, and for each person identified describe each individual's knowledge.

**ANSWER:** Plaintiff previously identified all individuals who have knowledge of the subject matter of the claims and/or allegations in regard to this matter, each individual's contact information, and a description of each individual's knowledge in Plaintiff's Initial Disclosures. *See* Plaintiff's Initial Disclosures.

In addition, the Plaintiff identifies: Phil Kelly (Kelly Plumbing (phone: 651-699-1232)) was onsite in the days following the loss to examine the plumbing; Burnomatic Mooney & Ridler (phone: 612-827-2825) has knowledge as to the condition of the boiler; The Snelling Company (phone: 651-646-7381) has knowledge as to the condition of the boiler; Jon Zak (American Leak Detection (phone: 763-633-7773)) has knowledge as to the damage sustained; Megan Seebeck (Claims Specialist, Bremer Insurance) has knowledge about the property's insurance needs and requirements; Eddie Silva (Residential Consultant, CSI Claims (phone: 888-345-2700 ext. 266)) has knowledge of the condition of the boiler and related parts following the loss; Janice Lameyer (Underwriter, MetLife) has knowledge as to cancelation of the MetLife policy; Brenda Scudder (Underwriter, MetLife) has knowledge of the then-existing value of the real and personal property

Exhibit 4

prior to the loss; Andre Aukamp (Underwriter, MetLife) has knowledge of the then-existing value of the real and personal property prior to the loss; Mike Davidson (Field Supervisor, MetLife Auto & Home) has knowledge of MetLife's claims-handling procedures and the specific actions taken to assess the loss at issue in this case; Lisa Doherty (Senior Analyst II-SIU, MetLife Auto & Home) has knowledge as to why MetLife ran a background check on Dr. Aviel Goodman shortly after the claim was reported; Kelly Sutter-Matthews (MetLife) has knowledge of the certification of policy number 6557430730; Dave Walker (MetLife) has knowledge of the certification of policy number 6557430730; Kim (MetLife) has knowledge of conversations with Plaintiff as to the policy and/or loss; Heather (MetLife) has knowledge of conversations with Plaintiff as to the policy and/or loss; and Tom Irmiter and Franklin Martin (Causation, Damages and Code Consultants for Forensic Building Science, Inc., 657 Lincoln Ave., St. Paul, MN 55105, (phone: 651-222-6509)) have knowledge about the cause of the loss and the extent of damage sustained to the residence.

In addition to the information provided in Plaintiff's Initial Disclosures, neighbors Tom Bergin and Jessica Dodge have knowledge of the condition of the house prior to the loss and Plaintiff's, Jeannine Ferland's, and Ms. Ferland's friend's visits to the house.

**INTERROGATORY NO. 2:**  Describe all means by which you or anyone acting on your behalf maintained the heat in the subject premises at all times during 2018.

**ANSWER:**  Plaintiff objects to this interrogatory as overbroad and unduly burdensome to the extent it asks Plaintiff to describe each and every means by which Plaintiff, or anyone on Plaintiff's behalf, maintained the heat in the subject property over the course of an entire year. Subject to and without waiving the foregoing objections, beginning in late July 2018, Plaintiff, Jeannine Ferland, and a friend of Ms. Ferland visited the subject property on a regular basis, often several times a week, for various purposes, including using the space to play cello, feeding and

3

Exhibit 4

caring for Dr. Aviel Goodman's cat, and collecting the mail, during which times they check ambient temperature and, sometimes, also checked the thermostat.

**INTERROGATORY NO. 3:** For each item of damage and/or loss alleged by you, set forth the following:

    a.    Type of alleged damage;

    b.    Amount of alleged damage;

    c.    State the basis of your claim of damage, including any and all calculations supporting your claim for damages; and

    d.    Provide a detailed itemization of your damages.

**ANSWER:** Plaintiff's damages are set forth in detail in her expert reports. *See* February 3, 2020 Expert Water Damage Report of Forensic Building Science, Inc., February 3, 2020 Expert Damages Estimate of Forensic Building Science, Inc., and April 6, 2020 Expert Rebuttal Letter of Forensic Building Science, Inc., all of which were previously sent to defendants.

**INTERROGATORY NO. 4:** State the names of all witnesses from whom you have obtained written and/or recorded statements, and list the name and address of the custodian of all such statements.

**ANSWER:** Plaintiff has not obtained written and/or recorded statements from any witness. Discovery is ongoing and Plaintiff reserves the right to supplement or amend her response to this interrogatory.

**INTERROGATORY NO. 5:** If you claim Defendants made any statements, communications, and/or representations acknowledging or implicating any fault and/or responsibility for your claims in this matter, please identify with specificity any and all such statements, communications, and/or representations.

**ANSWER:** Plaintiff objects to this request as overbroad and unduly burdensome to the extent it asks Plaintiff to identify with specificity, for an unspecified period of time, each and every statement, each and every communication, and each and every representation made by Defendants acknowledging or implicating fault and/or responsibility. Subject to and without waiving the

Exhibit 4

foregoing objections, in a November 26, 2018 letter addressed to Aviel Goodman, Economy Premier Assurance Company noted that they wanted to "help put things back the way they were – as quickly as possible;" this letter has been previously produced as ECON000061-62. And in a December 5, 2018 email to Plaintiff, MetLife Auto & Home Insurance Agency, Inc. implied that at least part of the Plaintiff's claim was covered by the applicable insurance policy; this email has been previously produced as ECON000034-35. Discovery is ongoing and Plaintiff reserves the right to supplement or amend its response to this interrogatory.

**INTERROGATORY NO. 6:** Identify any and all employees, owners, representatives and/or agents of Defendants that you interacted with and/or communicated with.

**ANSWER:** Plaintiff objects to this request as overbroad and unduly burdensome to the extent it asks Plaintiff to identify, for an unspecified period of time, each and every individual associated with Defendants that Plaintiff interacted with. Subject to and without waiving the foregoing objections, Plaintiff identifies the following individuals: Jami Hage of Economy Premier Assurance Company;  Megan Seebeck a Claims Specialist at Bremer Insurance Agency; Denise Hafner of Bremer Insurance Agency;  Kim and Heather of MetLife; Spencer Funk of MetLife Auto & Home Insurance Agency, Inc.; and Douglas PE Sands of MetLife Auto & Home Insurance Agency, Inc.

**INTERROGATORY NO. 7:** Identify all persons or entities that serviced or maintained the boiler system in the property at issue for the years 2016, 2017, and 2018, and set forth the following:

a.      Date of maintenance or service;

b.      Type of service or maintenance; and

c.      The cost of said maintenance or service.

**ANSWER:** Plaintiff objects to this request as overbroad and unduly burdensome to the extent it asks Plaintiff to identify, for a period of three years, each and every time the boiler system

Exhibit 4

was serviced and maintained, along with detailed information as to the type of service and cost of said service. Subject to and without waiving the foregoing objections, the boiler system was serviced after the loss occurred by both Burnomatic Mooney & Ridler and The Snelling Company.

**INTERROGATORY NO. 8:** Identify insurance agents and/or insurance agencies that Plaintiffs have interacted with, communicated with, purchased insurance through, and/or dealt with besides Defendants from 2010 to the Present.

**ANSWER:** Plaintiff objects to this request as overbroad and unduly burdensome to the extent it asks Plaintiff to identify, for over a ten year period, each and every insurance agent or agency that Plaintiff has interacted with, each and every insurance agent or agency that Plaintiff has communicated with, each and every insurance agent or agency that Plaintiff has purchased insurance through, and each and every insurance agent or agency that Plaintiff dealt with. Plaintiff further objects to this interrogatory as irrelevant; Plaintiff's interactions with insurance agents or agencies that have no connection to the property at issue are not relevant to any of the claims in the pending litigation. Subject to and without waiving the foregoing objections, Plaintiff identifies the following: Bremer Insurance Agency, Inc. and Bremer Insurance Agency, Inc. employees Debbie K. Abbasi, Denise Hafner, and Megan Seebeck.

**INTERROGATORY NO. 9:** Identify all documents not previously identified that you used or referred to in answering these Interrogatories.

**ANSWER:** Plaintiff incorporates herein its responses to Interrogatories Nos. 1-8 and its objections and responses to its response to Defendants' Request for Production of Documents Nos. 1-7. Plaintiff did not use or refer to on any additional unidentified documents.

12682636v2

Exhibit 4

Dated:  July 24, 2020

**TAFT STETTINIUS & HOLLISTER LLP**


By: *s/ John M. Degnan*
    John M. Degnan (#21817)
    Kirsten H. Pagel (#0399114)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
Telephone:  (612) 977-8400
Fax:       (612) 977-8650
Email:    jdegnan@taftlaw.com
        kpagel@taftlaw.com

**ATTORNEY FOR PLAINTIFF**


AS TO ANSWERS:


_____
Dr. Malka L. Goodman


Subscribed and Sworn to before me
this ____th day of July, 2020.


_____
Notary Public

7

Exhibit 4

MetLife Auto & Home®
Homeowner Operations Field Claim Office
Attention: Claims
P.O. Box 6040
Scranton, PA 18505
(800) 854-6011

**MetLife**®

January 20, 2019

Aviel L. Goodman
1347 Summit Avenue
St. Paul, MN  55105

Our Customer:       Aviel L. Goodman
Our Claim Number:   JDI01839 6M
Loss Type:          Water
Date of Loss:       November 20, 2018

Dear Aviel L. Goodman:

We have completed our investigation into your claim for damage as is referred to above.  Based on our investigation, we have concluded that the loss that occurred was damage from freezing.  Our investigation also causes us to conclude that there was no reasonable care used to keep the subject premises heated.  In addition, the water was not drained from all plumbing.

Your Pak II Policy under the Property Coverage provisions on page 15 0f 31 states in relevant part as follows:

> Freezing, Vandalism, Glass. PAK II covers damages from freezing inside your home only if you've used reasonable care to keep it heated or if you've drained the water from all plumbing and appliances…

The policy does not cover damages from freezing inside your home unless you have used reasonable care to keep it heated or you have drained the water from all plumbing and appliances. Due to your failure to comply with the policy provisions and requirements relative to freezing damage, your claim is hereby denied in all respects.

By denying your claim on the above grounds Economy Premier Assurance Company does not waive any other rights or defenses that may be available to it based on the terms, conditions, and provisions of the subject insurance policy and /or the facts and circumstances surrounding the loss. Economy Premier Assurance Company does hereby by reserve all such rights and defenses.

If you have any questions regarding this claim denial, you may contact the undersigned.

Yours very truly,

MetLife Auto & Home is a brand of Metropolitan Property and Casualty Insurance Company and its Affiliates. Warwick, RI

MPL STATUS

Printed in U.S.A  0698

EXHIBIT
8
10-29-20   CH

ECON000007
Exhibit 5

Sincerely,

Spencer Funk - LL
Economy Premier Assurance Company
Claim Adjuster
(800) 854-6011 Ext. 7578
Fax: (866) 699-1155

A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Civil File No. 19-cv-1815 PAM/ECW

Dr. Malka L. Goodman, Trustee of the
Aviel Goodman Revocable Trust,
Assignee of Dr. Aviel Goodman,

     Plaintiff,

vs.

Economy Premier Assurance Company, and
MetLife Auto & Home Insurance Agency, Inc.,
    Defendants.

_____

---------------------------------------------------------
ZOOM DEPOSITION OF
SPENCER FUNK
Thursday, October 29, 2020
---------------------------------------------------------

Reported by Christine K. Herman, RPR, CRR

Exhibit 6

**Zoom Deposition Spencer Funk - 10/29/2020**
**Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company; et al.**

## Page 18

1 see that and the one below it?

2    **A.**  **Yeah.**

3    Q.  So you would have forwarded this on to
4 Doug Sand?

5    **A.**  **Right.**

6    Q.  You say, Doug --

7    Have you worked with Doug Sand on other
8 occasions before this?

9    **A.**  **No.  Never knew him.**

10    Q.  The first time you ever worked with him
11 was on this case, huh?

12    **A.**  **Correct.**

13    Q.  Do you know how he was chosen to get
14 involved in this case?

15    **A.**  **No.  I don't remember the specifics of how**
16 **we landed on him.**

17    Q.  But you had retained him, hadn't you?

18    **A.**  **Apparently, yes.**

19    Q.  All right.  I want to go to number 51 as
20 another exhibit that we'll put up, and you can
21 review it.

22    (Deposition Exhibit Number 7 marked for
23 identification.)

24    Q.  Okay.  You see this is -- it's a series of
25 emails.  I'm mainly concerned about the one -- it

## Page 19

1 looks like from Joe Lulic.  And it's to a Stephanie
2 Brekke, but you're copied on it.  Do you see that?
3 It's the -- I think the third one down, it looks
4 like.

5    Do you see where I'm talking about?  It
6 says -- the subject is Goodman.  Do you see that?

7    **A.**  **Yeah.**

8    Q.  It's dated November 30, 2018.

9    **A.**  **Yes.  I see.  Yes.**

10    Q.  And then it looks like it's -- it was
11 hand-delivered to Aviel Goodman's address.  This
12 1347 Summit Avenue was the home in question, right?
13 That was the site that you were inspecting for the
14 loss?

15    **A.**  **Okay.**

16    Q.  And this is a letter from Joe Lulic.  He
17 had been retained already by Metropolitan in this
18 case?

19    **A.**  **Correct.**

20    Q.  And in that letter, he says that
21 basically, by requiring you to immediately cease
22 further destruction, demolition, removal or repair
23 of any portions of the structure, don't waive any
24 rights.  In other words, he wants to stop any
25 destruction, demolition, any changes or repairs at

## Page 20

1 that point, right?

2    **A.**  **Right.**

3    Q.  Have you not had a chance to completely
4 evaluate the case by then?

5    **A.**  **Well, I hadn't even gotten in.  I mean, I**
6 **think this is the time that this thing transferred**
7 **between Jami and myself.  There was talk that there**
8 **was demo happening or going to be happening, which,**
9 **of course, you don't want to walk into something**
10 **that's already been gutted, so we wanted to make**
11 **sure everyone's rights are preserved here.**

12    Q.  Do you remember ever changing that charge,
13 so that they could be allowed to proceed with
14 mitigation or repairs?

15    **A.**  **We didn't stop any mitigation work.**

16    Q.  How about repairs?  At any time did you
17 allow that they could go forward without prejudicing
18 any rights they have under the policy?

19    **A.**  **No.  We never -- we didn't have to.**

20    Q.  Why?

21    **A.**  **Well, ultimately it was because we denied**
22 **the claim, so we don't have a right to say what they**
23 **do.**

24    Q.  But do you remember the denial was based
25 upon a January 20th, 2019 letter from you?  And

## Page 21

1 we'll get into that in a minute.  Do you recall
2 that's when the denial occurred?

3    **A.**  **Right.  So that's six weeks later from**
4 **when this was sent out.**

5    Q.  And in between times had you changed that
6 direction, that allowed them to proceed if they
7 wished to do any repairing or cleaning up?

8    **A.**  **Maybe I had a verbal conversation to that**
9 **effect, but I would be speculating again.**

10    Q.  You don't recall?

11    **A.**  **No.  I don't recall.**

12    Q.  And maybe I asked this, but I want to make
13 sure.  Do you recall that there were further
14 discussions with Dr. Goodman prior to your denial on
15 January 20th of 2019?

16    **A.**  **All I can say is, I'm reasonably sure I**
17 **had several conversations with her.  But, again,**
18 **days and the specifics of them, I really don't know.**

19    Q.  Did you ever interview Jeannine Ferland,
20 F-E-R-L-A-N-D, who was a girlfriend of Aviel's who
21 had been watching the home?

22    **A.**  **No.**

23    Q.  Did you ever ask Dr. Goodman about the
24 specifics of what she did to watch over the home
25 while Aviel was gone?

Exhibit 6

**Zoom Deposition Spencer Funk - 10/29/2020**
**Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company; et al.**

## Page 22

1    A.   I'm sure I did, but, again, detail of
2 that I don't recall.
3    Q.   If you had asked anything like that, you
4 would have documented that, though, in your file,
5 wouldn't you?
6    A.   Not necessarily, no.
7    Q.   But you don't recall one way or the other
8 whether you did talk to her about that specific, do
9 you?
10    A.   No.
11    Q.   And I assume that, when you're adjusting
12 claims, particularly water claims that have resulted
13 from freezing pipes, you've found that it's not
14 unusual for homeowners in the, I guess rust belt, in
15 the colder weather, such as Minnesota, for the
16 homeowners to be gone during different times of the
17 winter, to go south to Florida, or whatever.
18        That's not unusual.  You've found that in
19 your adjusting?
20    A.   True.  Yep.
21    Q.   And when you do run into that, where the
22 homeowner has been gone for a period of time, do you
23 have a practice, then, or a protocol for finding out
24 who is watching over the home and the details of
25 that?

## Page 23

1    A.   Well, that's not nearly as important as --
2 Of course you're going to go through those
3 questions.  But the substance of what you're going
4 for is, did the furnace fail or not?  And that's
5 typically the case; the furnace failed at some
6 point.  And now you gotta figure out why it failed.
7    Q.   Well, but one of the parts of the policy
8 that's relied on by the insurance company in these
9 homeowners policies is whether reasonable care was
10 used; isn't that right?
11    A.   Correct.
12    Q.   Because if no reasonable care was used,
13 that's a basis for an exclusion, correct?
14    A.   Correct.
15    Q.   And so it is something that you should be
16 asking about to determine whether reasonable care
17 was used.  True?
18    A.   I'm sure those questions were asked.
19    Q.   But you don't recall ever discussing that
20 specifically with Dr. Goodman, correct?
21    A.   No.
22    Q.   Now, let's go to -- All right.  Why don't
23 we go to --
24        MR. LULIC:  Just a second.  I just want to
25 check.  Were you done with your answer?

## Page 24

1        THE WITNESS:  Yes.
2        MR. LULIC:  Okay.  Go ahead.
3        MR. DEGNAN:  I'm sorry.  Yeah.
4    Q.   (BY MR. DEGNAN)  Mr. Funk, if at any time
5 you haven't finished your answer, please tell me,
6 and I'll let you finish.  I'll try not to interrupt
7 you, and I'll try to finish my question first.
8 You've been very good so far, but I certainly don't
9 mean to cut you off.  Okay?
10        MR. DEGNAN:  Let's go to Exhibit 7.  I'm
11 sorry.  It's not Exhibit 7.  It's ECON 7.  And it'll
12 be whatever the next exhibit number is.
13        (Deposition Exhibit Number 8 marked for
14 identification.)
15    Q.   (BY MR. DEGNAN)  And this is the two-page
16 denial letter that you had sent to Aviel Goodman on
17 January 20th.  And go ahead and take your time, if
18 you wish to read it over.  You tell me when you're
19 finished with that.  We can then move to the second
20 page, if needed.  But you tell me when you're
21 finished.  Go ahead and have a chance to read that,
22 and then I'll have some questions.  Okay?
23    A.   Okay.  I'm ready.
24    Q.   All right.  This is a letter that you
25 sent, right?

## Page 25

1    A.   Correct.
2        MR. DEGNAN:  In fact, let's just go to the
3 second page, because that's got Mr. Funk's
4 signature.
5    Q.   (BY MR. DEGNAN)  All right.  Do you
6 remember doing this letter to the Goodman residence?
7    A.   Well, in the sense that I'm looking at it,
8 yes, but I don't remember looking.  You know, when I
9 first started going through the notes, I didn't even
10 remember that I necessarily had sent this, but I see
11 that I did send it.
12    Q.   Yeah.  This was a letter sent by you,
13 then, isn't it, based on your review?
14    A.   Yes.
15    Q.   I'm sorry.  You cut out a little bit.  I
16 couldn't get the answer.
17    A.   This is sent by me.
18    Q.   All right.  And you've referred to the
19 policy that was in place, correct?
20    A.   Correct.
21    Q.   And then, in the middle of it, you say,
22 The policy does not cover damages from freezing
23 inside your home unless you have used reasonable
24 care to keep it heated or you have drained the water
25 from all plumbing and appliances.

CASE 0:19-cv-01815-PAM-ECW    Doc. 44-1    Filed 11/04/20    Page 119 of 120

**Zoom Deposition Jami Hage - 10/29/2020**
**Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company; et al.**

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Civil File No. 19-cv-1815 PAM/ECW

Dr. Malka L. Goodman, Trustee of the
Aviel Goodman Revocable Trust,
Assignee of Dr. Aviel Goodman,

     Plaintiff,

vs.

Economy Premier Assurance Company; and
MetLife Auto & Home Insurance Agency, Inc.,
    Defendants.
_____

---------------------------------------------------------
ZOOM DEPOSITION OF
JAMI HAGE
Thursday, October 29, 2020
---------------------------------------------------------

Reported by Christine K. Herman, RPR, CRR

Exhibit 7

**Zoom Deposition Jami Hage - 10/29/2020**
**Dr. Malka L. Goodman, et al.  v. Economy Premier Assurance Company; et al.**

**Page 42**

1 ECON 57.  Anything that you've added to the standard
2 form?
3  **A.  No.**
4  Q.  All right.  And, now, going back to
5 page 1, are you aware of an exclusion for frozen
6 pipe damage unless reasonable care is used to take
7 care of the home?  Do you remember that provision?
8  **A.  Yes.**
9  Q.  You didn't refer to that exclusion or
10 refer in any way to reasonable care in this letter,
11 did you?
12  **A.  No, because I just received the claim, and**
13 **this is the form letter that goes out with an**
14 **acknowledgment letter and a Minnesota nonrenew**
15 **letter, and I hadn't been to the home to inspect**
16 **anything at this time.**
17  Q.  We've talked about, I think, several
18 different conversations you had with Dr. Goodman
19 about this claim.  Do you remember any further
20 discussions you had with her, either in person or
21 over the phone?
22  **A.  I don't recall.**
23  Q.  If there were any further discussions, you
24 would make a note of that in the file, wouldn't you?
25  **A.  Yes.**

**Page 43**

1  Q.  I'm sorry.  Did you say yes?
2  **A.  Yes.**
3  Q.  I'm sorry.  Sometimes it's hard to hear
4 some of your answers, Ms. Hage.
5  MR. LULIC:  Is that a volume or a cutting
6 out issue?
7  MR. DEGNAN:  No.  I think it's volume.  I
8 don't think it's cutting out.
9  So if you could just try to speak up a
10 little bit.  And obviously I'll do the same.  If you
11 have trouble hearing me, you just tell me.
12  THE WITNESS:  Okay.
13  Q.  (BY MR. DEGNAN)  By the way, we've been
14 going a little over an hour.  If you want to take a
15 break at any time, either now or later, you just
16 tell us, and we'd be happy to take a break.  If
17 we're in the middle of talking about a document or
18 subject, we'll probably complete that.  But are you
19 okay to keep going for now?
20  **A.  Yes.**
21  Q.  Okay.  Then at some point you turned this
22 claim over or had it reassigned to Mr. Funk.  And I
23 just want to ask, while you worked on the file,
24 while it was assigned to you, at no time did you
25 interview Dr. Goodman or Jeannine Ferland about what

**Page 44**

1 they did as far as visiting the home or looking
2 after the home on various days of every week.  You
3 never asked those questions, did you?
4  **A.  I don't recall.**
5  Q.  If you had asked those questions, again,
6 you would have made notes of it in your file,
7 wouldn't you?
8  **A.  I guess so.**
9  Q.  Well, I assume that you're aware that a
10 number of Minnesotans leave their home for some
11 period of time in the winter months.  So that's not
12 unusual, is it?
13  **A.  No.**
14  Q.  For your insured.
15  And I assume that, when people are gone,
16 one of the things you do want to determine is, okay,
17 while you're gone, is anyone looking after the home
18 and how frequently and how closely.  Isn't that
19 right?
20  **A.  Not really.**
21  Q.  Can you tell us how else you would
22 determine whether or not reasonable care was used by
23 the insured in some fashion, without asking those
24 questions when they're not at the home?
25  **A.  They usually provide us with the utility**

**Page 45**

1 bills, per our request.
2  Q.  And that's the extent of it?
3  **A.  Sometimes they give us the neighbor's**
4 **name, if they have somebody watching their home.**
5 **They just assist until -- if they're not there,**
6 **what's happened and what kind of damage they have.**
7  Q.  So, in other words, that's something you
8 would ask in adjusting the claim; if you weren't
9 there, who was looking after the home for you?
10  MR. LULIC:  She's answered that already.
11  Q.  (BY MR. DEGNAN)  Isn't that true?
12  **A.  I guess I thought I just answered that for**
13 **you, but --**
14  Q.  Well, I'm not -- I was a little confused
15 because of the prior answers.  And that's just what
16 I'm trying to confirm.  So what I stated was
17 correct?
18  **A.  What did you state?**
19  Q.  Well, you were just talking about getting
20 information about what neighbors or whoever is
21 looking over the home.  So that's something you
22 would ask about if you knew the person was not
23 there, particularly at the time of loss, isn't it?
24 Isn't that something you'd need to find out?
25  **A.  Yes.**