# Homeowner: First Party

This section addresses first-party homeowner claims made by an insured (or others) seeking coverage under Section I of the homeowner policy. In handling these claims, the adjuster must determine if the insured has coverage for the loss reported, and, if so, what amount is owed. The remainder of this section will provide guidance to the adjuster in handling claims within this category.

## CONTENTS

Coverage
    **Is coverage in force?**
    **Does Coverage Apply?**
    **Is Other Coverage Available?**
    **Primary/Excess**
    **Concurrent**
    **Most Claims Presented will be Covered**
    **Reservation of Rights (ROR)**
    **Declaratory Judgment Actions (DJA)**
    **Coverage Denials**

Investigation
    **Coverage Investigations**
    **Damage Investigations**
        **Timely**
        **Appropriate**
    **Review the First Notice of Loss**
    **Contact the Parties Involved**
    **Official Reports**
    **Statements**
    **Interviews**
    **On Site Inspection**
    **Expert Reports**
    **Other Reports**
    **Consent Agreement**
    **Real Property Claims**
    **Personal Property Claims**
    **Time Element Claims**

L0216456494[exp1218][All States] (All States)

ECON000838

Exhibit 8

<u>**Evaluation**</u>
    **Coverage Evaluation**
    **Damage Evaluation**

<u>**Reserving**</u>

<u>**Negotiation and Settlement**</u>

# Coverage

Prior to making a determination as to whether or not the insured has coverage for the loss reported, the adjuster must first determine what coverage is provided under the terms of the applicable homeowner policy and its endorsements. Coverage is the contractual obligation  between an insured and the insurer, subject to the policy coverages, conditions, exclusions, and limitations. The first steps in the claim handling process are to:

1. Verify that the policy is in force for the loss date.
2. Verify that coverage is applicable to the reported loss.
3. Identify if other coverage exists.

**1)  Is coverage in force?**

The adjuster must verify that the policy is in effect for the date of loss. If a question arises regarding whether a policy is in force, the adjuster should consider the following:

- Check the underwriting notes.
- Contact the underwriter.
- Contact the agent.

Although these three resources may help clarify questions regarding coverage in force, the adjuster must also be familiar with Errors/Omissions and Contested Coverage procedures.

**2) Does Coverage Apply?**

L0216456494[exp1218][All States] (All States)

ECON000839

Exhibit 8

A traditional determination of coverage begins with an analysis of the insuring agreement and declarations page. However, in addition to the insuring agreement, the adjuster should be familiar with policy definitions, coverage, causes of loss, exclusions, limitations and conditions, and their application to the loss.

In any case involving a question of coverage, the adjuster should liberally seek the assistance of a member of the field office management team (i.e., supervisor, manager, or examiner). If a coverage issue cannot be resolved, the adjuster should obtain proper authorization to submit a contested coverage request to the underwriting department and/or issue a reservation of rights (ROR) letter to the insured or person(s) seeking coverage under the policy. Guidance on RORs, coverage denials, and declaratory judgment actions are treated separately in this section

### 3) Is other coverage available?
Once it has been confirmed that the policy is in force and coverage applies, the adjuster should determine if any other coverage exists. Other coverage can apply as either primary, excess, or concurrent.

### Primary/Excess:

Typically, the policy the insured has will provide primary coverage for damage or loss to the covered property—but not always. There may be certain items of property that are separately described and insured. If so, the adjuster will have to determine the applicability of the insured's coverage to these items. There may also be situations where the policy could be excess over any other insurance that covers the property. In this situation the adjuster will want to review the applicable policy and the other policies or agreements that may provide coverage for the loss. The adjuster may also want to seek the assistance of a member of the management team (e.g., a supervisor, manager, or examiner).

Importantly, if we are the primary carrier, adjusters must be mindful of the duty to keep the excess carrier fully informed of significant file events (e.g., investigation, demands, offers, etc.). Likewise, when we are the excess carrier, adjusters must request that the primary carrier perform all necessary investigative functions and keep us informed of all significant developments. In the event we determine that the primary carrier is not investigating the loss, we must complete our own investigation.

### Concurrent:

3                                              L0216456494[exp1218][All States] (All States)

Once it has been confirmed that our policy is in force and coverage applies, the adjuster should determine if any other coverage exists beyond the coverage afforded by our policy. Concurrent coverage occurs when the insured may have coverage under another policy, with a different carrier, which was also in force at the time of the loss.

**Most Claims Presented Will Be Covered:**

Although most claims that are presented will be covered, the adjuster may encounter situations involving questions of coverage. This is why an understanding of reservation of rights, declaratory judgment actions, and coverage denials is in order.

**Reservation of Rights (ROR):**

A reservation of rights is a formal written notice to the insured or any person seeking coverage under the policy, explaining that a coverage problem potentially exists. Its purpose is to allow the company to continue an investigation, while also affording the insured an opportunity to provide information that may impact the coverage determination in the insured's favor. An ROR allows the company to avoid the application of legal principles such as waiver and estoppel, which could prevent the company from taking any further action (e.g., proceeding with a declaratory judgment action or denying coverage). Similarly, an ROR allows the insured the opportunity to protect their own interests (e.g., hire personal counsel).

A non-waiver agreement accomplishes the same purpose as an ROR. Some states may require a non-waiver as opposed to an ROR. While an ROR is a unilateral document issued by the company, a non-waiver is a bilateral agreement signed by and agreed to by both parties—the company and the insured.

An ROR should be issued as soon as a bona fide coverage issue is identified. It must be sent certified mail, and updated as needed. In some states, the law may require a coverage decision within a specific number of days. Consult with your management staff to ensure compliance with venue requirements.

An ROR should be sent to any person seeking coverage under the policy. If the insured is represented, send the ROR to his or her counsel. In third party cases, a copy should also be sent to the claimant, or to his or her legal counsel (if represented). If the insured has been provided an ROR defense in a lawsuit, defense counsel should receive a copy of the ROR. In circumstances involving potentially sensitive matters,

L0216456494[exp1218][All States] (All States)

ECON000841

Exhibit 8

consider seeking the advice of counsel concerning the content and recipients of all RORs, non-waiver agreements, and coverage denial letters.

The claim handling system provides sample forms to use as a guide in preparing an ROR letter. The ROR should specifically cite the portions of the policy that are in question. Additionally, the ROR should cite all reasons why coverage is at issue (some states require this). The ROR should also explain what action the company plans to take.

It is important to note that the decision to reserve our rights should not be taken lightly. Therefore, it is important to work diligently and make a coverage decision as soon as possible. In some situations, the better course may be to pursue a declaratory judgment action.

**Declaratory Judgment Actions (DJA):**

Questions of coverage may be resolved by the filing of a declaratory judgment action. A DJA is a lawsuit brought by a party to ask the court to declare the rights and obligations of all parties.

The decision to bring a DJA may often first require a legal opinion from defense counsel. It is recommended that a member of the management team become involved in any decisions. The home office staff is also available for consultations.

**Coverage Denials:**

In the event that a decision is made to deny coverage, we should clearly communicate to the insured that any new developments or information must be brought to our attention. Again, most claims are covered. It is recommended that a member of the management team (i.e., Supervisor, Manager or Examiner) become involved in any decisions regarding coverage. The Home Office staff also is available for consultations.

# Investigation

Investigation involves gathering the facts about a loss. The investigation into the facts and circumstances of the reported loss will be used to determine coverage, as noted in the section above. A timely and proper investigation will guide the adjuster in evaluating whether to pay the claim and if so, how much to pay. Investigations can be grouped into two main categories: Coverage Investigations and Damages Investigations.

L0216456494[exp1218][All States] (All States)

ECON000842

Exhibit 8

**Coverage Investigations:**
This type of investigation involves determining whether or not the insured's policy provides coverage for the loss.

**Damage Investigations:**

This type of investigation will focus upon gathering information to substantiate the extent of the loss.

Our philosophy is to investigate claims in both a timely and appropriate fashion.

- **Timely.** An investigation should be completed as soon as practicable. While this term  is almost impossible to define, we should recognize the need to act promptly. It is understood that insureds, witnesses, experts, and others are not always readily available. In these circumstances, employ the tools necessary to accomplish the task.

- **Appropriate.** The investigation should reflect the nature of the claim. Therefore, the investigation must be complete to the extent that it allows the adjuster to make an informed and proper decision. Additionally, the adjuster should be flexible and always willing to consider new information or to clarify previously gathered information. While "appropriate" investigations are just as difficult to define as "timely" investigations, the adjuster should liberally seek the advice of the management staff.

Generally speaking, the following investigative steps are common to all first-party homeowner claims.

**Review the First Notice of Loss:**

Who reported the loss and how? Did the insured or the claimant report the loss? Was the report made directly to the Claim Department, by an agent, an attorney, or through written correspondence? What type of damage was initially reported? The first notice of loss will assist the Claim Department in determining the type of claim, who will handle it, the necessary contacts, extent of investigation, etc. Receipt and analysis of the first notice of loss puts an adjuster in a position to determine the next step in the investigative process.

**Contact the Parties Involved:**

ECON000843
Exhibit 8

Typically, first contact is initiated by the insured. In a first-party situation, the insured, an attorney, or another representative may provide the first notice of loss. If the insured reports the loss, the first contact will be with the insured to verify the loss facts and secure details. The adjuster should verify the loss facts and secure details of the loss (please refer to the statements/interview section that follows).

**Official Reports:**

It is both common and advisable to request any "official reports" prepared by the governing authority in connection with a loss (e.g., fire, police). Official reports can provide valuable information that can allow the adjuster to continue or complete the investigation.

The following investigative tools may also be a consideration when undertaking an investigation in this category.

**Statements:**

Whether recorded or signed, statements allow the adjuster to gather and memorialize loss facts. Statements can be secured from anyone who has knowledge of a loss or information relevant to the investigation**.**

**Interviews:**

In some cases, it may be difficult to secure a recorded or written statement. In those situations, it is still advisable to ask relevant information from the interviewee. This information should be promptly recorded in the claim file running notes. Many times police officers, firefighters, repairman, witnesses, and other officials will not agree to provide a recorded statement. Nevertheless, the information this individual may share with you can be of use in completing the investigation.

A recorded statement or interview guide provides a comprehensive set of questions for the adjuster's use. This resource can be used whether or not the adjuster is securing a recorded/signed statement or interviewing a witness.

As each case is different, the technician may tailor the inquiries to fit the needs of the investigation at hand.   As each case is different, the adjuster may tailor the inquiries to fit the needs of the investigation at hand. The basics of "who, what, when, where, and how" will guide the technician.

7                                                          L0216456494[exp1218][All States] (All States)

ECON000844

Exhibit 8

L0216456494[exp1218][All States] (All States)

ECON000845

Exhibit 8

**On-Site Inspection:**

A scene investigation can help determine how a loss occurred, as well as helping the adjuster in the investigation of damages. On-site investigations can be completed by company adjusters or independent adjusters. A scene investigation may include photographs and diagrams.

**Expert Reports:**

There are a number of experts who can provide investigative assistance, based upon their training, education, and experience. Prior to seeking the advice of an expert, it is advisable to discuss your plans with a member of the management staff. Potential experts include:

- Cause & Origin
- Engineers
- Architects
- Appraisers
- Builders or Contractors
- Legal counsel

**Other Reports:**

Keep in mind that many other "organizations" and entities complete reports of an official nature that can impact the investigation. Potential sources include:

- PILR reports
- Title searches
- Weather reports
- Incident reports

**Consent Agreement:**

In a Consent Agreement, the insured grants us permission to remove evidence from the loss site. A consent agreement may be utilized by the adjuster, cause & origin expert, and others to assist in the investigation of the claim.

L0216456494[exp1218][All States] (All States)

ECON000846

Exhibit 8

**Real Property Claims**:

A scope of loss may be utilized to list the sizes, dimensions, quantities, and qualities of all items that are to be repaired or replaced. A repair estimate is a list of what work is to be done and the cost of that work. The adjuster may have to utilize local contractors, building inspectors, suppliers, various building trades personal, and others to estimate the insured's loss.

**Personal Property Claims**:

These losses may involve claims where damaged or destroyed items are available for inspection, or losses where the claimed items are no longer available for inspection (e.g., fire losses involving totally consumed items or theft losses), or both. An inventory accompanied by repair or replacement estimates, photographs, and documentation may be utilized by the adjuster in the substantiation of the insured's loss. To identify the items, the inventory may include notations such as manufacturer, model, size, age, etc. Documentation may include receipts, operating manuals, appraisals, etc.

**Time Element Claims**:

An insured loss may involve a time element loss such as additional living expenses, fair rental value, or loss of rents. The adjuster should work with the parties involved in the loss (the insured, the insured's representative, or contractor) to determine the necessary period of interruption. The adjuster will determine the insured's normal expenses, non-continuing expenses, and utilize a local realtor, temporary housing vendor, and others to assist with the resolution of the time element loss.

# Evaluation

Evaluation is the process of analyzing the coverage and damages and determining the settlement value.

**Coverage Evaluation:**

This takes into consideration the issues surrounding coverage in force, such as whether coverage is applicable, or whether there are potentially other coverages available. As a general rule, coverage should be in order before an evaluation is prepared.

L0216456494[exp1218][All States] (All States)

ECON000847

Exhibit 8

L0216456494[exp1218][All States] (All States)

ECON000848

Exhibit 8

**Damage Evaluation:**

Once applicable coverage is determined**,** it must be decided that the repair and/or replacement estimates are reasonable, necessary, and loss related.

The adjuster may seek the assistance of a member of the field office management team (i.e., supervisor, manager, or examiner) regarding questions that arise during the evaluation of the claim.
If a request for payment is made before the evaluation is completed, the adjuster must acknowledge the payment request to the insured/insured representative. When a demand for payment is received, the adjuster should promptly make an offer, if a damage evaluation has been completed. If a damage evaluation cannot be completed due to lack of supporting documentation (i.e., receipts/manuals, estimates), advise the insured or the insured representative what is needed to complete the evaluation, and pay the undisputed portion of the loss.

Once the claim adjuster has had an opportunity to assess Coverage and Damages, he or she has the following options:

**1. Pay the claim in full.** Coverage and Damages are not in question and the adjuster can perform a full evaluation of the claim.
**2. Pay the undisputed actual cash value of the loss.** Some aspect of the damages is in question and therefore, the undisputed portion of the damages is paid.
**3. Deny the claim.** Coverage is not provided under the policy.
Whether compromising a claim or denying it in its entirety, the claim adjuster must always be willing to consider any additional relevant information.

# Reserving

A reserve is the amount of money put aside to cover all loss costs. Timely, accurate, and consistent reserves are key to the financial integrity of the company.

Each homeowner exposure should be addressed with a separate reserve. For example, if a fire loss damages building items and contents, then a separate reserve should be opened for each.

Consider the following when setting reserves:

L0216456494[exp1218][All States] (All States)

ECON000849
Exhibit 8

- **Timely:** Upon receipt of new, relevant, and credible information, the reserve should be reviewed and adjusted, if necessary.

  For example, a first notice of loss is received from a representative of the insured, claiming water damage as a result of a broken pipe while the insured was on vacation. Based on the information supplied (scope of damages), a reserve is opened. However, upon inspection of the damage, it is determined that the repair cost exceeds the reserve amount. A reserve adjustment should be made at that time.

- **Accurate:** Reserving is not an exact science. However, every effort should be made to understand the factors that impact the reserve. The applicable homeowner policy form, endorsements, contractual limits and/or sub-limits, damages, expenses, and other exposure factors should be considered in the reserve process.

- **Consistent:** A consistent approach to reserving is necessary to maintain the financial integrity of the company. Similarly, if adjustments are made upon receipt of new and relevant information, consistency must be maintained.

## Negotiation and Settlement

Negotiation is the process whereby the adjuster and the insured or insured representative attempt to reach an agreement regarding the value of the claim. There is no "correct" negotiation style, but there are steps that should be taken when offering settlement.

Consider the following:

- **Know the File.** The adjuster should be familiar with all aspects of the file. This includes a thorough understanding of coverage, damages, and any other relevant factors.

- **Have a Plan.** Regardless of whether or not the insured or the insured representative makes a demand, the adjuster should determine the amount of the offer and the basis for the offer. It is important to note that the size of the demand is irrelevant. The adjuster is obligated to make a fair and reasonable offer. Additionally, it is good practice to anticipate what some of the insured's points may be and if possible, have a response prepared.

L0216456494[exp1218][All States] (All States)

ECON000850

Exhibit 8

- **Keep the Door Open.** A loss may require more than one attempt before a settlement is reached. The adjuster should always be willing to discuss the case with the insured or the insured representative, even if negotiations have broken down. If new relevant information is received, the adjuster should be willing to re-evaluate his or her position.

Negotiation practices should not differ based upon whether or not the insured is represented by a Public Adjuster or legal counsel. In all instances, the adjuster should be able to explain his or her position and support the reason(s) for the offer.

In the event an agreed-upon settlement cannot be reached, there are also a number of options available which may ultimately lead to settlement. Importantly, these options can be used at any stage of the negotiation process. Some of these options include, but not limited to, appraisal, mediation, arbitration and conferences.

L0216456494[exp1218][All States] (All States)

ECON000851

Exhibit 8

Zoom Deposition of Douglas A. Sand, PE - 11/4/2020
Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Civil File No. 19-cv-1815 PAM/ECW

Dr. Malka L. Goodman, Trustee of the
Aviel Goodman Revocable Trust,
Assignee of Dr. Aviel Goodman,

        Plaintiff,

vs.

Economy Premier Assurance Company; and
MetLife Auto & Home Insurance Agency, Inc.,
        Defendants.

-------------------------------------------------------
ZOOM DEPOSITION OF
DOUGLAS A. SAND, PE
Wednesday, November 4, 2020
-------------------------------------------------------

Reported by Christine K. Herman, RPR, CRR

## Page 14

1 say that there are quite a few more than just those
2 two?
3    A.    Yes.
4    Q.    Okay.  Do you remember when you were
5 retained in this case?
6    A.    I was retained --
7    Q.    And feel free to refer to your report,
8 too, because, you know, some of it is in your
9 report, so, you know, that may be easier.  There are
10 certain things I may refer to in your report.  Do
11 you have a copy of it there?
12    A.    I do.
13    Q.    And just for the record, it's dated
14 February 26, 2020.  It's addressed to Joseph Lulic
15 from you, correct?
16    A.    Correct.
17    Q.    Okay.  Feel free, like I say, to refer to
18 that.
19         Do you remember the date that you were
20 retained in this case?
21    A.    December 1st, 2018.
22    Q.    And you were retained by Spencer Funk of
23 MetLife?
24    A.    Yes.
25    Q.    Do you remember how you were retained?

## Page 16

1    A.    Correct.
2    Q.    And do you remember, then, the day that
3 you did go out to visit the property?
4    A.    Yes.  That was December 3rd, 2018.
5    Q.    And according to your report, on page 2,
6 it looks like you went out again on January 3rd of
7 2019.  Is that correct?
8    A.    That's correct.
9    Q.    And when you went out on December 3rd --
10 let's focus on that first -- who did you meet out
11 there at the property?
12    A.    I met with Spencer Funk of MetLife.  I met
13 with Aviel Goodman's mother.
14    Q.    Is that Dr. Malka -- is that Dr. Malka
15 Goodman?
16    A.    I suppose.
17    Q.    You don't remember her name?
18    A.    I think her name is Malka.
19    Q.    Who else was there?
20    A.    There may have been -- well, I do believe
21 there was at least one contractor there.
22    Q.    I'm sorry.  I didn't catch that.  One
23 what?
24    A.    A contractor was there.
25    Q.    And did you talk to that contractor as

## Page 15

1 Did you receive a call?  Did you receive an email?
2    A.    Well, I would think he called me.  And I
3 also received an email.
4    Q.    Had you worked with him or with MetLife or
5 Economy Insurance prior to that?
6    A.    Prior to that I may have worked with
7 Spencer Funk.  I don't recall working with him, but
8 I may have.  But, prior to that, I certainly have
9 worked for MetLife before.
10    Q.    Okay.  And when you say MetLife -- and
11 Economy is part of that group -- can you estimate
12 how frequently you've been an expert retained by
13 MetLife and/or Economy?
14    A.    Perhaps 10 times.  Maybe 20.  And that's
15 out of over 2,000 cases.
16    Q.    Do you recall if you've ever had any cases
17 in which you were retained when MetLife and/or
18 Economy was on the other side?  Have you ever been
19 adverse to them?
20    A.    I don't recall.
21    Q.    All right.  Did you, then, after receiving
22 this assignment, go out to visit the property?
23    A.    I did.  Yes.
24    Q.    And that's 1347 Summit Avenue in St. Paul,
25 correct?

## Page 17

1 well?
2    A.    I think so.
3    Q.    Did you, then, inspect the property that
4 day?
5    A.    Yes.
6    Q.    Inspect it along with Spencer Funk?
7    A.    In part.
8    Q.    Did anyone else accompany you on your
9 inspection besides Mr. Funk?
10    A.    No.  I went there by myself.
11    Q.    As you were doing the inspection.
12    A.    At times Spencer was with me; at other
13 times the contractor was with me; but, generally, I
14 was by myself.
15    Q.    And do you recall any conversations with
16 Dr. Malka Goodman that day?
17    A.    Yes.
18    Q.    What do you recall from your
19 conversations?
20    A.    Well, she had mentioned the events of
21 discovery of the flooding, and that was about it.
22    Q.    And that was on November 20th, as I
23 understand, when it was discovered.  Is that what
24 you recall?
25    A.    That's what she said, yes.

**Zoom Deposition of Douglas A. Sand, PE - 11/4/2020**
**Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.**

## Page 42

1 with that system, but I'm not quite clear on what
2 you are referencing in terms of a closed system.
3      Q.   Okay.  So you don't know what a closed
4 system is for that radiator type system in that
5 home?
6      A.   I think I do, but I don't know what you're
7 asking me.
8      Q.   Are you familiar with the term closed
9 system for radiators, or a radiator system like
10 this?
11      A.   Yes.
12      Q.   Okay.  What does that mean to you?
13      A.   I think the Webster's dictionary
14 definition means that it's not open to the
15 atmosphere.  And if that's what you're getting at, I
16 agree; it is a closed system.
17      Q.   All right.  What else on your notes, then,
18 that we haven't covered yet?  Anything else?
19      A.   Just a thought that -- where the ice
20 started, but it was just kind of an open question,
21 to kinda remind me to think about the -- how the
22 freezing occurred within that house.
23      Q.   Okay.  Is it likely the freezing started
24 on the third floor?
25      A.   Yes.  The third floor is most vulnerable

## Page 43

1 to cold infiltration.
2      Q.   Okay.  And why is that?
3      A.   Well, if you look at the third floor, it's
4 surrounded by exterior walls, but it's also
5 surrounded by the ceiling space or the attic space
6 above, which is also unheated.
7      Q.   Did you inspect the area above where the
8 pipe was frozen, the water pipe was frozen, as to
9 whether that would have been open to the attic?
10      A.   No.  There was no need to.
11      Q.   So do you know, one way or the other,
12 whether there was an opening that would have allowed
13 cold air to come into that interior wall?  Do you
14 know?
15      A.   Well, it was an interior wall space, and
16 there may have been some type of cracks or openings
17 in it, but nothing significant.
18      Q.   But you don't know because you didn't
19 inspect that area, correct?
20      A.   Correct.
21      Q.   And anything else in your notes, then,
22 about your ideas or conclusions that we didn't cover
23 already?
24      A.   No.
25      Q.   Okay.  Thank you.

## Page 44

1           Tell us, who was with you on that visit on
2 January 3rd?
3      A.   Attorney Joe Lulic, and another attorney
4 that I believe represented Mr. Goodman.
5      Q.   And did you talk to any of them or make
6 any notes about any discussion you had with them?
7      A.   No.  I made notes that day, that one
8 page that we had just gone over.
9      Q.   Do you recall any specific conversations
10 with them while you were there?
11      A.   No.
12      Q.   Anyone else present when you came back on
13 January 3rd?
14      A.   No.
15      Q.   Mr. Funk wasn't there?
16      A.   He was not.
17      Q.   And there were no contractors or third
18 parties there, correct?
19      A.   Correct.
20      Q.   And Dr. Malka Goodman was not there at
21 that time, correct?
22      A.   Correct.
23      Q.   And at no time did you ever talk to
24 Dr. Goodman at any other time, other than on
25 December 3rd, correct?

## Page 45

1      A.   Not that I recall.
2      Q.   We have an email.  Just put it up.  I
3 think it was marked in Mr. Funk's deposition, but
4 I'll just refer to it.  It's Exhibit 6.
5           (Previously Marked Funk Exhibit Number 6
6 introduced to the witness.)
7      Q.   Can you see that on your screen, too?
8      A.   I can.
9      Q.   And the top of it, the January 14, 2020
10 entry, do you see that?
11      A.   Yes.
12      Q.   And it looks like an email from Mr. Funk
13 to you; is that correct?  Is that what the document
14 seems to indicate?
15           MR. LULIC:  It's really small on the
16 screen.
17      Q.   (BY MR. DEGNAN)  It says
18 sandforensiceng.com.  Is that your email address?
19      A.   Yeah.  Okay.  Okay.  Now I see the
20 January 14th.  Okay.  I'm with you.  I'm looking at
21 it.
22           MR. LULIC:  Just for the record, it's
23 really small on the screen he's looking at, but
24 we'll make sure that he can read it.
25      Q.   (BY MR. DEGNAN)  Yeah.  It's Exhibit 6

Exhibit 9

**Zoom Deposition of Douglas A. Sand, PE - 11/4/2020**
**Dr. Malka L. Goodman, et al. v. Economy Premier Assurance Company, et al.**

### Page 50

1 out of that building.  The status of those doors was
2 changed.
3     Q.    Sure.  But you do recall that there are
4 doors both on the front and the back of the house
5 that can be closed off to the second and third
6 floor?  Do you recall that?
7     A.    There were --
8     Q.    In the stairwell?
9     A.    There were interior doors on the
10 stairwell, yes.
11     Q.    Between the first floor and the upper
12 floors, correct?
13     A.    I would have to review my photographs,
14 but, sure.
15     Q.    But as you sit here, you don't recall one
16 way or the other?
17     A.    Correct.
18     Q.    And you didn't do any studies or
19 investigation to determine the potential heat
20 variation between the main floor and the second and
21 third floors.  True?
22     A.    No.  It didn't matter.  There was no
23 natural gas consumed -- no natural gas of any
24 significance consumed in that house through
25 November --

### Page 51

1     Q.    So you -- Go ahead.
2     A.    -- through November 14th.  Therefore, the
3 house was unheated through November 14th, because
4 the boiler system was turned off.
5     Q.    Were you aware that Dr. Goodman was there
6 on November 14th, at the home?
7     A.    No.
8     Q.    Okay.  But in answer to my question, in
9 other words, you did not conduct any study to
10 determine a potential heat variation between the
11 main floor and the upper floors.  True?
12         MR. LULIC:  Object to the form of the
13 question.  Under what circumstances?  He's testified
14 regarding -- it's colder on the third floor.  But
15 object to the form of the question.
16     Q.    (BY MR. DEGNAN)  Okay.  You can answer it.
17     A.    I think I already did answer it.  I did
18 not conduct a study on the variation, heat variation
19 between the floors, because it's not relevant.
20 There was no active heating system within that house
21 at the period in question, because the boiler system
22 had been turned off.
23     Q.    Are you familiar with the term stack
24 effect?
25     A.    I think so, but could you give me some

### Page 52

1 context?
2     Q.    No.  I want you to define it.  If you know
3 the term stack effect, tell me what it means.
4     A.    Well, there is a stack effect that's a
5 draft through a chimney or an exhaust strip, where
6 hot air rises.
7     Q.    And that's the extent of your
8 understanding of the stack effect, even in homes
9 like this?
10     A.    I need more context.  If there's something
11 you're asking me about, please elaborate.
12     Q.    Well, the heat would raise in that home
13 from the lower floors to the upper floors, correct?
14 Wouldn't heat rise?
15     A.    Heat does rise.  However, there was no
16 source of heat within that house, because the boiler
17 system had been turned off during the period in
18 question.
19     Q.    You don't know for sure, though, if the
20 boiler system was turned off or just turned down, do
21 you?
22     A.    I do, actually.
23     Q.    And how do you know that?
24     A.    Because, if the boiler system had only
25 been turned down to, say, 62 degrees Fahrenheit, or

### Page 53

1 even 52 degrees Fahrenheit, it would have -- that
2 boiler system would have cycled, in an attempt to
3 reach that set point temperature, whether it's
4 52 degrees or 62 degrees.  And by cycling, it would
5 have consumed natural gas.  But we know it did not
6 consume natural gas, based on the daily Xcel Energy
7 natural gas meter readings.
8     Q.    When it was turned back on, it began to
9 heat the home right away, without the need to
10 restore the boiler; isn't that correct?  Do you
11 know?
12     A.    Could you ask that question again, please?
13         MR. DEGNAN:  Read it back,
14 Madam Court Reporter.
15         (Whereupon, the court reporter read back
16 the requested portion of the record.)
17     A.    On the 20th, the thermostat was turned on
18 by Mrs. Goodman.  And the boiler began operating on
19 November 20th, 2008 (sic), without any service.
20     Q.    Okay.  Thank you.  And that was a
21 thermostat that Dr. Goodman turned on on the main
22 floor.  Is that what you understand?
23     A.    Yes.  And that's based on this Forensic
24 Building Science, Inc. report.
25     Q.    And you have no reason to dispute that, do

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Dr. Malka L. Goodman o.b.o                    Case No. 0:19-cv-01815 (PAM/ECW)
Dr. Aviel Goodman,

                          Plaintiff,

v.                                            **DEFENDANTS' RESPONSES
                                              TO PLAINTIFF'S REQUEST
Economy Premier Assurance Company,            FOR ADMISSIONS**
and MetLife Auto & Home Insurance
Agency, Inc.

                          Defendants.

TO:   PLAINTIFF DR. MALKA GOODMAN o.b.o. DR. AVIEL GOODMAN AND
HER COUNSEL OF RECORD, LOMMEN ABDO, PA, 1000 International Centre, 920
Second Avenue South, Minneapolis, MN 55402

        Defendants Economy Premier Assurance Company and MetLife Auto & Home

Insurance Agency, Inc. (collectively referred to herein as "Defendants") for their

Responses to Plaintiff's Request for Admission, responds as follows:

                 **RESPONSES TO REQUEST FOR ADMISSIONS**

1.      Admit that Defendant Economy Premier Assurance Company issued policy

number 6557430730 to Dr. Aviel L. Goodman, with effective dates 1-5-18 through 1-5-

**RESPONSE:** Admit that there was a policy in effect.

2.      Admit that, subject to the policy's terms and conditions, it provided first-party

property coverage for Dr. Goodman's property located at 1347 Summit Avenue, St. Paul, MN

55105.

**RESPONSE:** Admit.

Exhibit 10

3.      Admit that, during the policy period, the property suffered a water-damage loss.

**RESPONSE:** Deny.

4.      Admit that Economy Premier Assurance Company received timely and adequate notice of the water-damage loss.

**RESPONSE:** Admit that notice was timely.

5.      Admit that Economy Premier Assurance Company concluded that the loss was caused by freezing.

**RESPONSE:** Admit.

6.      Admit that Economy Premier Assurance Company's policy number 6557430730 specifically provides coverage for losses due to freezing.

**RESPONSE:** Deny.

7.      Admit that Economy Premier Assurance Company denied coverage for the water-damage loss based on an exclusion for damage caused by freezing if the insured did not use "reasonable care" to keep the property heated, nor drained the water from all plumbing and appliances.

**RESPONSE:** Admit.

8.      Admit that, as of today's date, the sole basis for Economy Premier Assurance Company's denial is due to its conclusion that Aviel L. Goodman did not use "reasonable care" to keep the property heated or drain the water from all plumbing and appliances.

**RESPONSE:** Admit.

2

Exhibit 10

9.      Admit that the Economy Premier Assurance Company policy under which the property was insured did not exclude coverage for freezing if the home was vacant.

**RESPONSE:** Deny.

10.     Admit that the Economy Premier Assurance Company policy under which the property was insured provided coverage on a replacement-cost basis.

**RESPONSE:** Admit, subject to policy terms.

11.     Admit that the Economy Premier Assurance Company policy under which the property was insured provided coverage for additional expenses that might become necessary to meet Building Code requirements when repairing damage caused by a covered loss.

**RESPONSE:** Admit, subject to policy terms.

12.     Admit that Economy Premier Assurance Company has been properly served with Plaintiff's Complaint.

**RESPONSE:** Admit.


Dated: December 11, 2019          By:   /s/ Joseph F. Lulic
                                        Joseph F. Lulic (#65018)
                                        BROWNSON NORBY, PLLC
                                        225 South Sixth Street
                                        Suite 4800
                                        Minneapolis, MN 55402
                                        Telephone: (612) 332-4020
                                        Fax: (612) 332-4025
                                        jlulic@brownsonnorby.com

                                        *Attorneys for Defendants*

3

Exhibit 10

AFFIDAVIT OF SERVICE

STATE OF MINNESOTA )
                            ) ss
COUNTY OF HENNEPIN )

Lynnae I. Waskosky of the City of Coon Rapids, County of Anoka, State of Minnesota, being duly sworn, says that on December 11, 2019, she served the annexed:

     1.     Defendants' Responses to Plaintiff's Request for Admissions

on

Jenneane L. Jansen
LOMMEN ABDO, P.A.
1000 International Centre
920 Second Avenue South
Minneapolis, MN 55402

Re:   *Dr. Malka L. Goodman o.b.o. Dr. Aviel Goodman v. Economy Premier Assurance Company, and MetLife Auto & Home Insurance Agency, Inc.*
     USDC MN File: 19-cv-01815 (PAM/ECW)

by mailing to her a copy thereof, enclosed in an envelope, postage prepaid, and by depositing same in the post office at Minneapolis, Minnesota.

Lynnae I. Waskosky

Subscribed and sworn to before me
this December 11, 2019

Notary Public

OLIVIA MORELAND COOPER
NOTARY PUBLIC - MINNESOTA
My Commission Expires
January 31, 2022

Exhibit 10