UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Dr. Malka L. Goodman, trustee of the Aviel Goodman, Revocable Trust, Assignee of Dr. Aviel Goodman on behalf of Dr. Aviel Goodman,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>Economy Premier Insurance Company and MetLife Auto & Home Insurance Agency, Inc.,<br><br>　　　　　　　Defendants. | Civ. No. 19-1815 (PAM/ECW)<br><br><br><br><br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on Plaintiff's Motion for Summary Judgment. (Docket No. 41.) For the following reasons, the Motion is denied.

**BACKGROUND**

Plaintiff Dr. Malka Goodman brings this lawsuit as trustee of the Aviel Goodman Revocable Trust. Dr. Aviel Goodman is Dr. Malka Goodman's son.[1] (Am. Compl. (Docket No. 26) ¶ 3.) Aviel's home in St. Paul, Minnesota, flooded due to a frozen burst pipe and cracked radiators. Economy Premier Assurance Company ("Economy")[2] declined to provide insurance coverage on his claim for freeze-related damage to his home.

Aviel owns the Pierce and Walter Butler House at 1347 Summit Avenue, which was built in 1900 and is listed on the National Register of Historic Places. (Id. ¶ 9.) Plaintiff

---

[1] Because both Plaintiff Dr. Malka Goodman and her son are "Dr. Goodman", they will sometimes be referred to by their first names for the sake of clarity.
[2] Economy is a subsidiary of MetLife, Inc.

asserts that she is familiar with the house, because she and her husband are the previous owners. She used it as an office for 12 years, and her adult children lived there. (Malka Dep. (Docket No. 44-Ex. 4) at 12.) Aviel bought the house from his parents. (Am. Compl. ¶ 10.)

Aviel became incarcerated on July 20, 2018; since then, no one has lived at the house. Aviel asked Plaintiff and his then-girlfriend, Jeannine Ferland, to watch the house and take care of his cat. (Id. ¶ 37.) Plaintiff "regularly checked on the home, often daily." (Id. ¶¶ 42, 45.) Ferland stopped by daily to care for the cat, and at Aviel's suggestion, used the home to practice her cello and meet clients. (Id. ¶ 38.) At the end of September 2018, Ferland's friend took the cat to live with her. (Id. ¶ 43.) After that, Ferland typically visited the house weekly to "check on it and collect mail." (Id. ¶ 44.)

The women "sometimes . . . checked the thermostat." (Pl.'s Ans. to Interrog. (Docket No. 44-Ex.4) at 112) Plaintiff used hot water to wash her hands while visiting the house. (Malka Dep. at 19-20.) Plaintiff highlights that she and Ferland would often remove their coats and gloves in the house because it was a comfortable temperature. The house's utility bills were paid via automatic withdrawal from Aviel's bank accounts, and the payments were current. (Am. Compl. ¶ 8.)

From November 7 to November 13, 2018, the temperature in St. Paul stayed below freezing, dropping to as low as 7 degrees Fahrenheit. (Temperature Charts (Docket No. 49-3) at 4.) The natural-gas-meter readings reflect that the home's boiler did not consume enough natural gas to keep the temperature in the 5,000-square-foot home above freezing during that time. (Sand Report (Docket No. 49-2) at 8.) From November 6 to November

2

14, the house used a maximum of one therm of energy per day, which equated to the boiler operating for about 15 minutes. (Id.) On November 14, the outdoor temperature rose above freezing, and Plaintiff visited the home, where "[sh]e was comfortable . . . and did not observe anything amiss." (Am. Compl. ¶ 50.) Ferland believes that she visited the home at some point between November 8 and November 20, but does not know when. (Id. ¶ 9.)

On or about November 16, a pipe on the third floor of Aviel's home froze and burst, causing significant damage.[3] Radiators on the second and third floor also froze and cracked, "which would be impossible if the heat was on." (Sand Aff. ¶ 21.) The home's natural-gas consumption "increased markedly" on November 15, as "water flowed continuously through the domestic hot water heater." (Sand Report at 8.)

A few days later, on November 20, 2018, Ferland stopped by the house and heard running water and discovered one to two inches of standing water in the kitchen. (Am. Compl. ¶¶ 57-58.) She and a neighbor shut off the house's water and electricity. (Id. ¶ 60.) Ferland contacted Plaintiff, who came over to the house. (Id. ¶¶ 61-62) Plaintiff checked the thermostat, saw that it was set to 62 degrees, and increased it to 72. (Id. ¶¶ 62, 64.)

Unsurprisingly, the home's water-meter readings reflect a tremendous increase in water usage during the flood. From November 16 to November 20, 2018, the home consumed 14,200 gallons of water. (Sand Report at 3.) By contrast, between August 17

---

[3] It is estimated that the flood began on or around November 15 or 16, based on a significant increase in the home's water-meter readings and energy usage. (Sand Report at 9; Sand Aff. ¶ 15.)

3

and November 16, 2018, the home used only 4,500 gallons of water.  (Water-Meter Readings (Docket No. 49-5).)

From January 5, 2018, to January 5, 2019, the house was covered by an Economy policy.  The policy protected "against actual physical loss or damage," and included repair or replacement cost coverage, as well as coverage to bring any covered repairs up to current building code.  (Policy Excerpts (Docket No. 44-Ex. 3) at 8, 9.)  The policy provided coverage for freeze damage, if Aviel "used reasonable care to keep [the house] heated or . . . drained the water from all plumbing and appliances."  (Id. at 10.)  Additionally, if Aviel used reasonable care to keep the home heated, the policy covered damage to personal property caused by freezing of plumbing, heating, or household appliances or by "water or steam accidentally coming from . . . plumbing, heating, air conditioning or other household appliances."  (Id. at 17-18.)

Plaintiff reported the damage to Economy on November 21, 2018.  (Malka Dep. at 28-29.)  Jami Hage, an adjuster for Economy, visited the house on November 27 and 30.  (Id. at 38.)  In early December 2018, Economy sent Spencer Funk, a large loss adjuster, and Douglas Sand, a mechanical engineer, to the home.  (Id. at 38-39; Am. Compl. ¶ 74.)  Neither Plaintiff nor Funk recall Funk asking about how the home was cared for.  (Malka Dep. at 29; Funk Dep. (Docket No. 44-Ex.5) at 21-22, 23.)  Funk recommended that Plaintiff repair the burst pipe and the broken radiators, and also informed her that "the home's boiler system ha[d] in fact suffered a freeze break at some point in the past" and suggested that she service it, because it was last serviced in 2015.  (Am. Compl. ¶ 77.)

4

Sand determined that "it [wa]s an absolute engineering certainty that the freezing damage and loss [to Aviel's home] was a result of the heat not being turned on." (Sand Aff. ¶ 18.) Further, "all of the controls and components of the house boiler system were working at the time of the freeze and if the switch on the thermostat had been turned to 'on,' the premises would have been heated." (Id. ¶ 20.) Therefore, Economy denied coverage because it "concluded that the loss that occurred was damage from freezing" and that its investigation showed that "there was no reasonable care used to keep the subject premises heated. In addition, the water was not drained from all the plumbing." (Economy Letter (Docket No. 44-Ex. 5) at 114).)

Economy cancelled the policy, effective January 6, 2019. In the cancellation letter, Economy misstated the policy and said that the policy was being cancelled because the house was not occupied by Aviel. (Am. Compl. ¶ 71.) While Economy was correct that no one resided at the home, the policy contained no such exclusion for vacant homes if the insured took reasonable care. (Id. ¶ 70.)

Aviel was the only named insured on the policy. (Id. ¶ 15.) On February 1, 2020, Aviel assigned his claims regarding the insurance coverage to the Aviel Goodman Revocable Trust. (Id. ¶ 1-2.) Aviel is the trust's sole beneficiary. Plaintiff is the trustee and brings this lawsuit as such. (Id. ¶ 2.)

5

Plaintiff alleges a breach of contract and seeks a declaratory judgment as to that breach. She seeks damages for the cost of the flood's damage to the home, including repairs needed to "preserve the home's historic character" because it is on the National Register of Historic Places, as well as the cost to comply with state and municipal codes. (Id. ¶¶ 100-102.)

**DISCUSSION**

**A.    Standing**

Economy argues that Plaintiff does not have standing to bring this lawsuit, because she is not the insured under the policy. The policy requires Economy's written consent for any transfer of interest, and Economy did not consent here. (Policy Excerpts (Docket No. 48-3) at 4.)

But if Economy knew of the assignment when it filed its Answer, Economy should have raised any anti-assignment argument then. Regardless, the anti-assignment argument is without merit. While it is true that Economy did not agree in writing to the February 2020 transfer, Aviel did not transfer his interest to anyone—he transferred it to the Aviel Goodman Revocable Trust, and he is its sole beneficiary. Plaintiff is acting as a trustee on his account, and none of the insurance policy's rights or proceeds were assigned to her.

Economy cites several cases standing for the proposition that policies cannot be assigned in order to protect insurers from having to do business with people whom they did not agree to do business with. That is not what happened here. Economy references no authority supporting the argument that it is improper for an insured to assign insurance

6

interests to his or her own trust account. Economy's argument is unavailing, and the Motion will be not be denied on this ground.

**B.    Summary Judgment**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and inferences that "may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." Enter. Bank v. Magna Bank of Mo., 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. Paine v. Jefferson Nat'l Life Ins. Co., 594 F.3d 989, 992 (8th Cir. 2010).

**1.    Breach of Contract**

Plaintiff alleges that Economy breached its contract with Aviel by denying coverage for damage to the home. Under Minnesota law, the insured bears the initial burden of proof to establish a prima facie case of coverage. Boedigheimer v. Taylor, 178 N.W.2d 610, 614 (Minn. 1970). Ambiguities in the insurance policy are construed in the insured's favor. Lott v. State Farm Fire & Cas. Co., 541 N.W.2d 304, 307 (Minn. 1995). When an insurer denies coverage pursuant to an exclusion listed in the policy, the insurer bears the burden

7

to show that an exclusion applies.  Boedigheimer, 178 N.W.2d at 614.

Here, Plaintiff establishes that Aviel had a policy with Economy, and thus satisfies the standard for a prima facie case.  Therefore, Economy bears the burden to show that an exclusion applied because Aviel failed to exercise reasonable care to heat his home.  Because the policy does not define reasonable care, the applicable standard is the degree of care that a reasonable person would have taken in the circumstances.  Domagala v. Rolland, 805 N.W.2d 14, 22 (Minn. 2011).  Economy is adamant that the home's heat was off, and that "[i]f no one turns on the heat, there is no possible way that the policy condition to use reasonable care to keep the home heated can be met and the freeze exception applies."  (Opp'n Mem. (Docket No. 47) at 7, 8.)

Notably, Plaintiff provides no expert testimony or presents any explanation whatsoever for the freeze.  Moreover, the parties agree that "the gas boiler was operating" and that "no boiler system service was required to restore heat."  (Am. Compl. ¶ 88; Sand Report at 7.)  Indeed, when the flood was discovered, Plaintiff increased the home's temperature to 72 degrees.  (Am. Compl. ¶ 64.)  The Court cannot determine as a matter of law that Aviel exercised reasonable care, so that the freeze exception would not have applied.

Viewing the facts in the light most favorable to Economy, there is a genuine dispute of material fact as to whether Aviel exercised reasonable care to sufficiently heat his home.  The Motion is denied as to the breach-of-contract claim.

### 2.     Declaratory Judgment

Plaintiff seeks a declaratory judgment stating that Economy must pay the full replacement cost for all necessary repairs, including any building-code requirements, as well as compensatory damages. (Am. Compl. ¶ 112.) Because summary judgment is not warranted on the substantive coverage issue, the Court need not reach the declaratory-judgment issue.

### 3.     Rule 56(f)(1)

In its Memorandum, Economy seeks summary judgment under Rule 56(f)(1). Again, because there is a genuine dispute as to whether Aviel acted with reasonable care, Economy is likewise not entitled to summary judgment.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED that** Plaintiff's Motion for Summary Judgment (Docket No. 41) is **DENIED**.

Dated: December 23, 2020

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge